## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ELI SCHANLEY,

      Plaintiff,

v.                           Case No.:   8:25-cv-408-WFJ-SPF

CITY OF SARASOTA,

and

REX TROCHE,
in his Individual Capacity, Chief of Police
Sarasota Police Department,

      Defendants.

_____/

### AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** the Plaintiff, Eli Schanley (hereinafter referred to as "Schanley" or the "Plaintiff"), by and through his undersigned counsel, and by way of this Amended Complaint seeks relief against the above-named Defendants as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff, Eli Schanley, is an adult transgendered individual - female to male - who is a citizen of and resides within Sarasota County, Florida. At all times relevant herein, Plaintiff was a resident within the Middle District of Florida, Tampa Division.

1

2.    Defendant City of Sarasota, Florida (the "City"), was incorporated as a town in 1902 and later incorporated as a city in 1913 and is a municipality located on the western coast of Sarasota County, Florida.

3.    Defendant, Chief Rex Troche ("Chief" or "Troche" or "Chief Troche"), was at all times relevant to this case the Chief of Police of the City of Sarasota Police Department and is being sued in his individual capacity. Chief Troche is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case was acting under the color of law and, upon information and belief, had policy making authority as to who is subjected to fitness for duty exams, who would conduct such examination(s), and whether to accept the findings and Troche made these decisions with regard to Plaintiff.

4.    This Court has jurisdiction over this action under 28 U.S.C. § 1331; 28 U.S.C. § 1343(3) and (4); 29 U.S.C. §216, 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. The Court has supplemental jurisdiction over Plaintiff's state law claims under 42 U.S.C. §1367(a).

5.    The acts complained of herein occurred in Sarasota County, Florida. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## CONDITIONS PRECEDENT

6.    Plaintiff has complied with all conditions precedent before filing suit under the Florida Civil Rights Act ("FCRA"). Plaintiff has complied with all conditions precedent to the filing of this claim required by F.S. § 760.11, to-wit:  a

complaint of discrimination was filed with the Florida Commission on Human Relations ("FCHR") within 365 days of the unlawful employment practice; the Florida Commission On Human Relations failed to conciliate or determine whether there is reasonable cause on Plaintiff's complaint within 180 days of the filing of the Complaint; and this action was commenced within four years of the discriminatory action alleged in this complaint.

7.    Plaintiff timely filed a charge of gender and disability discrimination[1] and retaliation with the Equal Employment Opportunity Commission ("EEOC") on September 5, 2023.  This charge was simultaneously filed with the FCHR and alleged discrimination based upon handicap and disability, gender, and retaliation.  More than 180 days have passed since Plaintiff filed the charge and no cause finding has been issued.

## FACTUAL BACKGROUND

8.    Plaintiff Eli Schanley's natal sex is female. Plaintiff was born Elise D. Schanley. Schanley graduated from Lemon Bay High School in 2009 and completed his Associate of Science degree at Jefferson Davis College in Alabama in 2011. Schanley completed his Bachelor of Science in Criminology at the University of South Florida, Sarasota-Manatee Campus, in 2013. Schanley completed his law enforcement

---

[1] Plaintiff checked the box on the EEOC Claim alleging his claim was a disability discrimination claim.

training in February 2016 from Suncoast Technical College. Schanley passed the Florida State Law Enforcement examination on March 3, 2016.

9.     Eli Schanley is a female-to-male transgender individual who has been diagnosed with gender dysphoria (DSM-V). In order to treat this condition, he underwent a series of medical interventions, including hormone therapy beginning in 2021. At the time, he was living as a transitioning person without disclosing that fact publicly.

## Gender Identity

10.     With extraordinarily rare exceptions not at issue here, every person is born with external sex characteristics, male or female, and chromosomes that match. As the person goes through life, the person also has a gender identity—a deeply felt internal sense of being male or female. For more than 99% of people, the external sex characteristics and chromosomes—the determinants of what this order calls the person's natal sex—match the person's gender identity.[2]

11.     For less than 1%, the natal sex and gender identity are opposites: a natal male's gender identity is female, or vice versa.[3] This complaint refers to such a person who identifies as female as a transgender female and to such a person who identifies as male as a transgender male. This complaint refers to individuals whose gender identity matches their natal sex as cisgender.

---

[2] *Doe v. Ladapo*, No. 4:23CV114-RH-MAF, 2023 WL 3833848, at *1 (N.D. Fla. June 6, 2023) (internal citations omitted).
[3] *Id.* at *2.

4

12.    Despite the reality of gender identity, there are those who believe that cisgender individuals properly adhere to their natal sex and that transgender individuals have inappropriately chosen a contrary gender identity, male or female. Many people with this view also oppose medical care that supports a person's transgender existence.[4]

13.    Gender dysphoria is a disability and results from physical impairment necessitating gender affirming care. There are well-established standards of care for treatment of gender dysphoria. These are set out in two publications: first, the Endocrine Society Clinical Practice Guidelines for the Treatment of Gender Dysphoria; and second, the World Professional Association for Transgender Health ("WPATH") Standards of Care, version 8. The standards are used by insurers and have been endorsed by the United States Department of Health and Human Services.[5]

14.    Under the standards, gender dysphoria treatment begins with a comprehensive biopsychosocial assessment. In addition to any appropriate mental-health therapy, there are three types of possible medical intervention, all available only to adolescents or adults. The types of intervention relevant here are cross-sex hormones—testosterone for transgender males, estrogen for transgender females—can promote the development and maintenance of characteristics consistent with the patient's gender identity and can limit the development and maintenance of

---

[4] *Id.* at *2 (internal citations omitted).
[5] *Id.* at *3 (internal citations omitted).

5

characteristics consistent with the patient's natal sex. For some patients, surgery can align physical characteristics with gender identity, to some extent. The most common example: mastectomy can remove a transgender male's breasts.[6]

15.    Gender refers to cultural expectations specific to the sexes. Gender expression refers to a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's sex assigned at birth. Discrimination against a person for being transgender is sex discrimination for purposes of Title VII, the Florida Civil Rights Act and the Equal Protection Clause.

16.    Those whose gender identity does not match their natal sex often suffer gender dysphoria.[7] Gender dysphoria, which is a diagnosis distinct from gender identity disorders, is the formal diagnosis used by physicians and psychologists to describe people who experience significant distress and other disabling symptoms with the sex they were assigned at birth. Gender dysphoria has been identified as resulting from a physiological condition of the brain and neurological system.

17.    Gender dysphoria is a mental-health condition recognized in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"). The diagnosis differs from a diagnosis of gender identity disorder and, as a matter of statutory construction, does not fall within the gender identity disorder exclusion under the ADA. *See Williams v. Kincaid* 45 F.4th 759, 769 (4th Cir. 2022). The

---

[6] *Id.* at *4 (internal citations omitted).
[7] *Id.* at *3.

6

diagnosis applies when specific criteria are met. Among other things, there must be a marked incongruence between one's experienced gender identity and natal sex for at least six months, manifested in specified ways, and clinically significant distress or impairment. Transgender individuals suffer higher rates of anxiety, depression, suicidal ideation, and suicide than the population at large.[8]

18.    It is appropriate to refer to a transgender man who has begun to transition with male titles, honorifics (e.g., Mr.), and pronouns (e.g., his and he).

19.    Pushing individuals away from their transgender identity is not a legitimate state interest. Dissuading a person from conforming to the person's gender identity rather than to the person's natal sex is not a legitimate state interest.

20.    There has long been, and still is, substantial bigotry directed at transgender individuals.[9] Common experience confirms this, as does a Florida legislator's remarkable reference to transgender witnesses at a committee hearing as "mutants" and "demons."[10] The rights of transgender individuals, including their right to be addressed with particular pronouns and their right to alter their outward

---

[8] *Doe v. Ladapo*, No. 4:23CV114-RH-MAF, 2023 WL 3833848, at *3 (N.D. Fla. June 6, 2023) (internal citations omitted).

[9] *Id.* at *13.

[10] *Id.* at *13 citing Hearing on Facility Requirements Based on Sex, CS/HB 1521 2023 Session (Fla. Apr. 10, 2023), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8804 (time stamp 2:30:35 to 2:34:10). Representative Webster Barnaby said to transgender Florida citizens who spoke at the hearing that they were "mutants living among us on Planet Earth." He raised his voice and said, "[T]his is Planet Earth, where God created men, male and women, female!" He continued: "[T]he Lord rebuke you Satan and all of your demons and imps that come parade before us. That's right I called you demons and imps who come and parade before us and pretend that you are part of this world." Finally, he said, you can "take [him] on" but he "promises [he] will win every time."

appearance to conform with their true identity, is a matter of political and social concern to the community.

### Plaintiff's Employment with the Sarasota Police Department

21.    On May 13, 2015, the time Plaintiff commenced employment with the Sarasota Police Department, Schanley presented as a female with long hair and an outward female appearance and used the pronouns she/her and went by her legal name Elise Schanley. In 2021, Schanley cut his hair short and no longer conformed to gender stereotypes regarding how a female should present themselves and act.

22.    During the relevant time period(s), the Sarasota Police department consisted of approximately 190 sworn law enforcement officers and 61 civilian support personnel.

