## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ELI SCHANLEY,**

      Plaintiff,

v.                                                    Case No. 8:25-cv-00408-WFJ-SPF

**CITY OF SARASOTA,** and
**REX TROCHE,** in his Individual
Capacity, as the Chief of Police of the
Sarasota Police Department,

      Defendants.

_____/

## <u>ORDER</u>

Before the Court are Defendants City of Sarasota (the "City") and Rex Troche's ("Chief Troche") Motions to Dismiss. Dkts. 21, 22. The City, pursuant to Federal Rule of Civil Procedure 12(b)(6), moves this Court to dismiss with prejudice Counts V–XIII of the Amended Complaint. Dkt. 21. Chief Troche, pursuant to Federal Rule of Civil Procedure 12(b)(6), moves to dismiss with prejudice Counts XIV–XVII of the Amended Complaint. Dkt. 22. Plaintiff Eli Schanley ("Plaintiff") has responded in opposition, Dkts. 25, 26, and Defendants replied, Dkts. 29, 30. After careful consideration, the Court grants in part and denies in part Defendants' motions to dismiss.

## BACKGROUND

This dispute arises out of Plaintiff Eli Schanley's alleged termination from the Sarasota Police Department (the "SPD") due to being a transgender individual.[1] Plaintiff Schanley's natal sex is female. Dkt. 17 ¶ 8. Specifically, Schanley is a female-to-male transgender individual who has been diagnosed with gender dysphoria.[2] *Id.* ¶ 9. To treat this medical disability, Plaintiff underwent a series of medical interventions, including hormone therapy beginning in 2021. *Id.*

On May 13, 2015, when Plaintiff first began working for the SPD, Schanley presented as a female with long hair and an outward female appearance, using the pronouns "she/her" and going by Plaintiff's legal name, Elise Schanley. *Id.* ¶ 21. During Plaintiff's employment with SPD, Plaintiff consistently received positive performance reviews and assessments, as well as numerous commendations and medals. *Id.* ¶ 23.

On August 20, 2021, Plaintiff sent an email to Scott Mayforth (the former SPD patrol captain) and then Chief of Police James Rieser, stating that Plaintiff was transgender and was going to proceed with the transition process. *Id.* ¶ 24. Plaintiff's email requested, moving forward, to be called "Eli" and use the pronouns "he/him."

---

[1] The Court recites the facts based on the allegations within the Amended Complaint, Dkt. 17, which it must accept as true in ruling on a motion to dismiss. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983).

[2] Gender dysphoria is "a medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and biological sex. Left untreated, gender dysphoria may result in severe physical and psychological harms." *United States v. Skrmetti*, 605 U.S. 495, 502–03 (2025).

*Id.* Four minutes after Schanley's email, Chief Rieser sent an email to various supervisory SPD officials and the human resources department, including Defendant Rex Troche (who at the time was the Deputy Chief of Police), requesting to discuss Schanley's email. *Id.* On August 25, 2021, Chief Rieser announced his retirement due to health reasons and was replaced by then Deputy Chief Troche on an interim basis. *Id.* ¶ 25. Defendant Troche was appointed Chief of Police for the SPD in April 2022. *Id.* Plaintiff asserts to be the second (openly) transgender employee for the City and the first transgender police officer for the SPD. *Id.* ¶ 26.

On October 11, 2021, an SPD Chain of Command Form was circulated regarding Plaintiff's intent to change names, stating that in approximately three months, Plaintiff would be receiving a letter from Plaintiff's medical provider to proceed with a name change. *Id.* ¶ 27. On the same day, Plaintiff submitted a request to SPD for a name change from "Elise Schanley" to "Eli Schanley," which was subsequently denied because Plaintiff had failed to legally change names. *Id.* However, other officers in the SPD have been permitted to use a name other than their legal name, and these nicknames were used in official employment email addresses. *Id.*

In July 2022, Plaintiff was moved to the day shift, where Plaintiff asserts there was constant misgendering by co-workers who refused to use Plaintiff's preferred name and pronoun. *Id.* ¶ 28. On August 23, 2022, Plaintiff sent an email to Captain

Robert Armstrong regarding the ongoing issue of misgendering and requested assistance in addressing it. *Id.* ¶ 29. On or about August 23, 2022, Plaintiff met with Lieutenant Bruce King off-site to discuss the misgendering. *Id.* ¶ 30. Lt. King began by apologizing, but then expressed displeasure that Plaintiff had raised these concerns in a "public email." *Id.* Despite raising the issue of misgendering through the chain of command, Plaintiff alleges that the supervisors and most of the rank-and-file employees continued to misgender Plaintiff daily, which Plaintiff considered to be a sign of disrespect. *Id.* ¶ 31.

On April 7, 2023, Plaintiff was notified that there was going to be a formal investigation by Internal Affairs ("IA") in connection with a domestic violence call that Plaintiff responded to on March 26, 2023. *Id.* ¶¶ 32, 36, 66. Plaintiff was placed on administrative leave during the IA investigation. *Id.* ¶ 33. Plaintiff was also required to submit to a fitness for duty examination ("FFDE") by a provider of the SPD's choosing for a psychological evaluation. *Id.* IA Lieutenant Greg Miller informed Plaintiff that the decision to require a fitness for duty examination came directly from the Chief of Police, Defendant Troche. *Id.*

On April 10, 2023, Plaintiff was instructed to see Jill Fischer Peters ("Peters"), who would administer the FFDE. *Id.* ¶ 33. Peters is a purported "Christian Counselor" chosen by the SPD. *Id.* ¶ 41. Plaintiff alleges that Defendant Troche (as the Chief of Police) had final authority to establish policy with respect to

departmental determinations of fitness for duty, reprimands, and termination of police officers. *Id.* ¶ 70. Plaintiff also claims there was no provision for administrative review of these decisions in the City's rules and regulations. *Id.* When Plaintiff inquired about the reason for being subjected to the FFDE, no justification for the psychological evaluation was provided. *Id.* ¶ 33. Plaintiff points to one other SPD colleague, a male, who was subject to IA investigations for failing to follow SPD procedures when responding to domestic violence calls, but was never ordered to submit to a FFDE. *Id.* ¶ 39.

On April 11, 2023, Plaintiff met with Peters at her office, which was decorated with religious-themed items. *Id.* ¶ 42. Following the meeting, Peters told Plaintiff that Plaintiff passed with "flying colors." *Id.* However, Plaintiff claims that Peters' written report (issued on April 18, 2023) to the SPD contained numerous fabricated statements or faulty assumptions. *Id.* ¶¶ 42, 44–45. As quoted by the Amended Complaint, the report stated that "she [sic] is often harassed in uniform by various men because of the way she [sic] looks physically[]," and it was Peters' clinical opinion that "this pattern of behavior directed towards her [sic] effects [sic] her [sic] ability to assert herself as she [sic] is conflicted, fearful and submissive." *Id.* ¶ 47. The Amended Complaint further quoted the report, noting that "Officer Schanley is 5 foot tall and her [sic] internal ability to defend herself [sic] both physically and psychologically is not conducive to confrontation as she [sic] reacts by submitting."

*Id.* ¶ 49. Ultimately, Peters' report concluded the following: "While she [sic] may be an excellent employee due to her [sic] desire to follow the rules, her [sic] psyche unconscious psychological pathology plays [sic] large part in inability to do her [sic] job. As a result, she [sic] is a danger to herself [sic] and the public." *Id.* ¶ 46. Plaintiff contends this conclusion has no factual basis and is at odds with Plaintiff's eight-year employment history as a decorated patrol officer. *Id.* Plaintiff alleges the conclusions were reached because Plaintiff is transgender. *Id.* ¶ 47. On April 18, 2023, Plaintiff met with SPD supervisors to review the Fitness for Duty Report, during which Captain Robert Armstrong provided Plaintiff with a copy of the report. *Id.* ¶ 50. Plaintiff informed supervisors of the various inaccuracies and fabrications in Peters' written report. *Id.*

After Plaintiff's termination, Plaintiff underwent a second psychological evaluation with a licensed psychologist. *Id.* ¶ 73. Schanley claims the second report contradicts Peters' report, as the objective third party found Plaintiff to be fit to perform the duties of a law enforcement officer. *Id.* Additionally, irregularities were noted in the scoring and interpretation of Peters' testing. *Id.* Finally, the second report reviewed Plaintiff's medical records and found that "the records noted general physical health stability, general mental health stability, and no evidence of cognitive, emotional, or mood instability." *Id.*

On April 24, 2023, the City formally terminated Plaintiff's employment via letter. *Id.* ¶ 57. The termination letter stated, in relevant part, that: "We regret to inform you that based upon the determination of fit for duty report that the City of Sarasota is notifying you that you will be placed on Layoff effective April 24th, 2023." *Id.* The decision to terminate Plaintiff's employment was made before completion of the SPD internal affairs investigation into Plaintiff's handling of the domestic dispute call on March 26, 2023, and before any hearing before the Florida Department of Law Enforcement ("FDLE"). *Id.* ¶¶ 59, 66.