23.    During Plaintiff's employment, he consistently received positive performance reviews, assessments and Plaintiff received numerous commendations. For example, Plaintiff received numerous lifesaving medals. Plaintiff received Florida's 16th District Congressional Law Enforcement Preservation of Life Award on April 17, 2018, for his actions on August 31, 2017, which "showed courage and resolve."  In May 2017, Plaintiff received a promotion from Officer Second Class Probationary Officer to Officer 2nd Class Permanent. In the promotion recommendation from Chief Bernadette DiPino ("DiPino" or "Chief DiPino") it was noted that Plaintiff got along with his fellow officers, was courteous in dealing with

the public and was a dedicated officer whose attitude and bearing reflected well on the Sarasota Police Department.

### Schanley Communicates That He Planned to Begin Presenting as Male at Work

24.     On August 20, 2021, Plaintiff sent an email to the Scott Mayforth, who at the time was the patrol captain, and other supervisory officials including Chief of Police of the Sarasota Police Department, James Rieser, that he was transgendered (female to male) and was going to proceed with the transition process. Plaintiff explained that moving forward he would like to be referred to as Eli and to use he/him pronouns. On August 20, 2021, four minutes after Schanley's email, Chief Rieser sent an email to Scott Mayforth, (Captain and the commander of the Patrol Division at the time), Pat Robinson, (Deputy City Manager and former Deputy Chief of Police for the Sarasota Police Department), Rex Troche, (Deputy Chief of Police) and Stacie Mason, (Human Resources Director), requesting to discuss Schanley's email.

25.     Sarasota Police Chief James Rieser announced his retirement for health reasons effective August 25, 2021. Rieser was replaced by Deputy Chief Rex Troche on an interim basis. Chief Rex Troche was appointed Chief of Police for the Sarasota Police Department in April 2022.  From the time of the forward of the August 2021 email referenced above through Plaintiff's termination, Defendant Troche was aware not only of Plaintiff's intention and request but of the consistent and repeated failure of the members of the Department to abide by those requests.  Defendant Troche directly and/or tacitly condoned the behavior by failing to attempt to curtail it.

26.    During this time, Plaintiff's appearance did not reflect that Plaintiff was female. Plaintiff kept his hair short and presented himself as male outwardly. When Plaintiff sent the email, he worked the night shift. Upon information and belief, Plaintiff was the second transgendered employee for the City of Sarasota. Further, Plaintiff understands that when the first transgendered employee disclosed that they were transgendered, Human Resources ("HR") conducted an in-person meeting with staff during which HR explained how the transgendered employee would be addressed and explaining the discrimination rules. No such meeting was held when Plaintiff advised that he was transgendered as an employee of the Defendant's Police Department. Upon information and belief, Plaintiff was the first transgendered employee for the City of Sarasota Police Department.

27.    The Sarasota Police Department prepared a Chain of Command Form dated October 11, 2021, regarding Officer Schanley's intent to change his name. The form stated that Officer Shanley informed Lieutenant ("Lt.") Gregory Miller that in approximately three (3) months he will be receiving a letter from his medical provider to proceed with the name change. On October 11, 2021, Schanley submitted a request for a name change from Elise Schanley to Eli Schanley. The Sarasota Police Department denied the request and Plaintiff was told that he had to change his name legally first. Notably, the Department's list of employees includes each employee's legal name in addition to the name by which each employee chose to be called.  The list reflects that several officers use a name other than their legal name and it is

acceptable. In fact, some of these officers' nicknames were used in their official employment email address.

## Schanley is Subjected to Harassment Based on Transgendered Status

28.     Effective July 2022, Plaintiff was moved to the day shift. On the day shift, Plaintiff was constantly being misgendered by supervisors, who refused to use his preferred name Eli and his preferred pronoun he/him. This occurred on a daily basis. Since being on day shift from the beginning of his light duty.[11] Plaintiff's supervisors addressed him as Elise and used she/her pronouns daily. Others present had corrected the supervisors on the spot countless times.

29.     On August 23, 2022, Plaintiff sent an email to Captain Robert Armstrong ("Armstrong" or "Captain Armstrong") regarding his supervisors misgendering him and not using his preferred name Eli since being on night shift. Plaintiff asked Captain Armstrong for assistance moving forward on the night shift and he asked the Captain to address the misgendering issue.

30.     The week of August 23, 2022, Plaintiff met with Lieutenant ("Lt.") Bruce King ("King" or "Lt. King") off-site to discuss the misgendering issue. Lt. King started off apologizing but quickly shifted to expressing displeasure that Schanley wrote his concerns in a "public email" and did not go to Lt. King first with the concerns. Lt. King told Schanley that Lt. King did not like that Schanley went to the

---

[11] Plaintiff worked a light duty detail on day shift (Patrol Division's TDY shift 1B -restricted duty front desk) due to an on-the-job injury to his left thumb beginning on July 13, 2022. Plaintiff formally transferred from night shift to day shift as a patrol officer effective July 2022. Plaintiff was released to full duty and reassigned to the Patrol Division's Shift 1B effective August 22, 2022.

Captain instead of feeling comfortable going to him. He said he heard rumors regarding how to address Plaintiff but was never told anything directly.

31.    At the end of the meeting, Lt. King made a conscious effort thereafter to use the correct pronouns and name. Sargent Delcos ("Delcos" or "Sgt. Delcos") continued to misgender Plaintiff on a daily basis and most of the rank-and-file employees continued to misgender Plaintiff.  As the issue continued to persist over time, even after Plaintiff raised concerns about it, he concluded that some supervisors refused to use his preferred name and pronouns intentionally as a sign of disrespect.

### Schanley is Required to Take a Fitness for Duty Examination

32.    On April 7, 2023, Plaintiff was notified that he was going to be formally investigated by Internal Affairs. In the formal notice of the Internal Affairs ("IA") investigation, Plaintiff was misgendered repeatedly. Plaintiff asked one of the supervisors who issued the notice to correct it by using his preferred first name and pronouns. A corrected notification was never issued.

33.    Plaintiff was put on administrative leave during the IA investigation. The Sarasota Police Department, without explanation or justification, also mandated that Plaintiff submit to a fitness for duty examination ("FFDE") by a provider of their choosing for a psychological evaluation. Plaintiff inquired as to the reason he was being subjected to the examination, but the Sarasota Police Department would not provide any justification for a psychological evaluation as there was no reasonable basis whatsoever to believe that the highly decorated Officer Schanley was in any way

unfit for duty. Plaintiff was informed by Lieutenant Greg Miller ("Miller" or Lt. Miller"), (Lt. of Internal Affairs) that the decision to require a fitness for duty examination came directly from the Chief of Police. On April 10, 2023, Plaintiff was notified that he would be required to see Jill Fischer-Peters, who would administer the examination the following day.

34.    On April 6, 2023, Captain Robert Armstrong emailed Jill Fischer-Peters stating that the department had an employee that will need to come see her and that he "would like to discuss the situation prior to the appointment." Upon information and belief this pertained to Plaintiff's fitness for duty examination.

35.    Assuming the IA investigation, which had just begun at the time of the fitness for duty examination, was the basis for the fitness for duty examination, such a justification is pretextual.

36.    First, Plaintiff's conduct during the specific call at issue in the investigation did not implicate much less justify an inquiry into his fitness to perform his job. The call that was the subject of the investigation involved a potential domestic violence incident. After speaking with the victim and engaging in other investigative activities Plaintiff reached out to his supervisor, Sargent Kenton Montegna ("Montegna" or Sgt. Montegna"), (North District Sergeant) for guidance.

37.    Plaintiff notified his supervisor of all the details to obtain guidance on how best to proceed. Sgt. Montegna directed the Plaintiff to write a report as opposed to forwarding charges to the State Attorney's office because the situation no longer

met the criteria for domestic violence based on the victim's report. Plaintiff followed his supervisor's direction, wrote the report, and did not refer the matter to the state attorney's office.

38.    Plaintiff wrote a detailed report as directed and no additional directives were given to him by his supervisor regarding this incident. Nothing about the way Officer Schanley handled this call provides any reasonable basis for a belief that a fitness for duty examination was warranted.

39.    Moreover, Plaintiff's cisgender male counterparts who have been subject to IA investigations were not ordered to undergo a fitness for duty examination. For example, Officer Crenshaw was the subject of a formal IA investigation in March of 2022 for failing to investigate a domestic violence incident after the victim stated she was physically hit. This situation was strikingly similar to the call that led to the IA Investigation of Officer Schanley and similar violations were alleged as to. Officer Terry Crenshaw ("Crenshaw" or "Officer Crenshaw") as were alleged as to Officer Schanley. Officer Crenshaw, however, unlike Officer Schanley, was not ordered to submit to a fitness for duty evaluation. This was the case despite the fact that the findings regarding Officer Crenshaw state this was not the first documented incident and progressive discipline was needed. The action taken was a written reprimand and domestic violence training.

40.    Another cisgendered male colleague, Officer Derrick Gilbert, was the subject of an IA Investigation but was not required to submit to a fitness for duty

examination. Officer Gilbert failed to show up for work but answered his phone when Lt. King called to see where he was. He said he was not in the state and would not be coming into work. An IA Investigation was opened regarding his failure to show up for work. He was placed on front desk duty as a form of punishment while the investigation was taking place. He was not sent for a fitness for duty evaluation.