Plaintiff, however, claims that the termination letter is at odds with a meeting Plaintiff had on April 18, 2023, with the Deputy Chief and the City's Human Resource Director (Stacie Mason). *Id.* ¶¶ 50–51. During this meeting, the Deputy Chief and Director Mason informed Plaintiff of three options based on the FFDE results: "(1) FMLA [Family and Medical Leave Act] to keep benefits until [Plaintiff could] find a job; (2) two weeks of administrative leave after which . . . employment would end on May 5, 2023; (3) to apply for other jobs with the City (at the time there were only two vacancies – Accounting Specialist and a janitorial role -both outside Plaintiff's experience and/or qualifications); or (4) Plaintiff could resign at that time." *Id*. ¶ 51. These options were never provided in writing to Plaintiff. *Id.*

Additionally, before Plaintiff's termination by SPD, Plaintiff had made supervisors aware of gender related surgery that Plaintiff planned to undergo. *Id.* ¶

77. The City's termination letter stated that "Certain City provided benefits[,] such as Medical, Dental[,] and Employee Assistance, will be provided until the next month following your layoff date. You can retain those benefits until May 31, 2023." *Id.* In reliance upon that, Plaintiff scheduled gender-related surgery ("top surgery") on May 25, 2023. *Id.* ¶ 78. Despite the City's representations, Plaintiff received a letter from Florida Blue Cross Blue Shield stating that Plaintiff was no longer covered by insurance. *Id.*

After Plaintiff's employment was terminated, the IA Investigation of Plaintiff's handling of the March 2023 domestic dispute call continued as an informal investigation. *Id.* ¶ 80. On May 15, 2023, Detective Vollmer was assigned as the lead investigator for the informal investigation and completed an Interoffice Memorandum with his findings. *Id.* ¶¶ 81–82. On or around September 1, 2023, Chief Troche signed Det. Vollmer's "Conclusion of Fact," which Plaintiff claims has erroneous conclusions concerning Plaintiff's veracity and alleged falsification of documents. *Id.* ¶ 83. On May 15, 2024, the FDLE conducted a hearing regarding Plaintiff's handling of the March 26, 2023, domestic violence call and found that the appropriate action to be taken regarding Plaintiff's behavior was to place Plaintiff on six months' probation during which time Plaintiff would be required to complete approved Ethics Training. *Id.* ¶ 84. The FDLE did not consider or recommend

suspension, termination, or revocation of Plaintiff's certification to serve as a law enforcement officer. *Id.*

On September 5, 2023, Plaintiff timely filed a charge of gender and disability discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶ 7. This charge was simultaneously filed with a Florida Commission on Human Relations ("FCHR") complaint that alleged discrimination based upon disability, gender, and retaliation. *Id.* Plaintiff asserts that more than 180 days have passed since Plaintiff filed the charge, and the EEOC has not issued any cause finding. *Id.*

On February 18, 2025, Plaintiff filed suit against Defendants. Dkt. 1. In response to Defendants' initial motions to dismiss, Plaintiff filed an amended complaint on June 13, 2025. Dkt. 17. Plaintiff's Amended Complaint alleges thirteen claims against the City: gender discrimination under the Florida Civil Rights Act of 1992 ("FCRA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and 42 U.S.C. § 1983 (Counts I–VI); First Amendment retaliation under § 1983 (Count VII); violation of the Due Process Clause of the Fourteenth Amendment under § 1983 (Counts VIII–IX); disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA") and the FCRA (Counts X–XI); and retaliation under the FCRA and Title VII (Counts XII–XIII). Dkt. 17 ¶¶ 86–166.

Against Defendant Troche in his individual capacity, the Amended Complaint asserts four counts: gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment under § 1983 (Counts XIV–XV); violation of the Substantive Due Process Clause of the Fourteenth Amendment under § 1983 (Count XVI); and First Amendment retaliation under § 1983 (Count XVII). *Id.* ¶¶ 167–216.

On June 27, 2025, Defendants filed two motions to dismiss: the City's partial motion to dismiss seeks dismissal of Counts V–XIII of the Amended Complaint, and Defendant Troche's motion seeks to dismiss all four counts against him in his individual capacity (Counts XIV–XVII). *See* Dkts. 21, 22.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a short and plain statement of the claim showing that the plaintiff is entitled to relief to give the defendant fair notice of the claims and grounds. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted). In considering a Rule 12(b)(6) motion to dismiss, the court must construe the facts in the light most favorable to the plaintiff. *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 485 (11th Cir. 2015). A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78

(2009) (citation modified). However, "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) (citation omitted).

## DISCUSSION

### I.    The City's Partial Motion to Dismiss

Plaintiff alleges several municipal liability claims against the City in Counts I–XIII. *See generally* Dkt. 17. The City's partial motion to dismiss, however, only seeks dismissal of Counts V–XIII of the Amended Complaint: the gender discrimination claims (in violation of the Equal Protection Clause of the Fourteenth Amendment) under § 1983 (Counts V–VI); the First Amendment retaliation claim under § 1983 (Count VII); the Fourteenth Amendment Due Process Clause claims under § 1983 (Counts VIII–IX); disability discrimination claims under the ADA and FCRA (Counts X–XI); and retaliation claims under Title VII and the FCRA (Counts XII–XIII). Dkt. 21 at 2. The Court will address each one in turn.

Generally, municipalities—like the City—cannot be held liable on a theory of *respondeat superior* or for acts committed by their officers. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691, 693–94 (1978). Instead, municipal entities may be held liable under § 1983 only where "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. This standard requires

a plaintiff to show that (1) "his constitutional rights were violated"; (2) "the municipality had a custom or policy that constituted deliberate indifference to that constitutional right"; and (3) "the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). A plaintiff may satisfy the second element by alleging three theories of municipal liability: (1) an official policy; (2) the final policymakers acquiesce to a longstanding practice; or (3) a final policymaker ratifies the unconstitutional act and motive of a subordinate. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (citing *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002)). Each of Plaintiff's § 1983 claims must plausibly support a theory of municipal liability.

### a. *Gender Discrimination Claims under § 1983—Counts V–VI*

"The Equal Protection Clause of the United States Constitution prohibits unlawful sex discrimination in public employment." *Marshall v. Mayor & Alderman of City of Savannah, Ga.*, 366 F. App'x 91, 97 (11th Cir. 2010) (citing *Cross v. State of Ala.,* 49 F.3d 1490, 1507 (11th Cir. 1995)).[3] The City's partial motion to dismiss, however, does not contend that Plaintiff failed to sufficiently allege the elements of a gender discrimination claim under § 1983 or Title VII. *See* Dkt. 21 at 3. Instead,

---

[3] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited when the Court finds them persuasive on a particular point. *See McNamara v. GEICO*, 30 F.4th 1055, 1060–61 (11th Cir. 2022).

the City argues that it is not liable under § 1983, as the Plaintiff has not adequately alleged any of the three theories of *municipal* liability. *Id.* at 4.

As discussed above, the Eleventh Circuit has outlined three possible municipal liability theories: (1) an official (unconstitutional) policy; (2) the final policymakers acquiesce to a longstanding practice or a standard operating procedure; or (3) a final policymaker ratifies a subordinate official's unconstitutional decision. *Hoefling*, 811 F.3d at 1279. Plaintiff claims to have sufficiently alleged the second and third theories of municipal liability. Dkt. 25 at 12–13.

As to the third theory of liability, "[m]unicipal liability may arise with regards to an employment decision, such as a termination, provided that the decisionmaker 'possesses final authority to establish municipal policy with respect to the action ordered.'" *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1325 (11th Cir. 2003) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986)). However, "*Monell*'s policy or custom requirement . . . preclude[s] § 1983 municipal liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion." *Scala v. City of Winter Park,* 116 F.3d 1396, 1399 (11th Cir. 1997). Thus, "[f]inal policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." *Id.* at 1401.

Importantly, the Eleventh Circuit has warned that "identifying and proving that a final policymaker acted on behalf of a municipality is 'an evidentiary standard, and not a pleading requirement.'" *Hoefling*, 811 F.3d at 1280 (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002)). As such, "to survive a Rule 12(b)(6) motion[,]" all Plaintiff needed to do was "allege a policy, practice, or custom of the City which caused" the alleged constitutional violation. *Id.*

Here, given that the Amended Complaint only needed to state enough facts to "state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, the Court finds that Plaintiff sufficiently pled a municipal liability claim for the alleged Equal Protection violation under the Fourteenth Amendment. The Amended Complaint identified Chief Troche as a decisionmaker with final policymaking authority and alleged the following about said authority as Chief of Police:

> [Chief Troche] had policy making authority as to who is subjected to fitness for duty exams, who would conduct such examination(s), and whether to accept the findings and Troche made these decisions with regard to Plaintiff.