41. On April 11, 2023, Schanley met with a department-hired clinical social worker, Jill Fischer Peters ("Peters" or "social worker" or "provider"). Peters holds herself out as a "Christian Counselor" and, upon information and belief, was and/or is a member of the "Network of Christian Counselors Association." The services she purports to provide include "expert testimony in court cases."

42. On April 11, 2023, Schanley met with Peters at Peters' office as instructed. Peters' office was decorated with, among other things, religious themed posters and Peters served Schanley coffee in a mug containing religious affirmations. It was a cordial meeting and Peters said at the end of the meeting that Schanley passed with "flying colors." Peters prepared a written report entitled "Fitness for Duty Examination" which was incorrectly dated April 11, 2022. Plaintiff's understanding is that the report was issued on April 18, 2023. However, the examinations Plaintiff took as part of the evaluation were not scored until April 20, 2023.

43. Notably, part of the examination was two written tests which included approximately 600 questions between them, which Plaintiff completed. The specific tests were the MMPI-3 and MCMI-IV. This part of the evaluation was not scored prior

15

to the provider sending the fitness for duty report to the Sarasota Police Department. The test scoring and interpretation was completed on April 20, 2023. The interpretation and finalization were signed on April 25, 2023. Therefore, it appears the report did not take the test scores into consideration and was, instead, based solely on the provider's subjective opinion and not on objective criteria of any kind.

44.    In the report, Peters, as an agent of the City of Sarasota, made numerous claims of statements that Plaintiff allegedly made.  Many of the statements were fabricated, as Plaintiff never made them.  In the report Peters concluded that it was her clinical judgment that Plaintiff "wants to follow policy and procedure so much so that it actually interferes with her [sic]ability to perform and she [sic] second guesses herself [sic]."

45.    The report claimed that Plaintiff was "submissive, inferior and self-conscious that she [sic] may fail to act and retreat as she [sic] perceives this as safe." Plaintiff never stated that he may fail to act or may retreat nor that he perceived that behavior to be safe.  To the contrary, Plaintiff has received commendations for bravery. Based on faulty assumptions and outright fabrications, Peters ostensibly concluded that Plaintiff was not fit for duty to return to a patrol officer position and could only return to desk duty.

46.    The report claimed that: "While she [sic] may be an excellent employee due to her [sic] desire to follow the rules, her [sic] psyche unconscious psychological pathology plays [sic] large part in inability to do her [sic] job. As a result, she [sic] is a

danger to herself [sic] and the public." This is a baseless conclusion untethered to any factual basis and is at odds with Plaintiff's employment history as a patrol officer for the Sarasota Police Department. There was no factual basis for such a conclusion. No statements were made which could support such a conclusion. Further, no reasonable person could reach such a conclusion in light of Plaintiff's eight-year tenure and track record as a decorated patrol officer for City of Sarasota Police Department.

47.    The conclusions were reached because Plaintiff was transgendered. Peters stated that Plaintiff was perceived as being "self-conscious" or "inferior." This was a subjective conclusion that can only be based on bias due to Plaintiff's status as a transgendered officer. Upon information and belief, Peters' bias stems in large part from her status as a "Christian Counselor" and her resulting beliefs about the mental health and fitness of all transgendered individuals and the City of Sarasota Police Department was aware of Peters' bias when Peters was selected to conduct the Fitness for Duty Evaluation. The report expressly concluded in response to Schanley allegedly stating "she [sic] is often harassed in uniform by various men because of the way she [sic] looks physically[]," that it was her clinical opinion that "this pattern of behavior directed towards her [sic] effects [sic] her [sic] ability to assert herself as she [sic] is conflicted, fearful and submissive." To the extent, if any, these conclusions were based on statements made by the Plaintiff, the provider misunderstood and/or contorted those comments. Plaintiff is not conflicted, fearful or submissive. Upon information and belief, however, these conclusions were not based on statements made by the

17

Plaintiff but on Peters' bias and pre-conceived and deeply held religious beliefs that transgendered individuals must always be self-conscious and perceive themselves as inferior.

48.    During the examination, when Peters asked how Plaintiff handles the comments, Plaintiff explained that he does not react because he is in uniform. Plaintiff explained that he was accustomed to the comments and others' opinions did not affect him or how he does his job because he has a strong support system.  It appears Peters ignored or disregarded these comments.

49.    Instead, the report regarded Plaintiff as having an impairment which disqualified him from performing the duties of any patrol officer position for City of Sarasota Police Department. The report stated, "Officer Schanley is 5 foot tall and her [sic] internal ability to defend herself [sic] both physically and psychologically is not conducive to confrontation as she [sic] reacts by submitting."

50.    On April 18, 2023, at approximately 8:30 a.m., Plaintiff met with Captain Armstrong and Lt. Adams to go over the fitness for duty report.  Captain Armstrong provided Plaintiff with a copy of the report and Plaintiff reviewed it. Plaintiff stated Peters told him something completely different than what was written in the report and that the report had a lot of things written that were false and/or never asked or stated.

51.    The Captain said there was a meeting at 9:00 a.m. in the Chief's Office and they would have more answers regarding moving forward. Thereafter, Plaintiff

18

was escorted to the Chief's Office where the Deputy Chief (DC) was present with Stacie Mason ("Mason"), Human Resource Director for the City of Sarasota. The DC explained that they were there to discuss Plaintiff's options based on the results of the evaluation. Ms. Mason presented Plaintiff with the following options  (1) FMLA to keep benefits until he was able to find a job; (2) two weeks of administrative leave after which his employment would end on May 5, 2023; (3) to apply for other jobs with the City (at the time there were only two vacancies – Accounting Specialist and a janitorial role -both outside Plaintiff's experience and/or qualifications); or (4)  Plaintiff could resign at that time. Plaintiff was never provided with anything in writing concerning his options.

52.    At the meeting, a union representative was present. Mason asked Plaintiff what was inaccurate in the report, and Plaintiff went through some of the inaccuracies. Plaintiff asked if he was no longer going to be a police officer due to the report. The Deputy Chief shook his head affirmatively and confirmed that was correct. Stacie Mason also indicated that it was the route the Department decided to take and that they would assist Plaintiff with the transition. Plaintiff's union representative informed the City that they wanted a second opinion. Mason said they could consider taking a second opinion, but it was not guaranteed that they would accept it or take it into consideration. Plaintiff also disputed the determination that he was not fit for duty.

53.    On April 21, 2023, prior to the Department conducting any interviews as part of its IA Investigation and over four months prior to completing the Conclusions of Fact for the IA Investigation, Plaintiff was informed by the Union President that he just spoke with the Deputy Chief and the City was not going to accept or consider a second opinion. He said they were expecting Plaintiff's decision by 3:00pm that day. He said to contact the Deputy Chief ("DC") directly.

54.    Plaintiff called the DC and they eventually spoke. Plaintiff sought confirmation that they were not going to consider a second opinion. The DC confirmed that was correct and added that they had a "round table" about it and that was the ultimate decision. Plaintiff inquired about his options again.

55.    Plaintiff asked if there were any jobs in the department and the DC said he was not sure. He said he would check but Plaintiff should ask Stacie Mason. Plaintiff told him he would have to take the two (2) weeks on admin leave because he was not able to afford to take FMLA. Plaintiff told him that he was under the impression a second opinion regarding his fitness for duty would be considered and he was not able to speak with a union representative about what was the best decision. Notably, Plaintiff was already on administrative leave due to the IA investigation and therefore there was no justification to rush a decision and no reason why the Department could not await the second opinion regarding Plaintiff's fitness for duty.

56.    On April 24, 2023, Plaintiff contacted Stacie Mason and asked for more time to make a decision. Plaintiff asked for a chance to speak to someone in the Union

because on Friday Plaintiff was informed that they would not review a second opinion. Plaintiff's request for additional time to make a decision was denied. As noted, Plaintiff decided to take two weeks of administrative leave at the end of which his employment would be terminated.

### Schanley's Termination

57.    On April 24, 2023, the City terminated Plaintiff's employment via letter. In the termination notice it was stated that Plaintiff was laid off, which is incorrect. The termination letter stated in pertinent part that, "We regret to inform you that based upon the determination of fit for duty report that the City of Sarasota is notifying you that you will be placed on Layoff effective April 24th, 2023."

58.    On April 24, 2023, Plaintiff met with Captain Armstrong ("Armstrong") in Armstrong's  office. Armstrong gave Plaintiff the termination letter signed by Stacie Mason referenced above. Plaintiff stated to Capt. Armstrong "I just want to clarify; I am being let go solely based on the report regardless of my work reviews?" He responded, "yes that's correct."

59.    The decision to terminate Plaintiff's employment was made by, and with the approval of, those agents of City of Sarasota with final policy-making and decision-making authority as it concerns termination decisions and was made prior to completing the IA Investigation.

60.    Under the applicable collective bargaining agreement (CBA), Plaintiff had a right to file a grievance concerning his termination from employment. The CBA

provided: "The Employee's and IUPA's [International Union of Police Associations] election to proceed under this Disciplinary Grievance Procedure shall preclude it from proceeding in another forum on the same issue."