> From the time of the forward[ing] of the August 2021 email referenced above through Plaintiff's termination, Defendant Troche was aware not only of Plaintiff's intention and request but of the consistent and repeated failure of the members of the Department to abide by those requests. Defendant Troche directly and/or tacitly condoned the behavior by failing to attempt to curtail it.

> Plaintiff was informed by Lieutenant Greg Miller . . . that the decision to require a fitness for duty examination came directly from [Chief Troche].

As such, the decision to terminate Plaintiff's employment was made by, and with the approval of, those agents of City of Sarasota with final policy making and decision-making authority as it concerns termination decisions. The decision to terminate was made by the Chief of Police who had final policy and decision-making authority.

Chief Troche has final policymaking authority in the area of law enforcement and the Chief represents the City of Sarasota when acting in his law enforcement capacity.

Chief Troche was the final policymaker with respect to determining fitness for duty, and dismissal of police officers in the department.

Chief Troche has final authority to establish policy with respect to departmental determinations of fitness for duty, and reprimands including termination of police officers. There is no provision for administrative review of determinations of fitness for duty, and reprimands including termination of police officers in the City's rules and regulations.

When Chief Troche required Plaintiff to take a fitness for duty examination and concluded Plaintiff was unfit for duty based on the fitness for duty report and terminated Plaintiff, he acted as the official responsible for establishing final policy with respect to the subject matter in question.

Plaintiff was subjected to a fitness for duty examination, which resulted in a report in which all conclusions were based on assumptions due to Plaintiff's transgender status. Ultimately, Defendants finding Plaintiff unfit for duty was based on his transgender status.

Dkt. 17 ¶¶ 3, 25, 33, 65, 67, 69, 70, 71, 72. The Court finds that these allegations about Chief Troche having final authority to establish municipal policy with respect to fitness for duty examinations and termination of SPD employees are not the sort of "naked allegations" that warrant dismissal at this time. *See Hoefling*, 811 F.3d at 1281.

The City, however, contends that Chief Troche does not have "final policymaking authority over [Plaintiff's] termination, fitness for duty examination, or any other decisions" that allegedly violated Plaintiff's constitutional rights since "any such decision was subject to meaningful administrative review" by the City Manager. Dkt. 21 at 7–8. While the City is correct that "the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority," *id.* at 8 (quoting *Scala,* 116 F.3d at 1399), the rest of the quote from *Scala* holds that municipal liability can still apply if the delegation is "such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." 116 F.3d at 1399 (quoting *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989)).

As such, while the City might be correct that the City Charter only vests the City Manager with final policymaking authority, the factual allegations—accepted as true and viewed in the light most favorable to Plaintiff—suggest that Chief Troche is either a final policymaker or a subordinate who has been delegated authority (from the City) to make decisions within the SPD that are not constrained or subject to meaningful administrative review. *See* Dkt. 17 ¶ 67 ("Chief Troche has final policymaking authority in the area of law enforcement and the Chief represents the City of Sarasota when acting in his law enforcement capacity."); *id.* ¶ 68 (emphasis added) ("At all times pertinent hereto, the City of Sarasota has *delegated* to Chief

Troche final authority to determine fitness for duty, issue discipline, and discharge City of Sarasota police officers. The City *delegated* to Chief Troche authority to set policy regarding fitness for duty and discipline imposed on officers for violations of police departmental policies and procedures.").

The Court's finding, however, does not preclude the City from re-raising this argument on summary judgment if discovery reveals that the City Manager is the only final policymaker and/or Chief Troche is a subordinate whose employment decisions are subject to meaningful administrative review. *See Hill v. Clifton*, 74 F.3d 1150, 1151 (11th Cir. 1996) (affirming summary judgment in the City of Gainesville's favor when "the Police Chief was not the final policymaking authority" and finding "there is no evidence that the City Manager approved of any illegal or improper motive the Police Chief may have had"); *Gilroy v. Baldwin*, 843 F. App'x. 194, 197 (11th Cir. 2021) (affirming summary judgment in the police chief's favor since he was not the decisionmaker who could effectuate the plaintiff's termination under the City of Fort Pierce's charter, as only the person authorized by statute to terminate City employees was the City Manager).

The City's motion also argues that the police union's collective bargaining agreement outlines a three-step grievance process, in which the City Manager reviews the Chief of Police's employment decisions. Therefore, Chief Troche cannot be a final policymaker, as there is an opportunity for meaningful review of his

employment decisions. Dkt. 21 at 9; Dkt. 29 at 2–3; *see Scala*, 116 F.3d at 1401; *Holmes v. City of Fort Pierce, Fla.*, No. 20-13170, 2022 WL 247976, at *4 (11th Cir. Jan. 27, 2022) ("It is the *opportunity* for meaningful review of an official's actions that prevents the official from being a final policymaker and precludes the city from being liable for that official's decisions.").

But, construing the Amended Complaint in the light most favorable to Plaintiff, when Schanley attempted to file a grievance, the City denied Plaintiff the opportunity to use the first three steps in the grievance process, and "the relevant decision[] makers regarding the grievance ratified Chief Troche's unconstitutional motive and termination decision." Dkt. 17 ¶¶ 61, 63 ("The first three steps in the grievance process were denied by the City and the [police] Union declined to proceed to arbitration in part due to its belief that a resignation and/or layoff was not subject to the grievance procedures of the [collective bargaining agreement]."). Accepting these factual allegations as true, there was no opportunity for meaningful review of Chief Troche's termination decision because final policymakers within the City barred Plaintiff's opportunity to participate in the grievance process. Contrary to the City's arguments, this is not a case where Plaintiff failed to take advantage of a review process available to the employee or failed to request review in a timely manner. *See Holmes*, 2022 WL 247976, at *4 (citations omitted) ("A decision is still subject to review even if individuals must file an appeal to have the decision

reviewed, and even if review was available but not performed."); *Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1277 (11th Cir. 2000) (holding that review was available and the decisionmaker was not a final policymaker even though the plaintiff was denied review for not pursuing it in the required timely fashion).

Further, Plaintiff's allegation of "ratification" of a subordinate's unconstitutional decision is sufficient to establish municipal liability. *See Hoefling*, 811 F.3d at 1279 (citation modified) ("And a municipality can be held liable on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority."). Nor does Plaintiff's failure to identify the "relevant decision[] makers" who ratified Chief Troche's actions require dismissal under Rule 12(b)(6). Dkt. 17 ¶ 63; *see Hoefling*, 811 F.3d at 1280 (citations omitted) ("Although [the plaintiff] may ultimately have to identify (and provide proof concerning) a single final policymaker in order to survive summary judgment or prevail at trial, we do not think that he had to name that person in his complaint in order to survive a Rule 12(b)(6) motion.").

Thus, Plaintiff's allegations are sufficient to state a facially plausible municipal liability claim because they permit "the reasonable inference that [the City] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The City's partial motion to dismiss Counts V–VI is denied.

### b.  First Amendment Retaliation Claim—Count VII

The "First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Lindke v. Freed*, 601 U.S. 187, 196–97 (2024) (citation modified). "[T]he law is well-established that the state may not demote or discharge a public employee in retaliation for" exercising his or her First Amendment rights. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). When bringing a First Amendment claim for retaliation, courts apply a "four-stage analysis." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015).

To satisfy the first stage, a public employee must speak both as a private citizen *and* on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 419–20 (2006); *see also Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286, 1289–90 (11th Cir. 2025) ("At step one, the employee must show that in expressing herself she is (or was) speaking both (a) as a citizen—rather than in her capacity as a government employee—(b) about a matter of public—rather than private—concern."). If these threshold requirements are not satisfied, there is no First Amendment protection. *Alves v. Bd. of Regents of Univ. Sys. of Ga.*, 804 F.3d 1149, 1160 (11th Cir. 2015). But if "the employee spoke as a citizen and on a matter of public concern, 'the possibility of a First Amendment claim arises,' and the inquiry becomes one of balance" under the *Pickering* test. *Id.* (citing *Garcetti*, 547 U.S. at 418); *see*

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Under *Pickering*, 391 U.S. at 568, a court weighs a plaintiff's First Amendment interests against the employer's interest in regulating employee speech. *See Wood*, 142 F.4th at 1290; *Lane v. Franks*, 573 U.S. 228, 242 (2014). These first two stages "are questions of law that are decided by the court." *Moss*, 782 F.3d at 618.