61.     Plaintiff filed a grievance through the International Union of Police Associations ("IUPA" or "Union"). The first three steps in the grievance process were denied by the City and the Union declined to proceed to arbitration in part due to its belief that a resignation and/or layoff was not subject to the grievance procedures of the CBA. Step two is decided by the Chief of Police or designee. Step three is decided by the City Manager or designee.

62.     The grievance procedure utilized here does not constitute meaningful review. Schanley was not permitted to participate in any of the grievance step meetings. There was no adversarial hearing and Plaintiff had no ability to present evidence and testimony by witnesses who were under oath.

63.     To the extent a grievance constitutes meaningful review of the City of Sarasota, the relevant decisions makers regarding the grievance ratified Chief Troche's unconstitutional motive and termination decision, which decision was based on blatantly unconstitutional motives.

64.     Had the actions at issue been subject to the grievance procedure within the CBA, the final step would be adjudication by an independent arbitrator, who is not otherwise an employee of the city and is not vested with final policymaking authority for the City. That someone outside of the municipal government may reverse the

official's decision does not mean that the official does not speak for the municipality when he or she initially makes that decision.

65.    As such, the decision to terminate Plaintiff's employment was made by, and with the approval of, those agents of City of Sarasota with final policy making and decision-making authority as it concerns termination decisions. The decision to terminate was made by the Chief of Police who had final policy and decision-making authority.

66.    The decision to terminate Schanley was made prior to Defendant's completion of their internal investigation of Schanley's handling of the domestic dispute call of March 26, 2023 and prior to any hearing before the Florida Department of Law Enforcement ("FDLE").

67.    Chief Troche has final policymaking authority in the area of law enforcement and the Chief represents the City of Sarasota when acting in his law enforcement capacity.

68.    At all times pertinent hereto, the City of Sarasota has delegated to Chief Troche final authority to determine fitness for duty, issue discipline, and discharge City of Sarasota police officers. The City delegated to Chief Troche authority to set policy regarding fitness for duty and discipline imposed on officers for violations of police departmental policies and procedures. Police department civil service personnel are exempt from the general personnel system with the City of Sarasota.

69.    Chief Troche was the final policymaker with respect to determining fitness for duty, and dismissal of police officers in the department.

70.    Chief Troche has final authority to establish policy with respect to departmental determinations of fitness for duty, and reprimands including termination of police officers. There is no provision for administrative review of determinations of fitness for duty, and reprimands including termination of police officers in the City's rules and regulations.

71.    When Chief Troche required Plaintiff to take a fitness for duty examination and concluded Plaintiff was unfit for duty based on the fitness for duty report and terminated Plaintiff, he acted as the official responsible for establishing final policy with respect to the subject matter in question.

72.    Plaintiff was subjected to a fitness for duty examination, which resulted in a report in which all conclusions were based on assumptions due to Plaintiff's transgender status.  Ultimately, Defendants finding Plaintiff unfit for duty was based on his transgender status.  Plaintiff was terminated pursuant to a custom or practice to discharge transgendered employees based on finding that they are unfit for duty as a patrol officer due to their transgendered status. This is more than just a single case but sets precedent for other members of the transgendered community who wish to have a career in law enforcement. The City's justification for terminating Schanley, based on assumptions due to his transgender status, would easily apply to justify the termination of any other transgendered police officer.  A § 1983 cause of action is as

available for the first victim of a policy or custom that would foreseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right as it is for the second and subsequent victims.

73.    Plaintiff received a second evaluation report from a mental health professional on or about May 17, 2023. A formal psychological evaluation was conducted for fitness for duty as a law enforcement officer by a licensed psychologist. The second report completely contradicts the report by the agent of the City of Sarasota. The second report performed by an objective third party found Plaintiff to be fit to perform the duties of a law enforcement officer. Irregularities were noted in the scoring and interpretation of the testing performed by Peters, the agent of the City. The second report further noted that medical records from other providers were reviewed and "the records noted general physical health stability, general mental health stability, and no evidence of cognitive, emotional, or mood instability."

74.    The City of Sarasota terminated Plaintiff, without consideration of an independent third party evaluation, based on the conclusions of its agent who conducted a fitness for duty examination – conclusions which are based on an assumption of mental impairments flowing directly from Plaintiff being transgendered.

75.    Defendant discriminated against Plaintiff when the City of Sarasota refused to consider a second opinion and Plaintiff's employment was terminated.

76.    Plaintiff was subjected to discrimination based on his sex. Plaintiff was subjected to unequal terms and conditions of employment based on his failure to

25

conform with gender stereotypes associated with the gender the City perceived him to be and for being transgendered. Specifically, Plaintiff was discriminated against when placed under an IA investigation, by being required to take a fitness for duty examination, by being denied the ability to submit a second opinion, by being denied additional time to make a decision and for being terminated purportedly due to the fitness for duty examination.

77.    Plaintiff scheduled gender affirming top surgery after being let go by the department. However, prior to Plaintiff's termination, the Patrol Captain and Plaintiff's Lt. were aware of Plaintiff's plans to get it later in the year. Plaintiff's previous shift supervisors were also aware of Plaintiff's plans for surgery. Plaintiff's termination letter stated that "Certain City provided benefits such as Medical, Dental and Employee Assistance, will be provided until the next month following your layoff date. You can retain those benefits until May 31, 2023."

78.    Plaintiff scheduled gender affirming surgery (top surgery) on May 25, 2023. At the time of his termination, Plaintiff was told that his health benefits would be provided through May 31, 2023.   Despite these representations, Plaintiff received a letter from Blue Cross Blue Shield that Dr. Salgado was requesting authorization for the surgery but that Plaintiff was no longer covered by insurance.

79.    Therefore, Defendant City of Sarasota discriminated against Plaintiff based on his medical condition (GID), because receiving necessary medical treatment for a medical condition is an integral component of living with such a condition, and

blocking that treatment is a form of discrimination based on the underlying medical condition.

80.    After Schanley was terminated, ostensibly due to a finding that he was not fit for duty, the IA Investigation of Schanley's handling of the domestic dispute call of March 26, 2023, which was in its infancy, continued as an informal investigation.

81.    On or around May 15, 2023 Detective Vollmer ("Vollmer" or Det. Vollmer") was assigned as lead investigator for the informal investigation.

82.    On or around August 2, 2023, Det. Vollmer completed an Interoffice Memorandum with his findings.  In this Memorandum Det. Vollmer continues to misuse pronouns when referring to Plaintiff.  The Memorandum indicates that at least 8 individuals with the Department were interviewed in conjunction with the investigation, yet Officer Schanley was not one of them.

83.    On or around September 1, 2023, Chief Troche signed Det. Vollmer's "Conclusion of Fact."  Upon execution of these conclusion by Chief Troche, they became part of the Public Record and contained, *inter alia*, erroneous conclusions concerning Plaintiff's veracity and the alleged falsification of documents.

84.    The unconstitutional motives of Defendants are underscored by the fact that on May 15, 2024 the FDLE conducted a hearing regarding Schanley's handling of the domestic violence call of March 26, 2023. And, after reviewing the charges and eliciting the live testimony of the Plaintiff, found that the appropriate action to be taken

with regard to Plaintiff's behavior was to place Plaintiff on six months' probation during which time Plaintiff would be required to complete Commission approved Ethics Training.  At the end of the completion of the ethics program, "the staff will issue a letter of guidance."  FDLE did not consider, let alone recommend, suspension or termination or a revocation of Schanley's certification to serve as a law enforcement officer.

85.    Plaintiff has performed all conditions requisite and/or precedent to the filing of the below actions.

**COUNT I**

**GENDER DISCRIMINATION (FITNESS FOR DUTY EXAMINATION) IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992, FLA. STAT. 760 *ET SEQ.*, AGAINST DEFENDANT CITY OF SARASOTA**

86.    Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

87.    Defendant City is, and at all material times has been, an employer within the meaning of the FCRA.

88.    Plaintiff is the member of a protected class (gender), was qualified for the position he held, and was subjected to adverse employment action when he was required to take a fitness for duty examination and when Defendant City concluded based on the report that he was unfit for duty.

89.    Plaintiff's protected class (gender) was a motivating factor, as well as a but-for cause, of the adverse employment action to which he was subjected.

90.    As a direct and proximate result of Defendant City's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and loss of other fringe benefits. Plaintiff has also suffered and continues to suffer humiliation, embarrassment, mental and emotional distress and anguish, loss of self-esteem, loss of enjoyment of life and harm to personal and business reputation.

**WHEREFORE,** Plaintiff demands a trial by jury and relief in the form of economic damages, back pay, reinstatement or front pay, compensatory and emotional distress damages, damages for loss of earning capacity, repayment for attorneys' fees and costs pursuant to § 760.11, prejudgment interest, equitable relief, and any and all other relief that the court deems just, equitable, and proper.

<u>COUNT II</u>
**GENDER DISCRIMINATION (TERMINATION) IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992, FLA. STAT. 760 *ET SEQ.,* AGAINST DEFENDANT CITY OF SARASOTA**

91.    Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

92.    Defendant City is, and at all material times has been, an employer within the meaning of the FCRA.

93.    Plaintiff is a member of a protected class (gender), was qualified for the position he held, and was subjected to adverse employment action when he was terminated.