The third stage requires a plaintiff to demonstrate that their speech played a substantial role in the termination. *Id.* Finally, if the plaintiff makes this showing, the burden shifts to the employer to provide an alternative reason for the termination. *Id.* Because these final two stages "are questions of fact, a jury resolves them unless the evidence is undisputed." *Id.*

As an initial matter, "before [the Court] can decide whether [Schanley] spoke as a private citizen or a government employee, [the Court] must first identify exactly what speech [this] suit covers." *Wood*, 142 F.4th at 1290. The City argues that Plaintiff has only articulated two instances of speech: "his August 23, 2022 email to Captain Armstrong and his expression of his gender identity." Dkt. 21 at 10 (citing Dkt. 17 ¶¶ 29, 119–25). Plaintiff responds, arguing that the City "narrowly reads the Amended Complaint" and that "the Amended Complaint is replete with other instances where Plaintiff engaged in protected First Amendment speech." Dkt. 25 at 15. For example, Schanley points to the email on August 20, 2021, in which a request was made to be called "Eli" with male-related pronouns; the decision to openly

present as a (transgender) male at work; and the name change request on October 11, 2021. *Id.* (citing Dkt. 17 ¶¶ 24–27, 29–31, 119–31). Viewing the facts in the light most favorable to Plaintiff, the Court finds there are four instances of speech: (1) the email on August 20, 2021, about coming out as transgender; (2) the October 11, 2021, request to change names; (3) the email on August 23, 2022, to Captain Armstrong; and (4) Plaintiff's off-site discussion with Lt. King about misgendering issues. *See* Dkt. 17 ¶¶ 24–31.

The Court, however, does not find that Schanley openly presenting as a transgender male at work counts as an instance of speech. *See* Dkt. 17 ¶¶ 21, 24, 26. As to whether dress or physical expression can be a matter of public concern, the Supreme Court has repeatedly found that such conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Texas v. Johnson*, 491 U.S. 397, 404–05 (1989) (recognizing expressive conduct in students wearing black armbands to protest American military involvement in Vietnam, sit-ins at "whites only" lunch counters to protest segregation, "wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam," altering the American flag, and refusing to salute the flag). As pled, Plaintiff's expression of gender identity does not fall within the ambit of First Amendment protection.

"[T]he Supreme Court [has] formulated a two-part inquiry to determine whether conduct is sufficiently expressive under the First Amendment: (1) whether '[a]n intent to convey a particularized message was present;' and (2) whether 'in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'" *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974)). The second prong asks "whether the reasonable person would interpret [the expressive conduct] as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004). Further, a court should focus on "the perspective of those who view the expressive conduct." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1337 (11th Cir. 2021) (citation modified). "Expressive conduct has a 'communicative' element, but only insofar as it, 'in context, would reasonably be understood by the viewer to be communicative.'" *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984)).

As pled, the Court finds Plaintiff has failed to sufficiently allege that simply presenting as a transgender male at work is expressive conduct under the First Amendment. While Plaintiff satisfies the first prong by alleging the "decision to begin presenting as a male was intended to communicate a message of public concern about his gender identity and gender expression and about the rights of

transgender individuals," Dkt. 17 ¶ 119, Plaintiff fails on the second prong. The allegations do not show that a reasonable person observing Plaintiff—openly presenting as a transgender police officer in uniform—would interpret this physical appearance as an attempt to convey some message. The vagueness of Plaintiff's allegations only bolsters this finding, as the Amended Complaint ambiguously states that Plaintiff "no longer conformed to gender stereotypes," Plaintiff's "appearance did not reflect that Plaintiff was female," and Plaintiff "beg[an] presenting as a male at work." Dkt. 17 ¶¶ 21, 26, 119. Schanley's sole description that "Plaintiff kept his hair short," *id.* ¶ 26, is hardly sufficient, as there are so many more probable explanations for a person's decision to have short hair that have nothing to do with conveying any message. *Cf. Zinman v. Nova Se. Univ., Inc.*, No. 21-13476, 2023 WL 2669904, at *5 (11th Cir. Mar. 29, 2023) ("There are so many more probable explanations for a person's decision to go unmasked that have nothing to do with conveying any sort of message—political, religious, or otherwise.").

However, Plaintiff contends a change in "[h]is attire may be understood as an expression of his change in gender identity[,] . . . [and] Plaintiff's expression of a male identity through masculine dress and appearance, was expressive of his gender to the public at large." Dkt. 17 ¶ 123. Again, while the Court accepts as true that Plaintiff changed appearance after transitioning, the Amended Complaint lacks specificity about *how* that change conveyed a message. Without any specific factual

allegations of what Plaintiff's appearance looks like, the Court cannot find that simply presenting as one's preferred gender identity at work automatically qualifies as expressive conduct.

Plaintiff does not cite, nor can the Court find, any binding authority within the Eleventh Circuit that holds an expression of one's gender identity in the workplace can be considered expressive speech on a matter of public concern when bringing a First Amendment retaliation claim. To the contrary, there is at least one district court case in the Eleventh Circuit that suggests otherwise. *See Corporan v. Williams*, No. 717CV124WLSTQL, 2018 WL 10162386, at *5 (M.D. Ga. May 25, 2018) ("To the extent Plaintiff seeks redress under the First Amendment because she has been prevented from expressing her gender freely . . . there does [not] appear to be any authority for such a claim."); *cf. Adkins v. City of N.Y.*, 143 F. Supp. 3d 134, 138 (S.D.N.Y. 2015) ("To the extent that plaintiff's First Amendment claim is based on his somehow stymied gender expression, it must also be dismissed: plaintiff cites no authority for this kludging together of anti-discrimination and First Amendment law.").

Finally, Plaintiff's conclusory statement, asserting that Plaintiff's outward appearance "relates to matters of political, social, or other concern to the community because it reflected the public manifestation of his gender expression and because it sends a message about the rights of transgender individuals," Dkt. 17 ¶ 120, is a

"formulaic recitation" of an element in the First Amendment retaliation claim, which "will not do." *Twombly*, 550 U.S. at 555. The Court finds that the "speech" asserted by the Amended Complaint as to how Plaintiff presented physically is insufficiently expressive to be considered speech under the First Amendment.

### i. Government Employee or Private Citizen

Having identified the four instances of alleged speech at issue, the Court turns to the question of whether Schanley spoke as a private citizen or, instead, as a government employee. Under *Garcetti,* "[t]he central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss,* 782 F.3d at 618 (quoting *Garcetti,* 547 U.S. at 421). The Eleventh Circuit has identified several non-dispositive factors to consider when deciding whether speech occurs "pursuant to [an official's] duties: (1) speaking with the objective of advancing official duties; (2) harnessing workplace resources; (3) projecting official authority; (4) heeding official directives; and (5) observing formal workplace hierarchies." *Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 898 F.3d 1324, 1332 (11th Cir. 2018) (citations omitted). Importantly, the Supreme Court emphasized that the "controlling factor" is whether the employee's statements or expressions were made "pursuant to [his] official duties." *Garcetti,* 547 U.S. at 421. In other words, "[t]he critical question under *Garcetti* is whether the speech at issue

is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240.

Here, the Court finds that the October 11, 2021, request to change Plaintiff's name at work is not protected because Plaintiff was speaking as a public employee, not a private citizen. Plaintiff's decision to file a formal request to change names in the workplace was undoubtedly "pursuant to [Plaintiff's] official duties." *Garcetti*, 547 U.S. at 421. Stated differently, submitting a formal request to change the name the SPD uses is ordinarily within the scope of Plaintiff's duties as an employee. Moreover, applying the other non-dispositive factors, the SPD's requirement that Plaintiff submit a form to change names necessitated the use of workplace resources, adherence to official directives on how to change names, and compliance with workplace hierarchies by filing the request up the chain of command. *See Fernandez*, 898 F.3d at 1332. Thus, the Court finds that Plaintiff's request to change Plaintiff's name at work is unprotected government employee speech.[4]

However, when viewing the facts in the light most favorable to Schanley at this stage, the Court finds that the email on August 20, 2021, the email to Captain Armstrong on August 23, 2022, and Plaintiff's off-site discussion with Lt. King are

---

[4] Additionally, Plaintiff's failure to legally change names also cuts against a finding that requesting a name change is protected speech. *See Lovejoy v. Minnesota Dep't of Hum. Servs.*, No. 16-CV-2468 (JRT/LIB), 2017 WL 462015, at *8 (D. Minn. Jan. 3, 2017), *report and recommendation adopted*, 2017 WL 455933 (D. Minn. Feb. 2, 2017) (holding that a transgender plaintiff's act of signing her preferred name on an inmate form was not protected speech because she had not legally changed her birth name); *Brown v. Kroll*, No. 8:17cv294, 2017 WL 4535923, at *8 (D. Neb. Oct. 10, 2017) (permitting First Amendment retaliation claim to proceed since the transgender plaintiff legally changed her name).

all instances of speech that are not ordinarily within the scope of Plaintiff's duties as an SPD officer. Based on the Amended Complaint, the Court cannot find, nor does the City even argue, that these instances of speech owe their "existence" to Plaintiff's "professional responsibilities" as a police officer or that the SPD has "commissioned or created" the speech at issue. *Garcetti*, 547 U.S. at 421–22. Additionally, of the five non-dispositive factors outlined by the Eleventh Circuit, only one—observing workplace hierarchies by emailing and complaining to supervisors—weighs in favor of finding that the Plaintiff was speaking as a public employee.