29

94.     Plaintiff's protected class (gender) was a motivating factor, as well as a but-for cause, of the adverse employment action to which he was subjected.

95.     As a direct and proximate result of Defendant City's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and loss of other fringe benefits. Plaintiff has also suffered and continues to suffer humiliation, embarrassment, mental and emotional distress and anguish, loss of self-esteem, loss of enjoyment of life and harm to personal and business reputation.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of economic damages, back pay, reinstatement or front pay, compensatory and emotional distress damages, damages for loss of earning capacity, repayment for attorneys' fees and costs pursuant to § 760.11, prejudgment interest, equitable relief, and any and all other relief that the court deems just, equitable, and proper.

<u>**COUNT III**</u>
**GENDER DISCRIMINATION (FITNESS FOR DUTY) IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, AS AMENDED BY THE CIVIL RIGHTS ACT OF 1991, 42 U.S.C. § 2000e, *ET SEQ.,* AGAINST DEFENDANT CITY OF SARASOTA**

96.     Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

97.     Defendant City is, and at all material times has been, an employer within the meaning of Title VII.

98.    Plaintiff is the member of a protected class (gender), was qualified for the position he held, and was subjected to adverse employment action when he was required to take a fitness for duty examination and when Defendant City concluded based on the report that he was unfit for duty.

99.    Plaintiff's protected class (gender) was a motivating factor, as well as a but for cause, of the adverse employment action to which he was subjected.

100.    As a direct and proximate result of Defendant City's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and loss of other fringe benefits. Plaintiff has also suffered and continues to suffer humiliation, embarrassment, mental and emotional distress and anguish, loss of self-esteem, loss of enjoyment of life and harm to personal and business reputation.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of economic damages, back pay, reinstatement or front pay, compensatory and emotional distress damages, damages for loss of earning capacity, repayment for attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5, prejudgment interest, equitable relief, and any and all other relief that the court deems just, equitable, and proper.

## COUNT IV
## GENDER DISCRIMINATION (TERMINATION) IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, AS AMENDED BY THE CIVIL RIGHTS ACT OF 1991, 42 U.S.C. § 2000e, ET SEQ. AGAINST CITY OF SARASOTA

101.    Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

102.    Defendant City is, and at all material times has been, an employer within the meaning of Title VII.

103.    Plaintiff is a member of a protected class (gender), was qualified for the position that he held, and was subjected to an adverse employment action when he was unlawfully terminated.

104.    Plaintiff's protected class (gender) was a motivating factor, as well as a but for cause, of the adverse employment action to which he was subjected.

105.    As a direct and proximate result of Defendant City's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and loss of other fringe benefits. Plaintiff has also suffered and continues to suffer humiliation, embarrassment, mental and emotional distress and anguish, loss of self-esteem, loss of enjoyment of life and harm to personal and business reputation.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of economic damages, back pay, reinstatement or front pay, compensatory and emotional distress damages, damages for loss of earning capacity, repayment for

attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5, prejudgment interest, equitable relief, and any and all other relief that the court deems just, equitable, and proper.

### COUNT V
### GENDER DISCRIMINATION (FITNESS FOR DUTY) IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENTOF THE UNITED STATES CONSTITUTION UNDER 42 U.S.C. § 1983 *ET SEQ.,* AGAINST DEFENDANT CITY OF SARASOTA

106. Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

107. Plaintiff is the member of a protected class (gender), was qualified for the position he held, and was subjected to adverse employment action when he was required to take a fitness for duty examination and when Defendant City concluded based on the report that he was unfit for duty.

108. Plaintiff's protected class (gender) was a substantial or motivating factor, as well as a but-for cause, of the adverse employment actions to which he was subjected.

109. The Defendants, acting under color of law, in committing the actions described above, deprived Plaintiff of rights, privileges, and immunities provided by the United States Constitution and denied him equal protection under the law, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, whereby he has suffered and will continue to suffer both irreparable and compensable damages unless and until this Court grants relief.

33

110.   The acts of Defendants in discriminating against Plaintiff by requiring Plaintiff to take a fitness for duty examination, selecting a Christian Counselor with beliefs rendering objectivity impossible, and finding Plaintiff unfit for duty based on that counselor's opinion and without considering a second opinion was in violation of Plaintiff's Fourteenth Amendment rights and represented the official custom, policy, or practice of the City of Sarasota.

111.   As a direct and proximate result of the Defendant City's actions, Plaintiff suffered, and will continue to suffer damages. As a direct and proximate result of Defendant City's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and loss of other fringe benefits. Plaintiff has also suffered and continues to suffer humiliation, embarrassment, mental and emotional distress and anguish, loss of self-esteem, loss of enjoyment of life and harm to personal and business reputation.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of backpay, front pay, lost benefits, compensatory damages, damages for future pecuniary losses, damages for lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses, medical expenses, attorney's fees and costs with prejudgment interest thereon, injunctive relief and reinstatement, and any other such relief that Plaintiff may be entitled.

<u>COUNT VI</u>
**GENDER DISCRIMINATION (TERMINATION) IN VIOLATION OF THE
EQUAL PROTECTION CLAUSE OF THE
FOURTEENTH AMENDMENTOF THE UNITED STATES CONSTITUTION
UNDER 42 U.S.C. § 1983 *ET SEQ.*,
AGAINST DEFENDANT CITY OF SARASOTA**

112.    Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

113.    Plaintiff is a member of a protected class (gender), was qualified for the position that he held, and was subjected to an adverse employment action when he was unlawfully terminated.

114.    Plaintiff's protected class (gender) was a substantial or motivating factor, as well as a but for cause, of the adverse employment action to which he was subjected.

115.    The Defendant City, acting under color of law, in committing the actions described above, deprived Plaintiff of rights, privileges, and immunities provided by the United States Constitution and denied him equal protection under the law, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, whereby he has suffered and will continue to suffer both irreparable and compensable damages unless and until this Court grants relief.

116.    The termination of Plaintiff was in violation of Plaintiff's Fourteenth Amendment rights and represented the official custom, policy, or practice of the City of Sarasota.

117.    As a direct and proximate result of the Defendant City's actions, Plaintiff suffered, and will continue to suffer damages. As a direct and proximate result of

35

Defendant City's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and loss of other fringe benefits. Plaintiff has also suffered and continues to suffer humiliation, embarrassment, mental and emotional distress and anguish, loss of self-esteem, loss of enjoyment of life and harm to personal and business reputation.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of backpay, front pay, lost benefits, compensatory damages, damages for future pecuniary losses, damages for lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses, medical expenses, attorney's fees and costs with prejudgment interest thereon, injunctive relief and reinstatement, and any other such relief that Plaintiff may be entitled.

<u>COUNT VII</u>
**VIOLATION OF FIRST AMENDMENT FREEDOM OF SPEECH
PURSUANT TO 42 U.S.C. §1983-
AGAINST DEFENDANT CITY OF SARASOTA**

118.    Plaintiff incorporates by reference herein and realleges the allegations in Paragraphs 1-85 above as though set forth fully herein.

119.    Plaintiff exercised his right to freedom of speech as afforded by the First Amendment of the United States Constitution by speaking out on matters of public concern and of social and political significance and concern to the community as Plaintiff's decision to begin presenting as a male was intended to communicate a message of public concern about his gender identity and gender expression and about

the rights of transgender individuals to be addressed with the name and pronoun(s) of their choice and to alter their physical appearance to conform with their true identity. Plaintiff's decision to begin presenting as a male at work sent a clear and particular message about Plaintiff's gender identity.

120.    Plaintiff's speech relates to matters of political, social, or other concern to the community because it reflected the public manifestation of his gender expression and because it sends a message about the rights of transgender individuals..

121.    After a several-months long process of therapy during which Plaintiff decided to change his name, became Eli Schanley, and to be referred to with he/his pronouns to reflect his gender and male identity, Plaintiff decided to begin presenting to his coworkers and the world.

122.    Plaintiff's decision to begin presenting as male, and resulting speech, was not a matter of personal interest or one limited to his employment, but a thoughtful ultimate expression of his gender identity to society and of the rights of transgender individuals to be addressed as they request.

123.    Plaintiff's expression of his gender identity was not a matter of private concern or grounded in the minutiae of workplace life. Rather, expression of his gender and change of gender occurs both on and off the job, is directed to the public at large as well as his co-workers, and cannot be said to be about his employment. His attire may be understood as an expression of his change in gender identity, as it is clearly understood as such by his employer. Plaintiff's expression of a male identity

37

through masculine dress and appearance, was expressive of his gender to the public at large.

124.   Plaintiff's decision to present as a male at work did not cause excess disruption or interfered with the Sarasota Police Department's mission of providing services to residents of the City of Sarasota. Plaintiff's speech did not disrupt the operation and mission of the Police Department. To the extent that Plaintiff's speech had any disruptive impact on Plaintiff's performance of his official duties, the value and interest of Plaintiff's speech greatly outweighed any disruptive impact.

125.   Plaintiff continued to present as a female and thus continued to engage in protected activity after August 20, 2021, the alleged act of retaliation took place within close temporal proximity of the protected activity.

126.   Defendant City's acts against Plaintiff were because Plaintiff exercised his freedom of speech.

127.   Plaintiff's speech was a substantial or motivating factor and was a determinative consideration in Defendant City's actions in retaliating against Plaintiff and the termination of Plaintiff as a police officer.