To be clear, the Eleventh Circuit has found that "reporting conduct that interfered with . . . ordinary job duties" can mean a plaintiff is speaking as an employee if the reporting is done "pursuant to those duties." *Alves*, 804 F.3d at 1165 (finding that "[i]mplicit in Appellants' duty to perform their roles as psychologists, committee members, supervisors, and coordinators is the duty to inform . . . [regarding] the barriers to Appellants' performance."); *see also King v. Bd. of Cnty. Comm'rs*, 916 F.3d 1339, 1349 (11th Cir. 2019) (holding that a medical examiner's internal complaints were "that of an employee protecting the scope of her job responsibilities" and were motivated by "frustration at work, not fear for public safety"). But Plaintiff's two emails and off-site discussion with Lt. King were not done pursuant to Plaintiff's duties as an SPD officer. Indeed, nothing in the Amended Complaint suggests that Plaintiff had a duty to inform supervisors about

28

misgendering, nor is there any indication that being misgendered interfered with Plaintiff's job performance as a law enforcement officer. At most, Plaintiff only alleges that the intentional refusal by co-workers "to use his preferred name and pronouns" was taken "as a sign of disrespect." Dkt. 17 ¶ 31. Accordingly, viewing the allegations in the light most favorable to Schanley, the Amended Complaint sufficiently alleges that Plaintiff was (at times) plausibly speaking as a private citizen, not as a public employee.

ii.    Matter of Public Concern

Next, for Schanley's emails and misgendering complaints to qualify for First Amendment protection, they must also have been made on a matter of public concern. Public concern is a broad category, including "any matter of political, social, or other concern to the community," *Connick v. Meyers,* 461 U.S. 138, 146 (1983), as opposed to "matters of only personal interest," *Alves*, 804 F.3d at 1163. "If the 'main thrust' of a public employee's speech is on a matter of public concern, the speech is protected." *Id.* at 1162 (citing *Morgan v. Ford*, 6 F.3d 750, 754–55 (11th Cir. 1993)).

"Absent extraordinary circumstances, however, First Amendment protection remains unavailable when 'a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest.'" *Morgan*, 6 F.3d at 754 (quoting *Connick,* 461 U.S. at 147). "A court must

therefore discern the purpose of the employee's speech—that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee." *Id.* (citations omitted). "To accomplish this, a court considers 'the content, form and context of a given statement, as revealed by the whole record.'" *Id.* (quoting *Deremo v. Watkins,* 939 F.2d 908, 910 (11th Cir. 1991)). "[W]hether the speech at issue was communicated to the public or privately to an individual is relevant—but not dispositive." *Alves*, 804 F.3d at 1162.

In this case, the Eleventh Circuit's decision in *Morgan* is instructive. In *Morgan*, the plaintiff was a State Department of Corrections employee who claimed that she had been retaliated against for complaining about sexual harassment by her supervisor. 6 F.3d at 751. During a meeting with the Department Superintendent, the plaintiff reported the supervisor's behavior toward her and another coworker. *Id.* at 752. The plaintiff subsequently filed sexual harassment charges against her supervisor, first with the Department's Internal Affairs Division, and then with the State Office of Fair Employment Practices. *Id.* at 752–53. The plaintiff argued that sexual harassment complaints constituted speech on a matter of public concern because they related to "a matter of vital social interest." *Id.* at 754.

While the court in *Morgan* agreed that workplace sexual harassment is a matter of important social interest, the court explained that "the mere fact that the

topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." *Id.* at 754 (citing *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988)). Instead, the *Morgan* Court observed that the plaintiff's speech focused mainly on internal complaints about her supervisor's behavior and its effect on her work, which did not in any way draw "the public at large or its concerns into the picture," and "was driven by her own entirely rational self-interest in improving the conditions of her employment." *Id.* at 755. Thus, "the main thrust of [the plaintiff's] speech took the form of a private employee grievance," which "was not a matter of public concern." *Id.*

Here, Plaintiff asserts that "[t]he rights of transgender individuals . . . is a matter of political and social concern to the community." Dkt. 17 ¶ 20. However, as the Eleventh Circuit found in *Morgan*, "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." 6 F.3d at 754. Instead, this Court must "determine whether the purpose of [Schanley's] speech was to raise issues of public concern, on the one hand, or to further [Schanley's] own private interest, on the other." *Id.* (citation omitted). The Court finds that Plaintiff's email on August 20, 2021, about coming out as transgender, the email to Captain Armstrong on August 23, 2022, and Plaintiff's off-site discussion with Lt. King, are all instances where Plaintiff's goal was to further Plaintiff's own private interest of not being misgendered.

Even when construing the Amended Complaint in the light most favorable to Schanley, the allegations largely focused on how co-workers treated Plaintiff and how that conduct affected Plaintiff—i.e., being misgendered on a daily basis was taken as "a sign of disrespect." Dkt. 17 ¶ 31. As in *Morgan*, "[t]he speech that [Schanley] cites is in the form of complaints" to supervisors (i.e., Captain Armstrong and Lt. King), Plaintiff "did not relate . . . concerns about [misgendering] to the public," and Plaintiff did not "attempt to involve the public in any manner." 6 F.3d at 755. As such, Schanley's emails and complaints about being misgendered are not matters of public concern since these instances of speech "in no way dr[ew] the public at large or its concerns into the picture." *Pearson v. Macon Bibb Cnty. Hosp. Auth.*, 952 F.2d 1274, 1279 (11th Cir. 1992).

Even after liberally construing the factual allegations in Plaintiff's favor, Schanley's decision to come out as transgender and complaints about being misgendered were clearly "driven by . . . entirely rational self-interest in improving the conditions of . . . employment" by ensuring co-workers addressed Plaintiff by the preferred name and pronouns. *Morgan*, 6 F.3d at 755; *see* Dkt. 17 ¶¶ 24, 28–31. Because the "main thrust" of Plaintiff's speech is an employee grievance about being misgendered at work, the Court finds the alleged instances of speech are not a matter of public concern. *See Morgan*, 6 F.3d at 755 ("As an employee grievance, [the plaintiff's] speech was not a matter of public concern."); *Kalchbrenner v. City of*

*Bradenton*, No. 8:24-CV-866-MSS-AAS, 2025 WL 436766, at *7 (M.D. Fla. Feb. 7, 2025) (finding that "the allegations show Plaintiff sought to lodge a complaint against her coworkers with their employer's human relations department," which is not protected speech). The Court grants the City's motion to dismiss Count VII with prejudice.

### c. *Due Process Claims- Counts VIII and IX*

The Due Process Clause of the Fourteenth Amendment guarantees citizens that no State shall deprive them of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause has been interpreted to provide two distinct guarantees: substantive due process and procedural due process. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Plaintiff's Amended Complaint argues that both types of due process violations have occurred. *See* Dkt. 17 ¶¶ 132–41. Under either type of due process claim, Counts VIII and IX are due to be dismissed with prejudice.

### i. Substantive Due Process Claim—Count VIII

Beginning with Plaintiff's substantive due process claim, Schanley alleges that the City "interfered with Plaintiff's ability to define and express his gender identity and penalized Plaintiff for exercising his fundamental right to do so openly" by "depriving him of employment and career opportunities." Dkt. 17 ¶ 136, 138. The Court construes the Amended Complaint to be alleging two separate (substantive)

due process violations: (1) depriving Plaintiff of employment and career opportunities and (2) interfering with Plaintiff's ability to define and express gender identity. The Court will address each one in turn.

Substantive due process protects rights that "are fundamental, that is, rights that are implicit in the concept of ordered liberty." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (citation modified). The Constitution creates substantive due process rights, and "no amount of process can justify [their] infringement." *Id.* at 1557. When examining a substantive due process violation, a court must first identify the asserted right and then determine whether that right is fundamental. *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005). Fundamental rights include "most—but not all—of the rights enumerated in the Bill of Rights" and certain unenumerated rights. *McKinney*, 20 F.3d at 1556.

Here, regarding the first alleged substantive due process violation, the Court readily finds that Plaintiff does not have a fundamental right to employment and career opportunities. The Eleventh Circuit has long held "that employment rights are state-created and thus not 'fundamental,' so they do not enjoy substantive due process protection." *Sprauer v. Town of Jupiter*, 331 F. App'x 650, 652 (11th Cir. 2009) (citing *McKinney*, 20 F.3d at 1560 ("Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection.")); *Lewis v. Brown*, 409 F.3d 1271,

1272–73 (11th Cir. 2005) (citation modified) ("In particular, areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because substantive due process rights are created only by the Constitution.").