128.   Defendant City was acting under color of the authority of the City when Defendant City retaliated against and participated in requiring Plaintiff to take a fitness for duty examination, finding Plaintiff unfit for duty, denying Plaintiff the ability to submit a second opinion, denying additional time to make a decision and in the termination of Plaintiff.

129.    The termination of Plaintiff was in violation of Plaintiff's First Amendment rights and represented the official custom, policy, or practice of the City of Sarasota.

130.    The acts of Troche in retaliating against Plaintiff by instigating an IA investigation, requiring Plaintiff to take a fitness for duty examination, selecting a Christian Counselor incapable of objectivity to perform the examination, finding Plaintiff unfit for duty, denying Plaintiff the ability to submit a second opinion, denying additional time to make a decision, and in terminating his employment was in violation of Plaintiff's First Amendment rights and represented the official custom, policy, or practice of the City of Sarasota.

131.    As a direct and proximate result of Defendant City's actions, Plaintiff has suffered and will continue to suffer lost wages, benefits and entitlements, damage to his career and reputation, personal humiliation, mental anguish, and embarrassment justifying an award including, but not limited to, reinstatement, back pay, lost benefits, front pay, compensatory and consequential damages against Defendants.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of backpay, front pay, lost benefits, compensatory damages, damages for future pecuniary losses, damages for lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses, medical expenses, attorney's fees and costs with prejudgment interest thereon,

injunctive relief and reinstatement, and any other such relief that Plaintiff may be entitled.

**COUNT VIII**
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**SUBSTANTIVE DUE PROCESS**
**UNDER 42 U.S.C. § 1983 *ET SEQ.*, AGAINST**
**DEFENDANT CITY OF SARASOTA**

132.    Plaintiff incorporates by reference herein and realleges the allegations in Paragraphs 1-85 above as though set forth fully herein.

133.    Substantive due process protects fundamental liberty interests in individual dignity, autonomy, and privacy from unwarranted government intrusion.

134.    These fundamental interests include the right to make decisions concerning bodily integrity and self-definition central to an individual's identity.

135.    The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons to define and express their identity. Plaintiff has a liberty interest in the right to decide how he presents himself.

136.    Defendant City's actions interfere with Plaintiff's ability to define and express his gender identity and penalizes Plaintiff for exercising his fundamental right to do so openly by depriving him of employment and career opportunities.

137.    Defendant City permitted supervisory officials to continue to misgender Plaintiff even after Plaintiff complained about it. Defendant City was given numerous opportunities to strengthen its anti-harassment and anti-discrimination policy through training its personnel about how to properly address and treat a transgendered

40

employee within the Department. The first opportunity was when Plaintiff came out as transgendered to the Department in August 2021. Another opportunity was after Plaintiff complained to leadership about being constantly misgendered by supervisors. There is no evidence the Department sought to improve its anti harassment prevention program or otherwise reduce the risk of future harassment.

138. Defendant City's refusal to promptly or remedially address the harassment of Plaintiff interfered with Plaintiff's ability to define and express his gender identity and penalized Plaintiff for exercising his fundamental right to do so openly.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of backpay, front pay, lost benefits, compensatory damages, damages for future pecuniary losses, damages for lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses, medical expenses, attorney's fees and costs with prejudgment interest thereon, injunctive relief and reinstatement, and any other such relief that Plaintiff may be entitled.

## COUNT IX
## VIOLATION OF THE FOURTEENTH AMENDMENT
## PROCEDURAL DUE PROCESS
## UNDER 42 U.S.C. § 1983 *ET SEQ.,* AGAINST
## DEFENDANT CITY OF SARASOTA

139. Plaintiff incorporates by reference herein and realleges the allegations in Paragraphs 1-85 above as if set forth fully herein.

140.    Defendant City's decision to require Plaintiff to take a fitness for duty examination, finding Plaintiff unfit for duty based on a blatantly discriminatory fitness for duty report, denying Plaintiff the ability to submit a second opinion penalizes Plaintiff for exercising his fundamental right to define and express his gender identity openly by depriving him of employment and career opportunities in violation of Plaintiff's substantive due process rights under the 14th Amendment to the Constitution.

141.    Defendant City's action of terminating Plaintiff's health insurance prematurely interfere with Plaintiff's ability to define and express his gender identity.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of backpay, front pay, lost benefits, compensatory damages, damages for future pecuniary losses, damages for lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses, medical expenses, attorney's fees and costs with prejudgment interest thereon, injunctive relief and reinstatement, and any other such relief that Plaintiff may be entitled.

## COUNT X
### DISABILITY DISCRIMINATION IN VIOLATION OF 42 USC §§12101 *ET SEQ.,* AGAINST DEFENDANT CITY OF SARASOTA

142.    Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

143.    Plaintiff was found to be unfit for duty and terminated because of his

disability and/or because the Defendant City perceived him as having a disability. The fitness for duty report regarded Plaintiff as having an impairment which disqualified from performing the duties of any patrol officer position for City of Sarasota Police Department. The Defendant City's actions were expressly based on the findings of the fitness for duty report. As such, Plaintiff was perceived as having a physical or mental impairment which was neither temporary nor transient and which disqualified him from working as a patrol officer for Defendant City.

144.    Plaintiff has gender dysphoria which is a disability as defined under the ADA.

145.    During his employment with Defendant City, Plaintiff was a qualified person with a disability in that he could perform all the essential functions of his job with or without accommodation.

146.    At all times during Plaintiff's employment with Defendant City, Plaintiff performed his job in a manner which should have met Defendant City's reasonable expectations.

147.    Defendant City unlawfully discriminated against Plaintiff because of his disability by finding Plaintiff unfit for duty based on a blatantly discriminatory fitness for duty report based on a perception that Plaintiff could not work as a Patrol Officer due to a mental impairment caused by his transgendered status.

148.    In addition, Defendant City terminated Plaintiff's employment through because of his disability in violation of 42 U.S.C. § 12101 *et seq*.  Plaintiff's disability

was a motivating factor in, if not the but-for cause of, Plaintiff's termination.

149.    As a direct and proximate result of Defendant City's actions, Plaintiff has suffered damages including but not limited to, lost wages, benefits and entitlements, damage to his career and reputation, personal humiliation, mental anguish, severe anxiety, depression, embarrassment and additional health related problems justifying an award including but not limited to, back pay, lost benefits, front pay, compensatory and consequential damages against Defendant City.

150.    Plaintiff has retained the undersigned counsel and has agreed to pay them a reasonable fee for their services herein.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of back pay, front pay, lost benefits, compensatory damages and emotional distress damages, attorneys' fees and costs under the ADA, prejudgment interest thereon, injunctive relief and reinstatement, and any other such relief that Plaintiff may be entitled to under the law.

<u>**COUNT XI**</u>
**HANDICAP DISCRIMINATION IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992, FLA. STAT. 760 *ET.SEQ.*, AGAINST DEFENDANT CITY OF SARASOTA**

151.    Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

152.    Plaintiff was found to be unfit for duty and terminated because of his disability and/or because the Defendant City perceived him as having a disability. The fitness for duty report regarded Plaintiff as having an impairment which disqualified

44

him from performing the duties of any patrol officer position for City of Sarasota Police Department. The Defendant City's actions were expressly based on the findings of the fitness for duty report. As such, Plaintiff was perceived as having a physical or mental impairment which was neither temporary or transient and which disqualified him from working as a patrol officer for Defendant City.

153.    Plaintiff's perceived handicap was a motivating factor in, if not the but-for cause of, Plaintiff's termination.

154.    Plaintiff's perceived handicap was a motivating factor in, if not the but-for cause of, finding Plaintiff unfit for duty as a patrol officer.

155.    During his employment with Defendant City, Plaintiff was a qualified person with a disability in that he could perform all the essential functions of his job with or without accommodation.

156.    At all times during Plaintiff's employment with Defendant City, Plaintiff performed his job in a manner which should have met Defendant City's reasonable expectations.

157.    Defendant City unlawfully discriminated against Plaintiff because of his perceived disability by finding Plaintiff unfit for duty based on a blatantly discriminatory fitness for duty report based on a perception that Plaintiff could not work as a Patrol Officer due to a mental impairment caused by his transgendered status.

158.    In addition, Defendant City terminated Plaintiff's employment because of his disability in violation of the Florida Civil Rights Act.  Plaintiff's perceived disability was a motivating factor in, if not the but-for cause of, Plaintiff's termination.

159.    Plaintiff has retained the undersigned counsel and has agreed to pay them a reasonable fee for their services herein.

160.    Defendant City's termination of Plaintiff due to his handicap has caused, and will continue to cause, Plaintiff to suffer substantial damages for lost wages, other pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of back pay, front pay, lost benefits, compensatory damages and emotional distress damages, attorneys' fees and costs under the FCRA and Section 448.08, Florida Statutes (2014), prejudgment interest thereon, injunctive relief and reinstatement, and any other such relief that Plaintiff may be entitled to under the law.