Plaintiff's second substantive due process violation—interference with Plaintiff's ability to define and express a gender identity—fares no better. Plaintiff argues that the Amended Complaint sufficiently stated a substantive due process claim since Plaintiff was "'penalize[ed] . . . for exercising his fundamental right' to express his gender identity openly." Dkt. 25 at 17 (citing Dkt. 17 ¶¶ 24–30, 39–49, 57–59, 65–72, 134–38). Notably absent, however, is any binding authority within the Eleventh Circuit for such a proposition. *See id.* To the extent that Plaintiff is arguing that expression of a preferred gender identity is a fundamental right, such a claim may fall under the First Amendment, not the (substantive) Due Process Clause of the Fourteenth Amendment. *See Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) (finding that the First Amendment already protects the plaintiff's right to be free from retaliation when exercising the right to speak; therefore, "the Due Process Clause cannot be used to supplement that substantive right"); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (citation modified) ("Where a particular Amendment provides an explicit textual source of constitutional

protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.").

Therefore, a substantive due process claim for an alleged violation of one's freedom of expression is not appropriate since Plaintiff is already bringing a First Amendment retaliation claim in Count VII. Because Plaintiff has failed to allege a constitutionally protected right at stake, Plaintiff has not stated a plausible claim for relief under § 1983. The Court grants the City's motion to dismiss Count VIII with prejudice.

### ii. Procedural Due Process Claim—Count IX

As to Plaintiff's procedural due process claim in Count IX, these rights "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Morley's Auto Body, Inc. v. Hunter*, 70 F.3d 1209, 1213 (11th Cir. 1996) (citation omitted). These rights may be rescinded "so long as the elements of procedural—not substantive—due process are observed." *McKinney*, 20 F.3d at 1556. In other words, procedural due process guarantees fair procedure and "requires notice and an opportunity to be heard before any governmental deprivation of a [constitutionally-protected] interest." *Zipperer v. City of Fort Myers*, 41 F.3d 619, 623 (11th Cir. 1995). "[O]nly when the state refuses to provide a process sufficient to remedy the procedural deprivation does a

constitutional violation actionable under section 1983 arise." *McKinney*, 20 F.3d at 1557; *see also Cotton v. Jackson*, 216 F.3d 1328, 1330–31 (11th Cir. 2000).

"[A section] 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)). Under the first element, "[p]roperty interests stem not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts." *Arrington v. Helms*, 438 F.3d 1336, 1348 (11th Cir. 2006) (citation omitted). "Whether these sources create a property interest must be decided by reference to state law." *Id.* Plaintiff's two alleged procedural due process violations fail to pass the first element. *See* Dkt. 17 ¶¶ 140, 141.

As an initial matter, in the Amended Complaint, Plaintiff confusingly alleges that the "City's decision to require Plaintiff to take a [FFDE], finding Plaintiff unfit for duty based on a blatantly discriminatory fitness for duty report, [and] denying Plaintiff the ability to submit a second opinion" are all instances where the City "penalize[d] Plaintiff for exercising his *fundamental right* to define and express his gender identity openly by depriving him of employment and career opportunities in violation of Plaintiff's *substantive due process rights*" under the Fourteenth Amendment. Dkt. 17 ¶ 140 (emphasis added). In other words, Plaintiff seems to be

repeating the same allegations made in the substantive due process claim in Count VIII, which (for the above reasons) the Court dismisses for failure to state a claim.

Regardless, an employee must demonstrate a property interest in their job to state a procedural due process claim. *See Silva v. Bieluch*, 351 F.3d 1045, 1047–48 (11th Cir. 2003). "Under Florida law, an 'at will' employee—that is, one whose employment is not subject to a contract, statute, or other set of rules giving rise to an expectation of continued employment—does not have a protected property interest in his employment." *Hollis v. W. Acad. Charter, Inc.*, 782 F. App'x 951, 957 (11th Cir. 2019) (citing *Lee Cnty. Port Auth. v. Wright*, 653 So. 2d 1104, 1105 (Fla. 2d DCA 1995)).

Here, the Amended Complaint does not identify a statute, ordinance, or contract that provided Plaintiff with anything more than an "at-will" relationship with the City. *See id.* (affirming dismissal when the plaintiff failed to show "he had a protected property interest in his continued employment") (citing *Silva*, 351 F.3d at 1047–48 (finding the plaintiff officers had "no property interest in their rank as lieutenants")). Thus, Plaintiff has failed to demonstrate a property interest in continued employment with the SPD.

As for Plaintiff's second allegation that the "City's action of terminating Plaintiff's health insurance prematurely interfere[s] with Plaintiff's ability to define and express his gender identity," Dkt. 17 ¶ 141, Plaintiff again fails to state a claim

upon which relief can be granted. Plaintiff does not cite or allege any statute, regulation, ordinance, or contract that confers a constitutionally protected property interest in receiving gender change surgery. At most, Plaintiff cites only the termination letter, which stated that certain health benefits would continue until May 31, 2023, *id.* ¶ 77, but there are no factual allegations suggesting that the termination letter constitutes a legally binding contract between the City and Plaintiff. Even if there was a constitutionally protected property interest in Plaintiff's health insurance after termination, Plaintiff fails on the third element, as there are no factual allegations showing that the City "refuse[d] to provide a process sufficient to remedy the procedural deprivation." *See McKinney*, 20 F.3d at 1557. Because Plaintiff fails to state a procedural due process claim, Count IX is due to be dismissed with prejudice.

### d. Disability Discrimination Claims—Counts X and XI

Turning to Counts X and XI, the City argues that Schanley has failed to exhaust administrative remedies for the ADA and FCRA claims.[5] Dkt. 21 at 18. The Court agrees.

"An employee making a discrimination claim under the ADA must first exhaust her administrative remedies by filing a Charge of Discrimination with the

---

[5] "[D]isability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims." *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007) (citation omitted).

EEOC." *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) (citing *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001)). The purpose of the exhaustion requirement is to allow the EEOC the "first opportunity to investigate the alleged discriminatory practices [and] perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory v. Ga. Dept. of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (internal quotation marks omitted) (explaining exhaustion in the Title VII context). As such, the Eleventh Circuit "has noted that judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate." *Id.* at 1279–80 (citation modified).

However, the Eleventh Circuit has also noted courts should be "extremely reluctant to allow procedural technicalities to bar claims brought under [discrimination statutes]." *Id.* at 1280 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460–61 (5th Cir. 1970)). To that end, "the scope of an EEOC complaint should not be strictly interpreted." *Id.* (quoting *Sanchez*, 431 F.2d at 465). To determine whether a plaintiff has exhausted administrative remedies, the "proper inquiry" is whether the plaintiff's complaint is "like or related to, or grew out of, the allegations contained in [the] EEOC charge." *Id.* at 1280.[6]

---

[6] The exhaustion of administrative remedies also applies to Plaintiff's FCRA claim. *See Rainey v. United Parcel Serv.*, Inc., 816 F. App'x 397, 401 (11th Cir. 2020) (citing Fla. Stat. § 760.11(1), (4), (8)) ("As a prerequisite to bringing an employment discrimination claim under the FCRA, an employee must file a complaint with the Florida Commission on Human Relations or the EEOC within 365 days of the alleged FCRA violation.").

Here, the facts alleged in Plaintiff's EEOC charge[7] could not have reasonably been extended to encompass a claim for ADA discrimination because they neither related to nor grew out of the complaints of sex and gender discrimination. While Plaintiff checked the "disability" box in the EEOC complaint, *see* Dkt. 21-1 at 1, the rest of the allegation and the attached addendum do not refer to any actual or perceived disability, *id.* at 2–5. Specifically, the EEOC charge only states the following: Plaintiff informed superiors that Plaintiff was transgender, *id.* ¶ 2; that Plaintiff was the second transgendered employee for the City, *id.* ¶ 3; that Plaintiff was misgendered and complained to supervisors about this issue, *id.* ¶ 4; that Plaintiff was subjected to discrimination based on gender and sex following the FFDE and subsequent termination, *id.* ¶¶ 5–16; and that Plaintiff was retaliated against for reporting sex-based harassment, *id.* ¶ 17. However, nowhere in the EEOC charge does Plaintiff mention a diagnosis of gender dysphoria, that Plaintiff was a "qualified individual," or that the City regarded Plaintiff as disabled. The fact that the Amended Complaint provides additional allegations about Plaintiff's diagnosis for gender dysphoria—which are notably absent from the EEOC charge—does not

---

[7] Generally, a court considers only the four corners of the complaint and the exhibits attached to the complaint when resolving a motion to dismiss. *See Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023). However, "a document outside the four corners of the complaint may . . . be considered" as incorporated by reference if the document "is central to the plaintiff's claims and is undisputed in terms of authenticity," regardless of whether it is "mentioned in" or "attached to" the complaint. *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005); *see Johnson v. City of Atl.*, 107 F.4th 1292, 1299–1300 (11th Cir. 2024). Here, the Court considers Plaintiff's EEOC charge, Dkt. 21-1, under the incorporation by reference doctrine, as the document is central to Plaintiff's Title VII and ADA claims, and its authenticity is undisputed. *See* Dkt. 17 ¶ 7; Dkt. 25 at 19.

save the ADA and FCRA claims from dismissal. *Compare* Dkt. 17 ¶¶ 9–20 *with* Dkt.