## COUNT XII
### RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1992, FLA. STAT. 760 *ET. SEQ.,* AGAINST DEFENDANT CITY OF SARASOTA

161.    Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

162.    The sexual harassment of Plaintiff was based on his sex and would not have occurred but for Plaintiff's sex (transgendered male who failed to conform to gender stereotypes associated with his natal sex). Defendant City failed to engage in

46

reasonable efforts to prevent harassment against Plaintiff due to his transgendered status. Further, the Defendant City failed to take reasonable corrective action in response to harassment about which it knew or should have known. Plaintiff participated in an employer's internal complaint process. Plaintiff engaged in protected activity by participating in Defendant City's anti-harassment program mandated by Title VII, and otherwise had a good faith reasonable belief that the actions which were the subject of his complaint violated Title VII. Although the employer knew or should have known about the harassment, no remedial action was taken and the employer instead retaliated against Plaintiff. The sexual and retaliatory harassment of Plaintiff included actions that affected tangible aspects of Plaintiffs employment.

163.   Plaintiff was terminated, which would not have occurred but for his complaints of sexual harassment. As a result of the discrimination, harassment and retaliation described above, Plaintiff has suffered damages. Plaintiff has retained the undersigned attorneys and will continue to incur attorney's fees and costs.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of lost wages, back pay and front pay, emotional distress and compensatory damages, equitable relief and reinstatement, attorney's fees and costs, prejudgment interest, and any other such relief that the court deems just and proper.

## COUNT XIII
### RETALIATION IN VIOLATION OF TITLE VII OF
### THE CIVIL RIGHTS ACT OF 1964, AS AMENDED BY
### THE CIVIL RIGHTS ACT OF 1991, 42 U.S.C. § 2000e, *ET SEQ.,*
### AGAINST CITY OF SARASOTA

164.    Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

165.    The sexual harassment of Plaintiff was based on his sex and would not have occurred but for Plaintiff's sex (transgendered male who failed to conform to gender stereotypes associated with his natal sex). Defendant City failed to engage in reasonable efforts to prevent harassment against Plaintiff due to his transgendered status. Further, the Defendant City failed to take reasonable corrective action in response to harassment about which it knew or should have known. Plaintiff participated in an employer's internal complaint process. Plaintiff engaged in protected activity by participating in Defendant City's anti-harassment program mandated by Title VII, and otherwise had a good faith reasonable belief that the actions which were the subject of her complaint violated Title VII. Although the employer knew or should have known about the harassment, no remedial action was taken in the employer instead retaliated against Plaintiff.  The sexual and retaliatory harassment of Plaintiff included actions that affected tangible aspects of Plaintiff's employment.

166.    Plaintiff was terminated, which would not have occurred but for his complaints of sexual harassment.  As a result of the discrimination, harassment and

retaliation described above, Plaintiff has suffered damages.  Plaintiff has retained the undersigned attorneys and will continue to incur attorney's fees and costs.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of lost wages, back pay and front pay, emotional distress and compensatory damages, equitable relief and reinstatement, attorney's fees and costs, prejudgment interest, and any other such relief that the court deems just and proper.

<u>**COUNT XIV**</u>
**GENDER DISCRIMINATION (FITNESS FOR DUTY) IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENTOF THE UNITED STATES CONSTITUTION UNDER 42 U.S.C. § 1983 *ET SEQ.*, AGAINST DEFENDANT REX TROCHE IN HIS INDIVIDUAL CAPACITY**

167.    Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

168.    Plaintiff is a member of a protected class (gender), was qualified for the position he held, and was subjected to adverse employment action when he was required, upon information and belief based on directives emanating from Troche, to take a fitness for duty examination and when Defendant Troche, as the final decision maker, concluded based on the report from the examiner selected and/or approved by Troche without consideration of a second opinion, that Plaintiff was unfit for duty.

169.    Plaintiff's protected class (gender) was a substantial or motivating factor, as well as a but-for cause, of the adverse employment actions to which he was subjected.

170.    The actions and omissions of Defendant Troche were willful, wanton, intentional, conscious and malicious and in deliberate disregard of Plaintiff's Fourteenth Amendment rights.

171.    Defendant Troche had personal responsibility for the constitutional violation at issue. Defendant Troche is the decision maker regarding the decision to require Plaintiff to participate in a fitness for duty examination and the decision to find Plaintiff unfit for duty as a result of the fitness for duty report or otherwise directly participated in the violation. Defendant Troche was at all material times acting pursuant to his delegated authority or with the tacit or implied approval of Defendant, City of Sarasota, when Plaintiff was required to take a fitness for duty examination and concluded based on the report that he was unfit for duty.

172.    Said employment decisions complained of herein were made by the authorized decision-maker of Defendant City of Sarasota. Troche was the decision-maker for § 1983 purposes because the decision to require Plaintiff to take a fitness for duty examination and the decision to find Plaintiff unfit for duty based on the fitness for duty report was effective upon Defendant Troche's order, with nothing further required.

173.    Defendant Troche, acting under color of law, in committing the actions described above, deprived Plaintiff of rights, privileges, and immunities provided by the United States Constitution and denied him equal protection under the law, in violation of the Fourteenth Amendment to the United States Constitution and 42

50

U.S.C. § 1983, whereby he has suffered and will continue to suffer both irreparable and compensable damages unless and until this Court grants relief.

174.    The individual actions of Defendant Troche in discriminating against Plaintiff and violated the clearly established rights of Plaintiff of which reasonable persons in his position should have known.

175.    The acts of Defendant Troche in discriminating against Plaintiff by requiring Plaintiff to take a fitness for duty examination, and finding Plaintiff unfit for duty was in violation of Plaintiff's Fourteenth Amendment rights and represented the official custom, policy, or practice of the City of Sarasota.

176.    As a direct and proximate result of the Defendant Troche's actions, Plaintiff suffered, and will continue to suffer damages. As a direct and proximate result of Defendant Troche's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and loss of other fringe benefits. Plaintiff has also suffered continues to suffer humiliation, embarrassment, mental and emotional distress and anguish, loss of self-esteem, loss of enjoyment of life and harm to personal and business reputation.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of backpay, front pay, lost benefits, compensatory damages, damages for future pecuniary losses, damages for lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses, medical expenses, attorney's fees and costs with prejudgment interest thereon,

51

injunctive relief and punitive damages against Defendant Troche. and any other such relief that Plaintiff may be entitled.

**COUNT XV**
**GENDER DISCRIMINATION (TERMINATION) IN VIOLATION OF THE**
**EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENTOF**
**THE UNITED STATES CONSTITUTION**
**UNDER 42 U.S.C. § 1983 *ET SEQ.*,**
**AGAINST DEFENDANT REX TROCHE IN HIS INDIVIDUAL CAPACITY**

177.   Plaintiff hereby incorporates and re-alleges by reference herein the allegations in Paragraphs 1-85 above as though set forth fully herein.

178.   Plaintiff is a member of a protected class (gender), was qualified for the position that he held, and was subjected to an adverse employment action when he was unlawfully terminated.

179.   Plaintiff's protected class (gender) was a substantial or motivating factor, as well as a but for cause, of the adverse employment action to which he was subjected.

180.   The actions and omissions of Defendant were willful, wanton, intentional, conscious and malicious and in deliberate disregard of Plaintiff's Fourteenth Amendment rights.

181.   Defendant Troche was personally responsible for the constitutional violation at issue. Defendant Troche is the decision maker regarding the decision to terminate Plaintiff's employment or otherwise directly participated in the violation. Defendant Troche was at all material times acting pursuant to his delegated authority or with the tacit or implied approval of Defendant, City of Sarasota, with regard to the decision to terminate the Plaintiff.

182.    Said employment decision complained of herein were made by the authorized decision-maker of Defendant City of Sarasota. Defendant Troche was the decision-maker for § 1983 purposes because Plaintiff's termination was effective upon Troche's order, with nothing further required.

183.    The Defendant Troche, acting under color of law, in committing the actions described above, deprived Plaintiff of rights, privileges, and immunities provided by the United States Constitution and denied him equal protection under the law, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, whereby he has suffered and will continue to suffer both irreparable and compensable damages unless and until this Court grants relief.

184.    The individual actions of  Defendant Troche in discriminating against Plaintiff and violated the clearly established rights of Plaintiff of which reasonable persons in his position should have known.

185.    The termination of Plaintiff was in violation of Plaintiff's Fourteenth Amendment rights and represented the official custom, policy, or practice of the City of Sarasota.

186.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered, and will continue to suffer damages. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and loss of other fringe benefits. Plaintiff has also suffered continues to suffer humiliation,

embarrassment, mental and emotional distress and anguish, loss of self-esteem, loss of enjoyment of life and harm to personal and business reputation.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of backpay, front pay, lost benefits, compensatory damages, damages for future pecuniary losses, damages for lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses, medical expenses, attorney's fees and costs with prejudgment interest thereon, injunctive relief and reinstatement, consequential and punitive damages against Defendant and any other such relief that Plaintiff may be entitled.

<u>COUNT XVI</u>
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**SUBSTANTIVE DUE PROCESS**
**UNDER 42 U.S.C. § 1983 *ET SEQ.*, AGAINST**
**DEFENDANT TROCHE IN HIS INDIVIDUAL CAPACITY**

187.   Plaintiff incorporates by reference herein and realleges the allegations in Paragraphs 1-85 above as though set forth fully herein.