21-1 at 1–5; *see Little v. CSRA, Inc.*, 834 F. App'x 495, 498 (11th Cir. 2020)

("Although we can let judicial claims 'clarify' an EEOC charge, . . . [the plaintiff's]

allegations cannot clarify what is not in her EEOC charge.").

Put simply, there was no mention of (actual or perceived) disability

discrimination, nor could a disability discrimination claim "be expected to grow"

out of Plaintiff's sex and gender discrimination charge, even on a broad reading of

the EEOC complaint. *Penaloza v. Target Corp.*, 549 F. App'x 844, 848 (11th Cir.

2013) (finding the plaintiff failed to exhaust administrative remedies since a

disability discrimination claim could not be expected to grow out of the plaintiff's

sex and pregnancy discrimination charge). Thus, the Court dismisses without

prejudice Counts X and XI for failure to exhaust administrative remedies.

### e. Title VII Retaliation Claims—Counts XII–XIII

The City also moves to dismiss the Title VII and FCRA retaliation counts for

failure to state a claim.[8] Dkt. 21 at 22. Specifically, the City argues that the Amended

Complaint fails to plausibly allege that Plaintiff engaged in protected activity and

did not sufficiently establish a causal connection. *Id.* at 22–25. The Court disagrees.

---

[8] The FCRA is modeled after Title VII, so claims brought under both statutes are analyzed under the same framework. *See Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998). Accordingly, Plaintiff's state-law claims do not require a separate discussion because the outcome is the same under federal law. *See Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010).

To establish a *prima facie* case under Title VII for retaliation, a plaintiff is required to show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal relation between the protected activity and the adverse action. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).

As to the first element, "an employee has engaged in protected activity if she has: (1) opposed an unlawful employment practice, [the 'opposition clause'], or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII's retaliation provision, [the 'participation clause']." *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 776–77 (11th Cir. 2014) (quoting *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)). To establish a statutorily protected expression under the opposition clause, a "plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). "Even so, the plaintiff is not required to prove that the discriminatory conduct complained of was actually unlawful. The conduct opposed need only be close enough to support

an objectively reasonable belief that it is." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citation modified).

The reasonableness of a plaintiff's belief that the employer "engaged in an unlawful employment practice must be measured against existing substantive law." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (citation omitted). The Eleventh Circuit has already found that "[s]tatutorily protected expression includes internal complaints of discrimination to superiors," *Gerard v. Bd. of Regents of State of Ga.*, 324 F. App'x 818, 825 (11th Cir. 2009) (citing *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001)), and that "informal complaints can constitute protected activity." *Tebo v. City of DeBary*, 784 F. App'x 727, 731 (11th Cir. 2019) (citing *Rollins v. State of Fla. Dep't of L. Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989)); *see also Bolton v. Baldwin Cnty. Pub. Sch.*, 627 F. App'x 800, 803 (11th Cir. 2015) (citing *Rollins*, 868 F.2d at 400) ("Protected activities include the filing of a formal complaint, the voicing informally of a complaint to superiors, or the use of an employer's internal grievance procedure to report alleged discrimination.").

Concerning the causation element, a plaintiff must allege that the "protected activity was a but-for cause" of his or her termination. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1338 (11th Cir. 2023) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360 (2013) ("Title VII retaliation claims must be proved

according to traditional principles of but-for causation.")). In other words, "a plaintiff must prove that had she not complained, she would not have been fired." *Jefferson*, 891 F.3d at 924. "The burden of causation can [also] be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). However, "mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Here, beginning with elements one and two, the Amended Complaint sufficiently alleged that Plaintiff engaged in protected activity and suffered an adverse employment action. Accepting the factual allegations as true, the Amended Complaint states that Plaintiff "participated in the City's anti-harassment program and internal complaint process[,] . . . object[ed] to misgendering in person and by a meeting in August 2022[,] . . . and in mid-April 2023, shortly before his termination on April 24, 2023, Plaintiff met with management to object to the FFDE report." Dkt. 25 at 20; *see* Dkt. 17 ¶¶ 28–29, 50–52, 57, 162–165; *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) ("It is undisputed that [the plaintiff] has met the first two elements of his *prima facie* case of retaliatory discrimination, i.e., that he engaged in statutorily protected conduct (reporting alleged race discrimination) and suffered an adverse employment action (termination)."). Construing the facts in the light most favorable to Plaintiff, the Amended Complaint also sufficiently alleges

that Schanley not only subjectively believed that this conduct opposed gender and sex discrimination, but also that this belief was objectively reasonable, as Plaintiff had specifically made internal complaints to supervisors that identified the discriminatory conduct. *See* Dkt. 17 ¶¶ 28–29, 50–52, 57, 75–76, 162–165.

As to the causation element, at this stage of the proceeding, the Court also finds that the Amended Complaint alleged a causal relationship between the protected activity and the adverse action. While the protected activity in August 2022 is likely too attenuated to show causation, Plaintiff also asserts the City fired Plaintiff six days after the complaint about the inaccuracies in Peters' FFDE report. *Id.* ¶¶ 50–52, 57. The six days between the complaint (the statutorily protected activity) and the termination (the adverse employment action) sufficiently show a "close temporal proximity." *See Thomas*, 506 F.3d at 1364. Accordingly, Plaintiff has adequately stated a claim for retaliation under Title VII. The Court denies the City's motion to dismiss Counts XII–XIII.

In sum, the Court grants the City's motion to dismiss the First Amendment retaliation claim under § 1983 (Count VII); the Fourteenth Amendment due process claims under § 1983 (Counts VIII–IX); and the disability discrimination claims under the ADA and FCRA (Counts X–XI). However, the Court denies City's request to dismiss the gender discrimination claims (in violation of the Equal Protection

Clause of the Fourteenth Amendment) under § 1983 (Counts V–VI) and the retaliation claims under Title VII and the FCRA (Counts XII–XIII).

## II.    Section 1983 Claims against Defendant Troche

Turning to Defendant Troche's motion to dismiss, Chief Troche seeks to dismiss the following counts against him in his individual capacity: the gender discrimination claims in violation of the Equal Protection Clause of the Fourteenth Amendment under § 1983 (Counts XIV–XV); the Fourteenth Amendment substantive due process claim under § 1983 (Count XVI); and the First Amendment retaliation claim under § 1983 (Count XVII). *See* Dkt. 22; Dkt. 17 ¶¶ 167–216. Specifically, Chief Troche argues that all the counts must be dismissed "because (1) Plaintiff fails to state a § 1983 claim against Chief Troche in his individual capacity, and (2) Chief Troche is entitled to qualified immunity." Dkt. 22 at 2. Because much of the discussion on each count mirrors the Court's prior analysis in the counts against the City, the Court will incorporate and reference that analysis when relevant.

The qualified immunity defense shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982); *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012). "[E]ntitlement to qualified immunity is for the court to decide as a matter of law." *Simmons v.*

*Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018).[9] The Court accepts "the facts alleged in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). "Once an officer has raised the defense of qualified immunity, the burden of persuasion on that issue is on the plaintiff." *Id.*

To receive qualified immunity, an official must first "establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Robinson v. Sauls*, 46 F.4th 1332, 1340 (11th Cir. 2022) (citation modified). Once this showing is made, the burden shifts to the plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* at 1340–41 (quoting *Holloman*, 370 F.3d at 1264).

As an initial matter, there is no dispute that Defendant Troche was acting within the scope of his discretionary authority as the Chief of Police of the SPD. Dkt. 17 ¶ 3. Indeed, accepting the facts alleged in the Amended Complaint as true, Chief Troche had been "performing a function that, but for the alleged constitutional infirmity, would have fallen with[in] his legitimate job description" with the SPD to manage personnel and determine an officer's fitness for duty. *Holloman*, 370 F.3d

---

[9] Additionally, "[a]s an immunity from suit, qualified immunity is *not* . . . 'more appropriately resolved at the summary judgment sta[g]e or later in the proceedings.' To the contrary, [Eleventh Circuit] precedents mandate its resolution 'at the earliest possible stage in litigation.'" *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1334 (11th Cir. 2025) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994)).

at 1266 (emphasis omitted). As such, Plaintiff has the burden to show that Chief Troche violated a constitutional right and that this right was clearly established at the time of the alleged violation.

### a. Gender Discrimination Claim under § 1983—Counts XIV–XV

Similar to the City's argument that *municipal* liability does not apply under § 1983, Chief Troche solely argues that *individual* liability under § 1983 is not sufficiently alleged in the Amended Complaint. Dkt. 22 at 4. As such, to resolve the instant motion to dismiss, the Court only focuses on the individual liability element under § 1983 and does not address whether Plaintiff has alleged the underlying elements of a gender discrimination claim.