188.   Substantive due process protects fundamental liberty interests in individual dignity, autonomy, and privacy from unwarranted government intrusion.

189.   These fundamental interests include the right to make decisions concerning bodily integrity and self-definition central to an individual's identity.

190.   The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons to define and express their identity. Plaintiff has a liberty interest in the right to decide how he presents himself.

191.    Defendant Troche's actions interfere with Plaintiffs' ability to define and express his gender identity and penalizes Plaintiffs for exercising their fundamental right to do so openly by depriving him of employment and career opportunities.

192.    Defendant Troche permitted supervisory officials to continue to misgender Plaintiff even after Plaintiff complained about it. Defendant Troche was given numerous opportunities to strengthen its anti-harassment and anti-discrimination policy through training its personnel about how to properly address and treat a transgendered employee within the Department. The first opportunity was when Plaintiff came out as transgendered to the Department in August 2021. Another opportunity was after Plaintiff complained to leadership about being constantly misgendered by supervisors. There is no evidence the Department sought to improve its sexual harassment prevention program or otherwise reduce the risk of future harassment.

193.    Defendant Troche's refusal to promptly or remedially address the harassment of Plaintiff interfered with Plaintiff's ability to define and express his gender identity and penalized Plaintiff for exercising his fundamental right to do so openly.

194.    Defendant Troche had personal responsibility for the constitutional violation at issue. Defendant Troche is the decision maker regarding the decision to require Plaintiff to participate in a fitness for duty examination, the decision to find Plaintiff unfit for duty as a result of the fitness for duty report and the decision to

55

terminate Plaintiff's employment or otherwise directly participated in the violation. Defendant Troche was at all material times acting pursuant to his delegated authority or with the tacit or implied approval of Defendant, City of Sarasota, when he was required to take a fitness for duty examination, concluded based on the report that he was unfit for duty and terminated Plaintiff's employment.

195.   Said employment decisions complained of herein were made by the authorized decision-maker of Defendant City of Sarasota. Defendant Troche was the decision-maker for § 1983 purposes because the decision to require Plaintiff to take a fitness for duty examination, the decision to find Plaintiff unfit for duty based on the fitness for duty report and the decision to terminate Plaintiff's employment was effective upon Defendant Troche's order, with nothing further required.

196.   The Defendant Troche, acting under color of law, in committing the actions described above, deprived Plaintiff of rights, privileges, and immunities provided by the United States Constitution and denied him equal protection under the law, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, whereby he has suffered and will continue to suffer both irreparable and compensable damages unless and until this Court grants relief.

197.   The individual actions of Defendant Troche in discriminating against Plaintiff and violated the clearly established rights of Plaintiff of which reasonable persons in his position should have known.

198.    Defendant Troche's decision to require Plaintiff to take a fitness for duty examination, finding Plaintiff unfit for duty based on a blatantly discriminatory fitness for duty report, denying Plaintiff the ability to submit a second opinion penalizes Plaintiff for exercising his fundamental right to define and express his gender identity openly by depriving him of employment and career opportunities in violation of Plaintiff's substantive due process rights under the 14th Amendment to the Constitution.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of backpay, front pay, lost benefits, compensatory damages, damages for future pecuniary losses, damages for lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses, medical expenses, attorney's fees and costs with prejudgment interest thereon, injunctive relief, consequential and punitive damages against Defendant and any other such relief that Plaintiff may be entitled.

<u>**COUNT XVII**</u>
**VIOLATION OF FIRST AMENDMENT FREEDOM OF SPEECH PURSUANT TO 42 U.S.C. §1983-**
**AGAINST DEFENDANT TROCHE IN HIS INDIVIDUAL CAPACITY**

199.    Plaintiff incorporates by reference herein and realleges the allegations in Paragraphs 1-85 above as though set forth fully herein.

200.    Plaintiff exercised his right to freedom of speech as afforded by the First Amendment of the United States Constitution by speaking out on matters of public concern as Plaintiff's decision to begin presenting as a male was intended to

communicate a message of public concern about his gender identity and gender expression. Plaintiff's decision to begin presenting as a male at work sent a clear and particular message about Plaintiff's gender identity.

201.   Plaintiff's speech relates to  matters of political, social, or other concern to the community because it reflected the public manifestation of her gender expression.

202.   After a several-months long process of therapy during which Plaintiff decided to change his name, became Eli Schanley, and to be referred to with he/his pronouns to reflect his gender and male identity, Plaintiff decided to begin presenting to his coworkers and the world.

203.   Plaintiff's decision to begin presenting as male, and resulting speech, was not a matter of personal interest or one limited to his employment, but a thoughtful ultimate expression of his gender identity to society.

204.   Plaintiff's expression of his gender identity was not a matter of private concern or grounded in the minutiae of workplace life. Rather, expression of his gender and change of gender occurs both on and off the job, is directed to the public at large as well as his co-workers, and cannot be said to be about his employment. His attire may be understood as an expression of his change in gender identity, as it is clearly understood as such by his employer. Plaintiff's expression of a male identity through masculine dress and appearance, was expressive of his gender to the public at large.

205.    Plaintiff's decision to present as a male at work did not cause excess disruption or interfered with the Sarasota Police Department's mission of providing services to residents of the City of Sarasota. Plaintiff's speech did not disrupt the operation and mission of the Police Department. To the extent that Plaintiff's speech had any disruptive impact on Plaintiff's performance of his official duties, the value and interest of Plaintiff's speech greatly outweighed any disruptive impact.

206.    Plaintiff continued to present as a male and thus continued to engage in protected activity after August 20, 2021, the alleged act of retaliation took place within close temporal proximity of the protected activity.

207.    Defendant Troche's acts against Plaintiff were because Plaintiff exercised his freedom of speech.

208.    Plaintiff's speech was a substantial or motivating factor and was a determinative consideration in Defendant Troche's actions in retaliating against Plaintiff and the termination of Plaintiff as a police officer.

209.    Defendant Troche had personal responsibility for the constitutional violation at issue. Defendant Troche is the decision maker regarding the decision to require Plaintiff to participate in a fitness for duty examination, the decision to find Plaintiff unfit for duty as a result of the fitness for duty report and the decision to terminate Plaintiff's employment or otherwise directly participated in the violation. Defendant Troche was at all material times acting pursuant to his delegated authority or with the tacit or implied approval of Defendant, City of Sarasota, when he was

59

required to take a fitness for duty examination, concluded based on the report that he was unfit for duty and terminated Plaintiff's employment.

210.    Said employment decisions complained of herein were made by the authorized decision-maker of Defendant City of Sarasota. Defendant Troche was the decision-maker for § 1983 purposes because the decision to require Plaintiff to take a fitness for duty examination, the decision to find Plaintiff unfit for duty based on the fitness for duty report and the decision to terminate Plaintiff's employment was effective upon Defendant Troche's order, with nothing further required.

211.    Defendant Troche was acting under color of the authority of the City when Defendant Troche retaliated against and participated in requiring Plaintiff to take a fitness for duty examination, finding Plaintiff unfit for duty, denying Plaintiff the ability to submit a second opinion, denying additional time to make a decision and in the termination of Plaintiff.

212.    The individual actions of Defendant Troche in discriminating against Plaintiff and violated the clearly established rights of Plaintiff of which reasonable persons in his position should have known.

213.    The termination of Plaintiff was in violation of Plaintiff's First Amendment rights and represented the official custom, policy, or practice of the City of Sarasota.

214.    The acts of Defendant Troche in retaliating against Plaintiff by requiring Plaintiff to take a fitness for duty examination, finding Plaintiff unfit for duty, denying

Plaintiff the ability to submit a second opinion, denying additional time to make a decision, and the decision to terminate Plaintiff was in violation of Plaintiff's First Amendment rights and represented the official custom, policy, or practice of the City of Sarasota.

215.    The actions and omissions of Defendant Troche were willful, wanton, intentional, conscious and malicious and in deliberate disregard of Plaintiff's First Amendment rights.

216.    As a direct and proximate result of Defendant Troche's actions, Plaintiff has suffered and will continue to suffer lost wages, benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish, and embarrassment justifying an award including, but not limited to, reinstatement, back pay, lost benefits, front pay, compensatory, consequential damages against Defendant, and punitive damages against the individual Defendant.

**WHEREFORE**, Plaintiff demands a trial by jury and relief in the form of backpay, front pay, lost benefits, compensatory damages, damages for future pecuniary losses, damages for lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses, medical expenses, attorney's fees and costs with prejudgment interest thereon, injunctive relief and reinstatement, consequential and punitive damages against Defendant and any other such relief that Plaintiff may be entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  June 13, 2025                    Respectfully submitted,

*/s/ Neil L. Henrichsen*
Neil Henrichsen
Fla. Bar No. 0111503
HENRICHSEN LAW GROUP, PLLC
301 W. Bay St., 14th Floor
Jacksonville, FL 32202
(904) 381-8183
(904) 212-2800 (Facsimile)
nhenrichsen@hslawyers.com
service@hslawyers.com
**Lead Attorney for Plaintiff Eli Schanley**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 13, 2025, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system, which will automatically send an email notification of such filing to the attorneys of record.

*/s/ Neil L. Henrichsen*
Neil L. Henrichsen

62