For individual liability to attach under 42 U.S.C. § 1983, the alleged actor must have the power to make decisions. *See Quinn*, 330 F.3d at 1326 ("The 'decisionmaker' inquiry addresses who has the power to make official decisions and, thus, be held *individually* liable."). In the employment termination context, an official decisionmaker is someone who has the power to "immediately effectuate" termination, "not merely to recommend" it. *Id.* at 1328. "At times, a discharge recommendation by a party without actual power to discharge an employee may be actionable," but only if the recommendation "directly resulted in the employee's discharge." *Gilroy*, 843 F. App'x at 196 (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999)).

Here, Plaintiff's allegations (accepted as true) sufficiently show that Chief Troche was an official decision maker who had the power to effectuate Plaintiff's termination. Specifically, Plaintiff claims that "[f]rom the time of . . . the August 2021 email . . . [to] Plaintiff's termination, Defendant Troche was aware" of Plaintiff's transgender status, Dkt. 17 ¶ 25; Lt. Miller informed him that it was Chief Troche who personally decided that Plaintiff must submit to a FFDE, *id.* ¶ 33; "Plaintiff was subjected to a fitness for duty examination, which resulted in a report in which all conclusions were based on assumptions due to Plaintiff's transgender status," *id.* ¶ 72; "[w]hen Chief Troche required Plaintiff to take a fitness for duty examination and concluded Plaintiff was unfit for duty based on the fitness for duty report and terminated Plaintiff, he acted as the official responsible for establishing final policy with respect to the subject matter in question," *id.* ¶ 71; "[t]here is no provision for administrative review of determinations of fitness for duty, and reprimands including termination of police officers in the City's rules and regulations," *id.* ¶ 70; "[u]ltimately, Defendants finding Plaintiff unfit for duty was based on his transgender status," *id.* ¶ 72; and the subsequent "decision to terminate was made by the Chief of Police who had . . . decision-making authority," *id.* ¶ 65. Further, on the day Plaintiff was fired, the termination occurred in the "Chief's Office" where Deputy Chief confirmed that Schanley's termination was based on the results of Peters' FFDE report that the Chief Troche had personally ordered

Plaintiff to undergo. *Id.* ¶¶ 51–52; *see id.* ¶¶ 44–49 (showing results of Peters' report). Put simply, the allegations show that Chief Troche not only initiated the FFDE but also made the ultimate decision to terminate Plaintiff. *See id.* ¶¶ 168–71.

Next, the Court finds that, at the time of the alleged gender discrimination, clearly established law prohibited such conduct. *See Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011) ("We conclude that a government agent violates the Equal Protection Clause's prohibition of sex-based discrimination when he or she fires a transgender or transsexual employee because of his or her gender non-conformity."); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 683 (2020) ("In Title VII, Congress adopted broad language making it illegal for an employer to rely on an employee's sex when deciding to fire that employee. We do not hesitate to recognize today a necessary consequence of that legislative choice: An employer who fires an individual merely for being gay or transgender defies the law."). At this stage in the proceeding, the Court finds Chief Troche is not entitled to qualified immunity on these counts.

Accordingly, Plaintiff has sufficiently pled that Chief Troche "effectuate[d] [Plaintiff's] termination," *Quinn*, 330 F.3d at 1328, which "directly resulted in the employee's discharge." *Stimpson*, 186 F.3d at 1331. Because Plaintiff has alleged that Chief Troche was an official decisionmaker, Schanley has adequately stated a claim for individual liability under § 1983 in Counts XIV–XV.

### b. *Substantive Due Process Claim under § 1983—Count XVI*

As to Plaintiff's substantive due process claim against Chief Troche, the Court incorporates its discussion dismissing the same claim against the City in Count VIII. Again, Plaintiff does not have a fundamental right to "employment and career opportunities." Dkt. 17 ¶ 191; *see Sprauer*, 331 F. App'x at 652; *McKinney*, 20 F.3d at 1560; *Lewis*, 409 F.3d at 1272–73.

Regarding Chief Troche's alleged interference "with Plaintiff['s] ability to define and express his gender identity," Dkt. 17 ¶ 191, Plaintiff once again failed to cite any supporting or binding authority for such a fundamental right. *See* Dkt. 26 at 18. Moreover, as articulated above, to the extent that Plaintiff is arguing the expression of one's gender identity is a fundamental right, such a claim is proper under the First Amendment, not the Due Process Clause of the Fourteenth Amendment. *See Echols*, 913 F.3d at 1326; *Lewis*, 523 U.S. at 842. Thus, a substantive due process claim for an alleged violation of one's freedom of expression is not appropriate since Plaintiff is already bringing a First Amendment retaliation claim against Chief Troche in Count XVII. *See Graham v. Connor,* 490 U.S. 386, 395 (1989) (noting that when a particular amendment "provides an explicit textual source of constitutional protection" against the conduct of which the plaintiff complains, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing" the claim). Because Plaintiff has failed to

allege a constitutionally protected right at stake, the Amended Complaint fails to state a plausible claim for relief under § 1983. The Court grants Chief Troche's motion to dismiss Count XVI with prejudice.[10]

### c. First Amendment Retaliation Claim under § 1983—Count XVII

Plaintiff also brings a claim of First Amendment retaliation under § 1983 in Count XVII against Chief Troche in his individual capacity. The analysis for this claim is much the same as that for Count VII, which is against the City. *See Edom v. Chronister*, No. 8:20-CV-1624-KKM-AEP, 2021 WL 4244845, at *8 (M.D. Fla. Sept. 17, 2021) (finding that the First Amendment retaliation analysis under § 1983 against a municipality and an individual is essentially the same).

As discussed above, even when accepting the factual allegations as true, Schanley fails to plausibly allege a First Amendment retaliation claim for any of the alleged instances of speech. The Court reiterates that—on the "matter of public concern" prong—the factual allegations clearly show that Schanley's decision to come out as transgender and the complaints about being misgendered were "driven by [Plaintiff's] own entirely rational self-interest in improving the conditions of [Plaintiff's] employment" by ensuring co-workers addressed Plaintiff by the preferred name and pronouns. *Morgan*, 6 F.3d at 755; *see* Dkt. 17 ¶¶ 24, 28–31.

---

[10] Because Schanley fails to state a claim for a substantive due process violation against Chief Troche individually, the Court likewise agrees that Chief Troche is entitled to qualified immunity without needing to address the second prong of qualified immunity—whether, at the time of the violation, the constitutional right was clearly established. *See, e.g., Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

At bottom, the "main thrust" of Plaintiff's speech is an employee's personal grievance about being misgendered at work, which is not a matter of public concern. *See Morgan*, 6 F.3d at 755; *Kalchbrenner*, 2025 WL 436766, at *7. The Court grants Defendant Troche's motion to dismiss Count XVII with prejudice.[11]

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendant City of Sarasota's partial Motion to Dismiss Counts V–XIII, Dkt. 21, is **GRANTED in part and DENIED in part:**

    i.   The Court **GRANTS** the City's motion to dismiss the First Amendment retaliation claim under § 1983 (Count VII) and the Fourteenth Amendment due process claims under § 1983 (Counts VIII–IX) **with prejudice.**

    ii.  The Court **GRANTS** the City's motion to dismiss the disability discrimination claims under the ADA and FCRA (Counts X–XI) **without prejudice.**

    iii. The Court **DENIES** the City's motion to dismiss the gender discrimination claims (in violation of the Equal Protection Clause of the Fourteenth Amendment) under § 1983 (Counts

---

[11] Because Schanley fails to state a claim of retaliation under the First Amendment against Chief Troche individually, the Court likewise agrees that Chief Troche is entitled to qualified immunity without needing to address the second prong of the qualified immunity analysis. *See, e.g., Lee*, 284 F.3d at 1194.

V–VI) and the retaliation claims under Title VII and the FCRA (Counts XII–XIII).

2. Defendant Rex Troche's Motion to Dismiss Counts XIV–XVII, Dkt. 22, is **GRANTED in part and DENIED in part:**

    i. The Court **GRANTS** Chief Troche's motion to dismiss the Fourteenth Amendment substantive due process claim under § 1983 (Count XVI) and the First Amendment retaliation claim under § 1983 (Count XVII) **with prejudice.**

    ii. The Court **DENIES** Chief Troche's motion to dismiss the gender discrimination claims (in violation of the Equal Protection Clause of the Fourteenth Amendment) under § 1983 (Counts XIV–XV).

3. Defendants must file a responsive pleading to the remaining counts within **Fourteen (14) days** of the entry of this Order.

**DONE AND ORDERED** at Tampa, Florida, on October 31, 2025.

/s/ William F. Jung
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record

55