**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ELI SCHANLEY,**

Plaintiff,

v. Case No. **8:25-cv-00408-WFJ-SPF**

**CITY OF SARASOTA,** and
**REX TROCHE,** in his Individual
Capacity, as the Chief of Police of the
Sarasota Police Department,

Defendants.
_________________________________/

**ORDER**

Before the Court are Defendants City of Sarasota (the "City") and Rex Troche's ("Chief Troche") Motions for Summary Judgment. Dkts. 75, 79. The City moves for summary judgment on Counts I–VI and XII–XIII, Dkt. 79, and Chief Troche moves for summary judgment on Counts XIV–XV. Dkt. 75. Plaintiff Eli Schanley has responded in opposition, Dkt. 86, and Defendants replied. Dkt. 87. On July 14, 2026, the Court held a hearing on these motions. Dkt. 88. Upon careful consideration, and with the benefit of able argument by both sides, the Court grants in part and denies in part the City's motions for summary judgment and grants Chief Troche's motion for summary judgment.

## BACKGROUND

This dispute arises out of Plaintiff Eli Schanley's alleged termination from the Sarasota Police Department (the "SPD") due to being a transgender individual. *See generally* Dkt. 17. Plaintiff is a female-to-male transgender individual who has been diagnosed with gender dysphoria.[1] Dkt. 85 ¶ 3.

On May 13, 2015, when Plaintiff first began working for the SPD, Schanley presented as her natal, female gender using the pronouns "she/her" and going by Plaintiff's then-legal name, Elise Schanley.[2] *Id.* ¶¶ 1, 4, 8, 11, 12; Dkt. 78 ¶ 1. During Plaintiff's employment with SPD, Plaintiff received positive performance reviews and assessments, as well as commendations and promotions. Dkt. 85 ¶¶ 4–6. However, the record also shows that Plaintiff had six separate internal investigations with sustained findings from various instances of misconduct between August 2021 and March 2023. Dkt. 78 ¶¶ 20–25; *see also* Dkt. 52-1 at 117:16-22 (noting at least eleven investigations or counselings against Plaintiff between 2020 and 2023). Plaintiff was the SPD's first transgendered employee. Dkt. 78 ¶ 58.

On August 20, 2021, Plaintiff sent an email to his SPD supervisors, including then-Chief of Police James Rieser, stating that Plaintiff was transgender and was going to proceed with the female-to-male transition process. Dkt. 85 ¶¶ 8–9. The

---

[1] Gender dysphoria is "a medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and biological sex. Left untreated, gender dysphoria may result in severe physical and psychological harms." *United States v. Skrmetti*, 605 U.S. 495, 502–03 (2025).

[2] Plaintiff officially changed his legal name to "Eli" Schanley on June 18, 2024. Dkt. 78 ¶ 10 n.7; Dkt. 52-35.

email requested that, moving forward, Plaintiff be called "Eli" and use the pronouns "he/him." *Id.* ¶ 8. On August 25, 2021, Chief Rieser announced his retirement for health reasons and was replaced by then-Deputy Chief Troche on an interim basis. *Id.* ¶ 9. Defendant Troche was appointed Chief of Police for the SPD in April 2022. *Id.*

In July 2022, Plaintiff was assigned to the day shift. Dkt. 78 ¶¶ 13–14. During the day shift, supervisors and fellow patrol officers misgendered Plaintiff by failing to use Plaintiff's preferred name and pronouns. *Id.* ¶¶ 15, 17. On August 23, 2022, Plaintiff sent an email to Captain Robert Armstrong regarding the issue of misgendering and requested assistance in addressing it. *Id.* ¶ 16, 17. In the email, Plaintiff expressed that he "did not want this to be made into a big issue because [he] d[id] not feel there [was] any ill intent" and "d[id] not feel this [was] being done maliciously[.]" *Id.*; *see* Dkt. 52-32 (showing Plaintiff's email to Captain Armstrong). The same day, Captain Armstrong met with Plaintiff, who told the captain that Lt. Bruce King and Sgt. Jaymi Delcos were the supervisors who had used his incorrect name or pronouns. Dkt. 78 ¶ 17.

Captain Armstrong later met with Lt. King and Sgt. Delcos to discuss the Plaintiff's concerns, and the supervisors became "upset," believing the Plaintiff should not have raised the issue with the captain and that it was unjustified. Dkt. 85 ¶ 16. Lt. King then requested that Plaintiff meet him outside of work at a Starbucks,

where Lt. King supposedly expressed displeasure that Plaintiff wrote his concerns about being misgendered in an email to Captain Armstrong instead of going to him first. *Id.* ¶ 17. Despite Captain Armstrong meeting with Sgt. Delcos, Plaintiff claims that the sergeant continued to misgender Plaintiff throughout 2022 and 2023. *Id.* ¶ 19. Plaintiff believes that the misgendering and refusal to use his preferred name by some supervisors was done intentionally as a sign of disrespect. *Id.*

On April 6, 2023, an internal affairs ("IA") investigation (I.I. 23-0027) was initiated against Plaintiff after a random audit of his body-worn camera ("BWC") footage revealed several potential policy violations related to a domestic violence call he responded to on March 26, 2023. Dkt. 78 ¶¶ 26–27; *see also* Dkt. 52-18 (showing I.I. 23-0027). The BWC footage shows Plaintiff met with a female victim who told him that her boyfriend injured her arm "again" and that "he beat the shit out of me." Dkt. 78 ¶ 27. The victim led Plaintiff inside the house to the bathroom, where there were signs of a physical altercation. *Id.* The victim stated that her boyfriend kicked in the bathroom door while she was in the shower and began to beat her. *Id.* Plaintiff then acknowledged that the victim's arm "looks swollen," and the victim said she needed to go to the hospital. *Id.* However, as the investigation continued, the victim began to retract her prior statements and minimize the severity of the physical altercation. *Id.* ¶ 28. In his case report, Plaintiff later reclassified the incident from a "domestic battery" to a "dispute," stated that the victim had "no

visible injuries that would indicate a physical altercation took place," and concluded that "[t]here is no probable cause for charges against [the victim's boyfriend]." *Id.* ¶ 31; Dkt. 52-20 at 104. On September 1, 2023, Chief Troche approved I.I. 23-0027's findings, which sustained eighteen policy violations and found that Plaintiff "chose to falsify [his] case report and intentionally lie to [his] supervisor to avoid having to conduct a proper domestic violence investigation." Dkt. 78 ¶ 34; *see* Dkt. 52-18 at 4, 24.[3]

On April 7, 2023, while the IA investigation was ongoing, Chief Troche and Deputy Chief Scott Mayforth reviewed Plaintiff's BWC video of the March 26 domestic violence incident and found that Plaintiff should be placed on administrative leave pending a fitness for duty evaluation ("FFDE"). Dkt. 78 ¶¶ 37–38. The same day, Chief Troche placed Plaintiff on paid administrative leave and ordered him to complete an FFDE with a licensed clinical social worker, Jill Fischer-Peters ("Peters"). *Id.* ¶ 39. On April 11, 2023, Plaintiff met with Peters at her office, which was decorated with religious-themed posters, and Peters served Plaintiff coffee in a mug containing religious affirmations. Dkt. 85 ¶ 25. Plaintiff asserts that

[3] Douglas Vollmer was the IA detective who led the investigation on I.I. 23-0027. Dkt. 85 ¶ 20. On the memorandum notifying Plaintiff of the IA investigation, Detective Vollmer repeatedly misgendered Plaintiff. *Id.* Interestingly, when Detective Vollmer retired from the SPD in October 2023, he sent an email to the entire SPD with a quote from a pastor named Martin G. Collins. *Id.* ¶ 22; Dkt. 57-3 (showing Vollmer's retirement email with the quote: "Nothing erodes convictions and standards faster than compromise. If we compromise our obedience to God, we also expose our reputation to suspicion or disrepute. To compromise is to weaken or give up our principles or ideals for reasons of expediency"). Plaintiff placed into the record a sermon from Collins titled "The LGBTQ Cultural Revolution," where the pastor claims that transgender people and progressives are "conspiring to reshape society by projecting an individual disorder to the whole of society and then demanding the delusion be shared by all." Dkt. 85-3 at 3. Vollmer, however, denied knowing about Collins or his views on transgenderism. Dkt. 57-1 at 44:11-48:5.

the meeting was cordial and that, at the conclusion of the discussion, Peters said Plaintiff passed with "flying colors." *Id.* As part of the FFDE, Plaintiff also had to undergo two written tests, the MMPI-3 and MCMI-IV, neither of which were scored before Peters completed the fitness-for-duty report on April 18, 2026. *Id.* ¶¶ 25–26.

Plaintiff claims that Peters' ensuing report to the SPD contained numerous fabricated statements or faulty assumptions. *Id.* ¶¶ 27–30; *see also* Dkt. 52-23 (showing Peters' report). Peters' report stated that "she is often harassed in uniform by various men because of the way she looks physically[]," and it was Peters' clinical opinion that "this pattern of behavior directed towards her [a]ffects her ability to perform and assert herself as she is: conflicted, fearful and submissive." Dkt. 85 ¶ 29; Dkt. 52-23 at 2. The report further noted that "Officer Schanley is 5 [feet] tall and her internal ability to defend herself both . . . physically and psychologically is conducive to confrontation[,] and she reacts by submitting." Dkt. 85 ¶ 30; Dkt. 52-23 at 2. Ultimately, Peters' report concluded that "[w]hile she may be an excellent employee due to her desire to follow the rules, her psyche and unconscious psychological pathology plays a large part in her inability and prevents her from doing her job. As a result, she is a danger to herself and the public." Dkt. 85 ¶ 28; Dkt. 52-23 at 3.

On or about April 17, 2023, Peters had a phone call with Captain Armstrong, Captain Kenneth Rainey, and then-HR Director Stacie Mason to discuss her finding

that Plaintiff was not fit for duty as detailed in her report. Dkt. 78 ¶ 44. On April 18, 2023, Plaintiff and his union representative, Bill Bjork, met with Captain Armstrong and Lt. King to discuss Peters' finalized report. *Id.* ¶ 45. During this meeting, Plaintiff told his supervisors that he had given Peters different answers than those in the report and that the report contained many falsehoods. Dkt. 85 ¶ 31.[4]

Immediately thereafter, Plaintiff was escorted to the Chief's Office, where Deputy Chief Scott Mayforth and HR Director Mason presented Plaintiff with four options in light of Peters' finding that Plaintiff was not fit for duty: (1) take Family Medical Leave Act leave to keep benefits until he was able to find a job; (2) take two weeks of administrative leave after which his employment would end on May 5, 2023; (3) apply for other jobs with the City (at the time there were only three jobs available: a parks service janitorial worker, a part-time life guard position, and an off-duty coordinator position for the SPD, all of which were outside of Plaintiff's experience and qualifications); or (4) resign. *Id.* ¶ 34. At this meeting with Deputy Chief Mayforth, Plaintiff continued to object to the findings in Peters' report, explained the inaccuracies, and requested a second opinion. *Id.*

[4] Captain Armstrong had communications directly with Peters both before and after the FFDE of Plaintiff. Dkt. 85 ¶ 32; *see also* Dkt. 85-6 (showing text messages between Captain Armstrong and Peters). Captain Armstrong told Peters before the FFDE that Plaintiff was transgender. Dkt. 85 ¶ 32. After Peters completed the FFDE Report, she texted Captain Armstrong on April 12, 2023, to ask if she should send a draft over to see if revisions were needed, as she knew "this one is sensitive." *Id.*; Dkt. 85-6 at 2 ("My report is done would you like to go over it before I send. If I need to revise anything I can. I know this one is sensitive."). Additionally, when Peters became aware that Plaintiff was seeking a second opinion from another licensed psychologist, Dr. Daniel Baughn, Peters texted Captain Armstrong on April 27, 2023, saying "Ugh… Gay psychologist Daniel Baughn." Dkt. 85 ¶ 32; *see* Dkt. 85-6 at 4.

On April 21, 2023, Plaintiff was informed by the Union President that SPD would not accept or consider a second opinion from another psychologist. *Id.* ¶ 35. Plaintiff called and spoke with Deputy Chief Mayforth that same day and sought confirmation that the City would not consider a second opinion, which Mayforth confirmed was correct, and added that this was the ultimate decision following a "round table." *Id.* During this call, Plaintiff also informed Deputy Chief Mayforth that he would take two weeks of administrative leave. *Id.*[5]

On April 24, 2023, based on Peters' finding that Plaintiff was not fit for duty, HR Director Mason recommended that Plaintiff be "laid off" to then-Deputy City Manager Pat Robinson, who approved of the termination. Dkt. 78 ¶ 48. On the same day, Captain Armstrong and Sgt. Dustin Luciano met with Plaintiff to inform him that he was being terminated and provided a letter from the City stating the same. *Id.* ¶ 49. The termination letter stated, in relevant part, that: "We regret to inform you that based upon the determination of fit for duty report that the City of Sarasota is notifying you that you will be placed on Layoff effective April 24th, 2023." Dkt. 52-25. The decision to terminate Plaintiff's employment was made before

[5] After Plaintiff's termination on April 24, 2023, Plaintiff underwent a second FFDE with a licensed psychologist, Dr. Daniel Baughn. Dkt. 85 ¶ 36; *see also* Dkt. 83 at 65–74 (showing Dr. Baughn's report). Plaintiff asserts that Dr. Baughn's second report contradicts Peters' report, as it found Plaintiff to be fit to perform the duties of a law enforcement officer. Dkt. 85 ¶ 36-37. The second report reviewed Plaintiff's medical records and performed several tests, ultimately concluding that "[o]verall, the patient is recommended for employment as a law enforcement officer from a psychological perspective at this time as there are no absolute psychological contraindications to employment." Dkt. 83 at 65.

completion of the internal affairs investigation (I.I. 23-0027) into Plaintiff's handling of the domestic dispute call on March 26, 2023. Dkt. 85 ¶ 37.

While Chief Troche ordered Plaintiff to undergo the FFDE, Chief Troche did not make the recommendation or the decision to terminate Plaintiff's employment. Dkt. 78 ¶ 50; Dkt. 85 par. 23. The City's personnel rules and regulations provide under Section 7.17 that a " Department Head may remove a permanent employee at any time for cause, or for the good of the City, with prior notice to the Director of Human Resources and the City Manager or City Auditor and Clerk." Dkt. 85 ¶ 39; *see also* Dkt. 58-5 at 61–62 (showing Section 7.17 in the City's personnel rules and regulations). To terminate an SPD employee, the SPD command staff would bring a personnel action to the HR department and discuss whether to recommend termination to the City Manager. Dkt. 85 ¶ 39; *see also* Dkt. 60-1 at 11:2–15:8 (showing HR Director Mason discussing how the HR department and SPD command staff would recommend that the City Manager terminate an employee).

Under the applicable collective bargaining agreement ("CBA"), Plaintiff attempted to file a grievance through the International Union of Police Associations (the "Union"). Dkt. 85 ¶ 41. The City denied the first three steps of the grievance process, and the Union declined to proceed to arbitration in part because it believed that Plaintiff's termination being labeled as a "layoff" was not subject to the CBA's

grievance procedures. *Id.*; *see* Dkt. 52-25 (showing Plaintiff's termination letter where he "will be placed on Layoff effective April 24, 2023").

On September 5, 2023, Plaintiff timely filed a charge of gender and disability discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Dkt. 52-37. This charge was simultaneously filed with a Florida Commission on Human Relations ("FCHR") complaint that alleged discrimination based upon disability, gender, and retaliation. *Id.* Plaintiff asserts that more than 180 days have passed since Plaintiff filed the charge, and the EEOC has not issued any cause finding. Dkt. 17 ¶ 7.

On February 18, 2025, Plaintiff filed suit against Defendants. Dkt. 1. In response to Defendants' initial motions to dismiss, Plaintiff filed an amended complaint on June 13, 2025. Dkt. 17. Plaintiff's Amended Complaint alleges thirteen claims against the City: gender discrimination under the Florida Civil Rights Act of 1992 ("FCRA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and 42 U.S.C. § 1983 (Counts I–VI); First Amendment retaliation under § 1983 (Count VII); violation of the Due Process Clause of the Fourteenth Amendment under § 1983 (Counts VIII–IX); disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA") and the FCRA (Counts X–XI); and retaliation under the FCRA and Title VII (Counts XII–XIII). Dkt. 17 ¶¶ 86–166.

Against Defendant Troche in his individual capacity, the Amended Complaint asserts four counts: gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment under § 1983 (Counts XIV–XV); violation of the Substantive Due Process Clause of the Fourteenth Amendment under § 1983 (Count XVI); and First Amendment retaliation under § 1983 (Count XVII). *Id.* ¶¶ 167–216.

On June 27, 2025, Defendants filed two motions to dismiss: the City's partial motion to dismiss sought dismissal of Counts V–XIII of the Amended Complaint, and Defendant Troche's motion sought to dismiss all four counts against him in his individual capacity (Counts XIV–XVII). *See* Dkts. 21, 22. On October 31, 2025, the Court granted the motions in part, dismissing Counts VII–XI as to the City and Counts XVI–XVII as to Chief Troche. Dkt. 35. Accordingly, Plaintiff's remaining claims against the City are for gender discrimination under the FCRA, Title VII, and § 1983 (Counts I–VI) and retaliation under the FCRA and Title VII (Counts XII–XIII). As to Chief Troche in his individual capacity, there are only two gender discrimination claims under § 1983 (Counts XIV–XV). Defendants now move for summary judgment on all the remaining counts. Dkts. 75, 79.

## LEGAL STANDARD

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a).

An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e), (c). The court may not weigh the evidence to resolve a factual dispute; if a genuine issue of material fact exists, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, the court should deny summary judgment if reasonable minds could differ on the inferences arising from undisputed facts. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

Additionally, a district court is only required to consider "the cited materials" when deciding a motion for summary judgment, Fed. R. Civ. P. 56(c)(3), and "[m]aking district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. . . . [D]istrict court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

## DISCUSSION

### I. The City's Motion for Summary Judgment

Plaintiff brings six gender discrimination claims under the FCRA, Title VII, and § 1983 (Counts I–VI) and two retaliation claims under the FCRA and Title VII (Counts XII–XIII) against the City. *See generally* Dkt. 17. Three of these gender discrimination claims—Count I (FCRA), Count III (Title VII), and Count V (Section 1983)—are based on Plaintiff being subjected to the FFDE. *Id.* ¶¶ 86–90, 96–100, 106–11. Count II (FCRA), Count IV (Title VII), and Count VI (Section 1983) are gender discrimination claims arising from Plaintiff's termination for the SPD. *Id.* ¶¶ 91–95, 101–05, 112–17.

To better organize these overlapping claims, the Court's discussion of these eight counts proceeds in four parts. First, the Court examines Plaintiff's two (FFDE) gender discrimination claims under the FCRA and Title VII, concluding that these FFDE counts cannot survive summary judgment. Second, the Court considers the

two (termination) gender discrimination claims under the FCRA and Title VII, finding that the City is not entitled to summary judgment. Third, the Court considers the two (FFDE and termination) gender discrimination claims under § 1983, explaining why summary judgment is granted on these municipal liability counts. Fourth, the Court discusses the two retaliation claims under the FCRA and Title VII, holding that the City is entitled to summary judgment on these counts.

*a. Counts I and III—FFDE Gender Discrimination Claims under the FCRA and Title VII*

This action primarily arises under Title VII, which makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).[6] "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices" that have been used to disadvantage protected minorities in the workplace. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). The Supreme Court has further recognized that the "broad language" in Title VII also mean "[a]n employer who

[6] Plaintiff also brings a parallel claim under the FCRA. Because claims under the FCRA are evaluated under the same analytical framework as Title VII claims, the Court only focuses on Plaintiff's Title VII claims. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010).

fires an individual merely for being gay or transgender defies the law." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 683 (2020).

There are three avenues to establish a gender discrimination claim under Title VII: "(1) presenting direct evidence of discriminatory intent; (2) succeeding under the *McDonnell Douglas* framework; and (3) demonstrating a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination." *Thomas v. Sheriff of Jefferson Cnty., Ala.*, No. 22-13875, 2023 WL 6534602, at *2 (11th Cir. Oct. 6, 2023) (citation modified). As discussed below, the Court finds that Plaintiff's FFDE gender discrimination claims in Counts I and III do not survive summary judgment under any of the three avenues.

i. Direct Evidence of Discrimination

"Direct evidence is evidence[] that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (citation modified). The Eleventh Circuit has "explained that only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor[,] constitute direct evidence of discrimination." *Id.* at 922 (citation modified). Additionally, "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs.,*

*Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (citation omitted), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Here, Plaintiff points to several instances of misgendering by supervisors and Chief Troche as direct evidence of discrimination, Dkt. 86 at 4–5, but each instance falls short of the rigorous direct evidence standard.[7] Beginning with Plaintiff's supervisors, the record contains several instances where Plaintiff's lieutenant, sergeant, and fellow patrol officers misgendered Plaintiff by using the wrong name and pronouns. Dkt. 85 ¶¶ 15–19. However, there is no dispute that none of these SPD officers were involved in Plaintiff's referral for a FFDE by Chief Troche. Being misgendered by coworkers is "not direct evidence of [gender] discrimination because they were not decisionmakers in [the FFDE] that [Plaintiff] alleged w[as] [an] adverse employment action[]." *Thomas v. Atlanta Pub. Schs.*, No. 23-11101, 2024 WL 2992938, at *6 (11th Cir. June 14, 2024).[8]

As to Chief Troche, it is undisputed that he was the decisionmaker who ordered Plaintiff to undergo the FFDE, Dkt. 78 ¶¶ 38–39, and Plaintiff points to two times when Chief Troche misgendered him. Dkt. 86 at 5 (citing Dkt. 85 ¶¶ 13, 21,

---

[7] Plaintiff also cites to Peters' conduct as being evidence of direct discrimination. Dkt. 86 at 4. This evidence, however, relates to Plaintiff's termination gender discrimination claims in Counts II and IV, not the FFDE gender discrimination claims in Counts I and III, as Peters' actions only came after Plaintiff was subjected to the FFDE by Chief Troche.

[8] In Plaintiff's opposition briefing, he emphasizes the intentional and pejorative nature of misgendering by various SPD coworkers. Dkt. 86 at 5–6. But Plaintiff legally changed his name to "Eli" Schanley after his termination from the City. *See* Dkt. 78 ¶ 10 n.7; Dkt. 52-35. For the first six years of Plaintiff's employment, he presented as his natal, female gender, was known to coworkers as biologically female, had the name "Elise," and used female pronouns. In August 2021, Plaintiff suddenly demanded to be called "Eli" with male pronouns without any legal name change or apparent change in physicality or visage. *See* Dkt. 78 ¶¶ 8–12. This casts questions on how much "misgendering" in this timeframe was intentional or purposeful discrimination.

23). The first time Chief Troche misgendered Plaintiff was by using his then-legal name, "Elise" Schanley, in interoffice memoranda when Plaintiff first joined the day shift in July 2022. Dkt. 85 ¶ 13. The second time was Chief Troche (again) using Plaintiff's then-legal name, "Elise" Schanley, in the April 7, 2023, interoffice memorandum that placed him on administrative leave pending the FFDE. Dkt. 85 ¶¶ 21, 23; *see also* Dkt. 83 at 59 (showing the memorandum being sent to "Officer Elise Schanley"). These two times Chief Troche used Plaintiff's then-legal name clearly do not rise to the level of being "blatant remarks, whose intent could mean nothing other than to discriminate on the basis of [Plaintiff's gender]." *Jefferson*, 891 F.3d at 922 (citation modified). Indeed, Plaintiff readily admits in his deposition that Chief Troche never made transphobic comments and concedes that he does not believe Chief Troche referred him to a FFDE because of Plaintiff's transgender status. Dkt. 52-1 at 215:15-21 ("Q. And do you believe that Chief Troche referred you for a fitness-for-duty only because you're a transgender officer? A. No."). As such, no reasonable jury could find that these two isolated instances constitute direct evidence of gender discrimination.

ii. <u>Circumstantial Evidence under *McDonnell Douglas*</u>

Because Plaintiff fails to raise any direct evidence of gender discrimination in this context, the Court proceeds to analyze his FFDE gender discrimination claims under the three-step *McDonnell Douglas* framework. The first step is to consider

whether the plaintiff can establish a prima facie case for discrimination. *See Ismael v. Roundtree*, 161 F.4th 752, 764 (11th Cir. 2025). A plaintiff establishes the prima facie case "by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) ("*Lewis* I"). At step two, if the plaintiff succeeds in making out a prima facie case, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action." *Ismael*, 161 F.4th at 759 (citation omitted). "Third, if the employer provides an adequate reason, the plaintiff has the opportunity to demonstrate that the employer's proffered rationale is pretextual." *Id.* (citation omitted).

The City argues that Plaintiff cannot establish the third and fourth elements of his prima facie case. Dkt. 79 at 8.[9] Since the "failure to establish any of the four elements dooms [Plaintiff's] prima facie case," the Court begins with the fourth element: whether the City treated "similarly situated" employees outside of

[9] As an aside, the City's motion never raised any argument about whether being placed on administrative leave pending a fitness for duty evaluation constitutes an adverse employment action under *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 354 (2024). However, during the motion hearing, defense counsel briefly argued that a fitness for duty evaluation is not an adverse employment action. *See* Dkt. 88. Being subjected to an "adverse employment action" is an indispensable part of any Title VII discrimination claim. *See Davis v. Legal Servs. Alabama, Inc.*, 19 F.4th 1261, 1265 (11th Cir. 2021); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1246 (11th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ("Because adverse employment action is an indispensable element of a Title VII plaintiff's case, [the plaintiff's] failure to present sufficient evidence for a reasonable jury to find that this element was met is fatal to his case."). Here, the Court assumes (without deciding) that being placed on administrative leave pending a FFDE constitutes an adverse employment action under *Muldrow*.

Plaintiff's class more favorably than him—i.e., the "comparator analysis." *Johnson v. Miami-Dade Cnty.*, 169 F.4th 1301, 1308 (11th Cir. 2026).

The Eleventh Circuit has explained that comparators are "similarly situated" if they are "similarly situated in all material respects." *Lewis* I, 918 F.3d at 1229. While there is "no bright-line rule for what constitutes a valid comparator," a valid comparator is ordinarily someone who: "(1) has engaged in the same basic conduct (or misconduct) as the plaintiff, (2) is subject to the same employment policy, guideline, or rule as the plaintiff, (3) is under the jurisdiction of the same supervisor as the plaintiff, and (4) shares the plaintiff's employment or disciplinary history." *Johnson*, 169 F.4th at 1308 (citing *Lewis* I, 918 F.3d at 1227–28). The "ultimate question" is whether "the plaintiff and her comparators [are] similar enough that they 'cannot reasonably be distinguished.'" *Id.* (quoting *Lewis* I, 918 F.3d at 1228).

Here, Plaintiff points to Terry Crenshaw, Taylor Rossnagle, and Derrick Gilbert as potential comparators. Dkt. 86 at 9–10. Plaintiff argues that all three SPD officers were subjected to IA investigations for misconduct without being subjected to a FFDE or terminated. *Id.* at 9. But this alone is not enough to demonstrate that the three comparators were "similarly situated in all material respects." *Lewis* I, 918 F.3d at 1224. A closer look at the IA investigations into each comparator reveals that none engaged in the same basic misconduct as Plaintiff and none shared the same disciplinary history.

Beginning with Officer Crenshaw, his IA investigation (I.I. 22-007) concerned his response to an "Officer Standby" call. Dkt. 78 ¶ 55; Dkt. 61-10 (showing I.I. 22-007). When Officer Crenshaw later learned that the incident involved a domestic battery, he continued to treat the incident as an "Officer Standby" call and failed to conduct a domestic battery investigation. Dkt. 78 ¶ 55. The IA investigation sustained five policy violations against Officer Crenshaw for which he received a written reprimand and was required to complete domestic violence training. *Id.*; Dkt. 61-10 at 33–34; Dkt. 61-11 at 10. In contrast, Plaintiff's IA investigations (I.I. 23-0027) into the March 26th domestic violence incident sustained findings that Plaintiff committed eighteen policy violations and that he "chose to falsify [his] case report and intentionally lie to [his] supervisor to avoid having to conduct a proper domestic violence investigation" on BWC. Dkt. 78 ¶ 34. None of Officer Crenshaw's sustained policy violations involved dishonesty, intentionally lying, or falsifying a case report. *Id.* ¶ 56.

At the time of the incident at issue in I.A. 22-007, Officer Crenshaw had one prior instance of misconduct (a written reprimand), whereas Plaintiff had four incidents (a documented verbal counseling, a letter of instruction & cautioning, and two written reprimands). *Id.*; *see* Dkt. 61-10 at 34 (showing Officer Crenshaw's discipline record); Dkt. 52-18 at 27–29 (showing Plaintiff's discipline record); Dkt. 78 ¶¶ 20–25 (noting Plaintiff had six separate internal investigations with sustained

findings against him from various instances of misconduct between August 2021 and March 2023).

Similarly, Officer Derrick Gilbert was subjected to an IA investigation (I.I. 23-001) for being absent without leave. Dkt. 78 ¶ 57; *see also* Dkt. 55-31 (showing I.I. 23-001). Due to his five sustained policy violations in the IA investigation, the City decided to terminate Officer Gilbert, but he resigned before the termination took effect. Dkt. 78 ¶ 57. Officer Gilbert's misconduct was totally distinct from the misconduct that led to Plaintiff's FFDE, and there is no evidence in the record indicating that Officer Gilbert shared a similar disciplinary history to Plaintiff. Additionally, Plaintiff and Officer Gilbert reported to different supervisors. *Id.* ¶¶ 14, 57.

As to Taylor Rossnagle, the records show that Officer Rossnagle was subject to an IA investigation (I.I. 22-004) for the improper handling of a domestic violence incident and for dishonesty. Dkt. 58-1 at 98:4–99:8; *see also* Dkt. 58-10 (showing I.I. 22-004 report). However, at the conclusion of the IA investigation, only two sustained violations were found for "report procedures," while the violations for "procedures for obtaining a warrant and dishonesty" were not sustained. Dkt. 58-1 at 99:14–25; *see* Dkt. 58-10 at 1. Officer Rossnagle's disciplinary record notes that he has a "storied past." Dkt. 58-1 at 98:4-6; *see also* Dkt. 58-9 at 1–7 (showing

Officer Rossnagle's investigation history). But there is no other evidence indicating that Officer Rossnagle shared a similar disciplinary history to Plaintiff.

In sum, the proposed comparators neither engaged in the same basic misconduct as Plaintiff nor shared the same disciplinary history as Plaintiff. Because Plaintiff was unable to identify comparators who were "similarly situated in all material respects," he cannot make a prima facie case for discrimination. *Lewis* I, 918 F.3d at 1229, 1231. As a result of that failure, Plaintiff does not enjoy the benefit of a presumption of intentional discrimination. *See Ismael*, 161 F.4th at 765. Instead, he must demonstrate a material issue of triable fact by constructing "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* at 760 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

iii. Convincing Mosaic

When determining whether the plaintiff has demonstrated a genuine issue of material fact at the convincing mosaic stage, the Eleventh Circuit provided the following guidance:

> Employees are not limited in the kinds of circumstantial evidence they may present. We have identified three nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct: evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's justification for its

action is pretextual. *See Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022).

*Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023).

Additionally, the Eleventh Circuit has emphasized that the failure to "meet the *Lewis* standard at step one does not foreclose [the plaintiff's] argument that his comparators contribute to a convincing mosaic of discrimination." *Johnson*, 169 F.4th at 1310. When examining the entire record, "a district court should [still] consider . . . all evidence of disparate treatment, even if there are material differences between the plaintiff and the comparators." *Id.* However, "[a]t this stage in the analysis, the extent of the material differences only influences 'how much weight the comparator evidence should be given.'" *Id.* (quoting *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 947 (11th Cir. 2023)).

Here, Plaintiff's convincing mosaic argument fails because the proffered mosaic of circumstantial evidence relates to the termination gender discrimination claims in Counts II and IV, not to the FFDE gender discrimination claim in Counts I and III. *See* Dkt. 86 at 6. For example, Plaintiff points to the suspicious timing of his termination, the discriminatory bias of Peters, the alleged falsities and inaccuracies in Peters' report, the misgendering in Peters' report, Peters allowing Captain Armstrong an opportunity to review and alter the report, the instances of misgendering by supervisors and Chief Troche, and the comparators who were never terminated or subjected to a FFDE. *Id.* at 6, 9. Out of all these "irregular tiles" of

circumstantial evidence, *Johnson*, 169 F.4th at 1309, only Chief Troche's misgendering and the comparators relate to the FFDE gender discrimination counts. But, as discussed previously, a reasonable trier of fact could not infer any unlawful intent from the two minor instances of misgendering by Chief Troche. Concerning the comparator evidence, standing alone, this weak evidence is insufficient to demonstrate a convincing mosaic of discrimination. *See id.* at 1310 (finding that the plaintiff's "distinguishable comparators, standing alone, do not raise a reasonable inference of unlawful conduct"). In short, there is little circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker (Chief Troche) when subjecting Plaintiff to the FFDE. Therefore, the Court finds the City is entitled to summary judgment on Counts I and III.

*b. Counts II and IV—Termination Gender Discrimination Claims under the FCRA and Title VII*

Next, the Court turns to Plaintiff's termination gender discrimination claims under Title VII. For the sake of brevity, the Court incorporates by reference all prior legal standards.

i. Direct Evidence of Discrimination

Plaintiff's attempt at demonstrating direct evidence of discrimination fails on similar grounds as Counts I and III. Plaintiff mainly points to Peters' conduct as direct evidence of discrimination due to the repeated misgendering in her report, the allegedly false statements in the report, Peters alleged lying to Plaintiff by telling

him he passed the FFDE, and Peters' texting Captain Armstrong "Gay psychologist" when referencing the doctor involved with Plaintiff's second opinion. Dkt. 86 at 4–5.

However, direct evidence shows an employer's discriminatory intent "without inference or presumption." *Jefferson*, 891 F.3d at 921 (citation modified). While there is circumstantial evidence that Peters' report may have been biased against Plaintiff, a reasonable trier of fact would need to make the extra jump (i.e., inference or presumption) that Peters intentionally found Plaintiff unfit for duty due to his transgender status. The Eleventh Circuit has explained that "the quintessential example of direct evidence would be a management memorandum saying, Fire Earley—he is too [transgender]," *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1190 (11th Cir. 1997) (citation modified), but there is nothing in Peters' report that directly declares Plaintiff unfit to be a police officer because he is transgender. Additionally, while the report's conclusion that Plaintiff was not fit for duty may have contributed to his termination, it is undisputed that Peters is not the decisionmaker who ultimately terminated Plaintiff's employment. *See* Dkt. 78 ¶ 48; *Standard*, 161 F.3d at 1330.

ii. Circumstantial Evidence under *McDonnell Douglas*

Turning to whether Plaintiff has demonstrated a prima facie case of discrimination, the Court incorporates its prior discussion on Counts I and III. Again,

Plaintiff fails on the fourth element because Plaintiff relies on the same three comparators—Officers Rossnagle, Gilbert, and Crenshaw—to argue he was similarly situated in all material respects. Dkt. 86 at 9. But, as the Court fully explained above, the comparators are not so similarly situated since they had materially different disciplinary records, engaged in different misconduct, and/or had a different supervisor from Plaintiff. Because Plaintiff is unable to make a prima facie case for discrimination, he must demonstrate a material issue of triable fact by constructing "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Johnson*, 169 F.4th at 1309 (citation omitted).

iii. Convincing Mosaic

At this stage of the analysis, the Court asks "whether the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination . . . by the decisionmaker." *Ismael*, 161 F.4th at 764 (citation modified). For the reasons explained below, the Court finds that the record (viewed in the light most favorable to the nonmovant) demonstrates a mosaic of circumstantial evidence that raises genuine issues of material fact as to the termination gender discrimination claims.

There are three general categories of circumstantial evidence that could raise a reasonable inference of discrimination: "evidence of suspicious timing, ambiguous

statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's justification for its action is pretextual." *Berry*, 84 F.4th at 1311. "Whatever form the evidence takes, 'so long as [it] raises a reasonable inference' that the employer retaliated against the employee, 'summary judgment is improper.'" *Id.* (quoting *Lockheed-Martin*, 644 F.3d at 1328).

Here, Plaintiff argues there is sufficient circumstantial evidence based on the suspicious timing of his termination, ambiguous statements by Peters, better treatment of comparators, various instances of misgendering by coworkers, and Detective Vollmer's citation to a pastor who has publicly expressed views against transgenderism. Dkt. 86 at 4–6. This evidence, viewed in the light most favorable to Plaintiff, would allow a reasonable jury to infer that the City terminated him due to his protected status.

Beginning with Peters, the record provides enough circumstantial evidence in the present light to raise a genuine dispute as to whether Peters—the author of the FFDE report that directly led to Plaintiff's termination—harbored some level of discriminatory animus toward Plaintiff. In addition to the repeated misgendering throughout the report, there is a factual dispute over whether Peters' written report contained numerous fabricated statements or faulty assumptions. *See* Dkt. 85 ¶¶ 27–30. As explained above, Plaintiff asserts that a wide range of statements made in the

report were completely false and contrary to the answers Plaintiff gave during their FFDE meeting. *Id.*; Dkt. 52-23 (showing Peters' report). On April 18, 2023, Plaintiff made it clear to Captain Armstrong, Lt. King, Deputy Chief Scott Mayforth, and HR Director Mason that he had given Peters different answers and that the report contained numerous falsehoods. Dkt. 85 ¶¶ 31, 34.

Moreover, the FFDE report that was disseminated to Plaintiff on April 18, 2023, was seemingly incomplete and based solely on Peters' subjective opinion. There is evidence in the record that the MMPI-3 and MCMI-IV tests Plaintiff had taken were not scored until April 20, 2023, and that the entire report, including the test scores, was not finalized until April 25, 2023—one day *after* Plaintiff was terminated. *Id.* ¶¶ 26, 37. Further, Plaintiff's expert, Dr. Justin A. D'Arienzo, later concluded that Peters' fitness for duty evaluation "did not conform to widely accepted professional standards for occupationally mandated evaluations of law enforcement officers in Florida or nationally." Dkt. 84 at 35.

Peters' conduct beyond the report also may be cited to suggest circumstantial evidence of gender discrimination. Peters and Captain Armstrong had direct communications while Plaintiff's FFDE was ongoing. Dkt. 85 ¶ 32; *see also* Dkt. 85-6 (showing text messages between Captain Armstrong and Peters). Peters knew that Plaintiff was transgender before the FFDE began because Captain Armstrong told her. Dkt. 85 ¶ 32. After Peters completed a draft FFDE Report, she texted

Captain Armstrong on April 12, 2023, to ask whether she should send the draft to see if any revisions were needed, since Peters knew "this one is sensitive." *Id.*; Dkt. 85-6 at 2. Further, when Peters became aware that Plaintiff was seeking a second opinion from another licensed psychologist, Dr. Daniel Baughn, Peters texted Captain Armstrong on April 27, 2023, "Ugh… Gay psychologist Daniel Baughn." Dkt. 85 ¶ 32; *see* Dkt. 85-6 at 4. Despite these ambiguous statements, the City attempts to sidestep them by claiming Peters is not an employee of the City or the SPD. Dkt. 87 at 2. True enough, but the City's own Rule 30(b)(6) witness testified that Peters is an agent for the City and was hired by the chief of police. *See* Dkt. 58-1 at 63:7–25; *see also* Dkt. 53-1 at 58:16–20. There is no dispute that, as an agent for the City, Peters authored the FFDE report that directly led to Plaintiff's termination. Dkt. 78 ¶¶ 48–49.

Next, Plaintiff cites evidence that, if believed by a jury, could suggest the City's stated reasons for firing Plaintiff were pretextual. A plaintiff can demonstrate pretext by "casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1186 (11th Cir. 2019) ("*Lewis* II"). The main reason offered by the City for Plaintiff's firing is that "Chief Troche became concerned about Plaintiff's well-being and fitness for duty as a patrol officer due to . . . issues he

observed with Plaintiff's handling of the March 26th domestic violence incident." Dkt. 79 at 14. This led to Chief Troche ordering Plaintiff undergo a FFDE with Peters, and Plaintiff's subsequent termination "based on Ms. Fischer-Peters' finding that he was not fit for duty as a patrol officer." *Id.* at 14–15. As discussed above, there is sufficient circumstantial evidence that casts doubt on Peters' finding that Plaintiff was unfit to be a police officer.

Plaintiff offers additional circumstantial evidence, albeit slight, that the IA investigation into the March 26 domestic violence incident may have been pretextual. The detective in charge of Plaintiff's IA investigation, Douglas Vollmer, misgendered Plaintiff in the memorandum notifying him of the investigation. Dkt. 85 ¶ 20. In October 2023, when Detective Vollmer retired from the SPD, he sent an email to the entire SPD with a quote from a pastor who had previously published anti-LGBTQ views. *Id.* ¶ 22; Dkt. 57-3 (showing Vollmer's retirement email); Dkt. 85-3 at 3 (showing a May 2017 sermon from Martin G. Collins, placed into the record by Plaintiff, titled "The LGBTQ Cultural Revolution (Part One): The Transgenderism Conspiracy"). While Vollmer denies ever knowing about Collins or his views on transgenderism, Dkt. 57-1 at 44:11–48:5, his retirement email is something from which bias could be inferred. Concerning the timing of the IA investigation, the City never waited for the results of the internal investigation (I.I. 23-0027) before terminating Plaintiff. It was not until September 1, 2023, over four

months after Plaintiff's termination on April 24, 2023, that I.I. 23-0027 concluded. Dkt. 78 ¶ 34. Instead of waiting to see if there were any sustained violations, the City directly terminated Plaintiff based on the finding in Peters' FFDE report. *Id.* ¶¶ 48–49; *see* Dkt. 52-25 (showing Plaintiff's termination is "based upon the determination of fit for duty report").

Moreover, two comparators (Crenshaw and Rossnagle) were also subjected to IA investigations due to their conduct during a domestic violence incident. *See* Dkt. 78 ¶ 55; Dkt. 61-10; Dkt. 58-1 at 98:4-99:25; Dkt. 58-10. This comparator evidence is sufficient to permit the conclusions that (1) three officers—two men and Plaintiff—each were subjected to IA investigations over their handling of a domestic violence incident; (2) each had sustained violations against them for mishandling a domestic violence incident; and (3) both of the non-transgender men were treated more favorably than Plaintiff in that both were neither subjected to a FFDE nor terminated after their IA investigations ended, but Plaintiff was subjected to a FFDE and terminated before the IA investigation concluded. *See Lewis* II, 934 F.3d at 1187–88 (comparing two white men and one African-American woman to demonstrate disparate treatment). While Crenshaw and Rossnagle's IA investigations sustained different violations than Plaintiff's own investigation, this is still "evidence of disparate treatment, even if there are material differences between . . . [P]laintiff and the comparators." *Johnson*, 169 F.4th at 1310.

"Finally, there are still more tiles in this mosaic," as it relates to Plaintiff's termination. *Lewis* II, 934 F.3d at 1188. The record shows that the City refused Plaintiff's request for a second opinion to the FFDE, despite the City's personnel rules and the CBA not prohibiting an officer from requesting a second opinion. Dkt. 85 ¶¶ 34–35. After Plaintiff's termination on April 24, 2023, Plaintiff underwent a second FFDE with Dr. Daniel Baughn on May 17, 2023. *Id.* ¶ 36; *see* Dkt. 83 at 65–74. Dr. Baughn's report directly contradicts Peters' report, as it found Plaintiff to be fit to perform the duties of a law enforcement officer. Dkt. 85 ¶ 36; *see* Dkt. 83 at 65. Similarly, there is evidence in the record showing that Plaintiff attempted to file a grievance under the CBA following his termination, but the City denied him the opportunity to participate in the first three steps of the grievance process. Dkt. 85 ¶ 41. The Union also declined to proceed to arbitration in part because it believed that the City's labeling of the termination as a "layoff" meant Plaintiff could not use the CBA's grievance procedures. *Id.*; *see* Dkt. 52-25 (noting Plaintiff "will be placed on Layoff effective April 24, 2023").[10]

[10] One additional consideration to note—there must be a "causal link" between the "discriminatory animus" and the "discharge or other significant change in the terms or conditions of employment." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). Under the "cat's paw theory," a causal link can be established when the decisionmaker is a "mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* at 1332. To invoke the cat's paw theory, "causation must be truly direct." *Id*. at 1331. "Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001). Here, the City neither discusses causation nor mentions the words "cat's paw" in its briefing on Counts II and IV. Regardless, the Court finds that a causal link between the discriminatory animus of various SPD supervisors (including Peters) and Plaintiff's termination by Deputy City Manager Robinson could be proven by Plaintiff. There is no evidence in the record that Robinson ever conducted his own evaluation or independent investigation before terminating Plaintiff.

Taken together, all these tiles of circumstantial evidence coalesce into a mosaic sufficient to create a triable issue of material fact on whether the City's actions were discriminatory on the basis of gender. Therefore, the Court denies the City's motion for summary judgment on Counts II and IV.

*c. Counts V and VI—FFDE and Termination Gender Discrimination Claims under § 1983*

"The Equal Protection Clause of the United States Constitution prohibits unlawful sex discrimination in public employment." *Marshall v. Mayor & Alderman of City of Savannah, Ga.*, 366 F. App'x 91, 97 (11th Cir. 2010) (citing *Cross v. State of Ala.,* 49 F.3d 1490, 1507 (11th Cir. 1995)). However, unlike the FCRA and Title VII gender discrimination claims, Plaintiff's claims under § 1983 require an additional showing that the City is *municipally* liable.

Generally, municipalities—like the City—cannot be held liable on a theory of *respondeat superior* or for acts committed by their officers. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691, 693–94 (1978). Instead, municipal entities may be held liable under § 1983 only where "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. This standard requires a plaintiff to show that (1) "his constitutional rights were violated"; (2) "the municipality had a custom or policy that constituted deliberate indifference to that constitutional right"; and (3) "the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). A plaintiff may satisfy the second

element by alleging three theories of municipal liability: (1) an official policy; (2) the final policymakers acquiesce to a longstanding practice; or (3) a final policymaker ratifies the unconstitutional act and motive of a subordinate. *See Hoefling v. City of Mia.*, 811 F.3d 1271, 1279 (11th Cir. 2016) (citing *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002)). Plaintiff only argues that the ratification theory of municipal liability applies because Peters, the SPD command staff, and HR Director Mason all worked together to (unlawfully) recommend Plaintiff's termination to Deputy City Manager Robinson. Dkt. 86 at 12.

Under the doctrine of ratification, municipal liability will only attach "when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Matthews*, 294 F.3d at 1297. "The final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it." *Id.* (citing *Gattis v. Brice,* 136 F.3d 724, 727 (11th Cir. 1998)); *see also Scala v. City of Winter Park*, 116 F.3d 1396, 1403 (11th Cir. 1997) (affirming the grant of summary judgment in the City of Winter Park's favor because there was no evidence that the city's civil service board "approved any improper motive" the decisionmakers may have had); *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) (explaining that, even if a policymaker approved a decisionmaker's actions, and those actions were based on

improper motives, the municipality would not be liable because the plaintiff presented no evidence that the policymaker approved of those improper motives).

Here, assuming that the SPD command staff and HR Director Mason were collectively "decisionmakers" as to Plaintiff's termination, none of them are final policymakers with respect to termination decisions of SPD employees. Instead, the record indicates that either Chief Troche (pursuant to Section 7.17 of the City's personnel rules and regulations) or the deputy city manager has the power to remove an employee. Dkt. 85 ¶ 39; Dkt. 78 ¶ 59. In Plaintiff's case, Deputy City Manager Robinson is the final policymaker who ultimately approved Plaintiff's termination from the SPD. Dkt. 78 ¶ 58. As such, municipal liability will only lie if there is evidence showing Robinson approved of the improper motives of the decisionmakers.

Even though Robinson approved of the recommendation to terminate Plaintiff, there is no evidence in the record showing that Robinson approved any improper motive that SPD command staff and HR Director Mason may have had. *See Hill*, 74 F.3d at 1152; *Scala*, 116 F.3d at 1403. Because Plaintiff has not provided any such evidence, the § 1983 claims against the City fail as a matter of law. *See Hoefling*, 811 F.3d at 1280 (noting that a plaintiff must "identify (and provide proof concerning) a single final policymaker in order to survive summary judgment"). Nor is there any evidence Chief Troche had an improper motive when

ordering Plaintiff to undergo the FFDE. Again, Plaintiff admitted he does not believe Chief Troche referred him to a FFDE because of Plaintiff's transgender status. Dkt. 52-1 at 215:15-21. Therefore, the Court grants the City's motion for summary judgment on Counts V and VI.

*d. Counts XII and XIII—Retaliation Claims under the FCRA and Title VII*

Finally, the City requests summary judgment on the retaliation claims in Counts XII and XIII. Dkt. 79 at 22. To establish a prima facie case under Title VII for retaliation, a plaintiff is required to show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal relation between the protected activity and the adverse action. *Jefferson*, 891 F.3d at 924; *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).

As to the first element, "an employee has engaged in protected activity if []he has: (1) opposed an unlawful employment practice, [the 'opposition clause'], or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII's retaliation provision, [the 'participation clause']." *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 776–77 (11th Cir. 2014) (quoting *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)). To establish a statutorily protected expression under the opposition clause, a "plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his

belief was objectively reasonable in light of the facts and record presented." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).

Concerning the causation element, a plaintiff must allege that the "protected activity was a but-for cause" of his termination. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1338 (11th Cir. 2023) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360 (2013)). In other words, "a plaintiff must prove that had []he not complained, []he would not have been fired." *Jefferson*, 891 F.3d at 924. "The burden of causation can [also] be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). However, "mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

For the first prima facie element, the City contends that "Plaintiff's retaliation claims are based solely on his August 23, 2022 email to Captain Armstrong regarding Lt. King and Sgt. Delcos allegedly misgendering him." Dkt. 79 at 23. Plaintiff, however, points to his April 18, 2023, meeting with the SPD command staff as the alleged protected activity. Dkt. 86 at 13 (citing Dkt. 85 ¶¶ 31–33). While Plaintiff did make objections to the SPD command staff concerning the accuracy of Peters' reports, Plaintiff's deposition makes clear that the sole basis for his

retaliation claims is the August 23, 2022 email to Captain Armstrong where Plaintiff complained of misgendering. Dkt. 52-1 at 55:2–10, 140:5–15. Plaintiff further concedes that he made no other complaints about misgendering or discrimination, including during the April 18, 2023, meeting with Captain Armstrong and Lt. King over the results of Peters' report or the April 24, 2023, meeting with the SPD command staff regarding his termination. *See id.* 52-1 at 27:1–16, 55:2–10, 169:13–16, 170:17–171:21, 206:11–15, 216:18–24.

Because the August 23, 2022, email is the sole protected activity alleged, Plaintiff must demonstrate some causal relationship between the protected activity and adverse employment action. However, the record is clear that the protected activity in August 2022 is too attenuated to show causation, as the two adverse employment actions—the FFDE and termination—happened in April 2023. This seven-month gap between the protected activity and the adverse employment actions is not enough to satisfy Plaintiff's prima facie case of retaliation. *See Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."); *Nevins v. DCH Health Sys.*, No. 25-12124, 2026 WL 1103517, at *5 (11th Cir. Apr. 23, 2026) ("The time gap between the email and her appeal of unemployment benefits was at least seven months, which is insufficient to establish causation on its own.").

However, the Court's analysis is not complete. "If the plaintiff cannot establish a prima facie case, she does not automatically lose on summary judgment." *Ismael*, 161 F.4th at 764. Instead, the Court "advance[s] directly to the convincing mosaic inquiry" and considers whether Plaintiff has "produce[d] enough evidence, on h[is] own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact" on his retaliation claim. *Id.* at 765.

Unlike Plaintiff's gender discrimination claims, the Court finds there is insufficient evidence to establish a convincing mosaic of intentional retaliation. Most fatally for Plaintiff's retaliation claim is the lack of evidence that any decisionmaker's "desire to retaliate was the but-for cause" of his FFDE or termination. *Nassar*, 570 U.S. at 352 (holding that, for a plaintiff to succeed on a retaliation claim, he must prove "the desire to retaliate was the but-for cause of the challenged employment action"); *see also Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1274 (11th Cir. 2021) ("And in line with his retaliation argument, Bailey (mistakenly) contended that the 'but for' standard is not a precondition under the convincing mosaic model." (internal quotations omitted)).

In the intervening seven months between Plaintiff's email in August 2022 and the two adverse employment actions in April 2023, Plaintiff has not pointed to any suspicious timing or ambiguous statements made by Chief Troche or Deputy City Manager Robinson that would constitute circumstantial evidence of retaliation. To

be sure, there is some evidence of disparate treatment between officers and disputed facts as to whether the City's reason for Plaintiff's termination was pretextual, but there is no proof the FFDE and termination were because of Plaintiff's protected activity of emailing Captain Armstrong about misgendering. Stated differently, while there might be circumstantial evidence demonstrating (gender) discrimination, the same evidence does not create a reasonable inference of intentional retaliation stemming from a singular email Plaintiff sent in August 2022.

Nor is there any information in the record from which unlawful intent may be inferred on the part of Deputy City Manager Robinson, as there is no evidence that Robinson even knew about the August 2022 email sent to Captain Armstrong. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1057 (11th Cir. 2020) ("[T]he plaintiff must establish that the employer was actually aware of the protected expression at the time it took adverse employment action. . . . Without any evidence of knowledge, the timing is just not relevant." (citation modified)). As to Chief Troche, Captain Armstrong informed his superiors about the August 2022 email by sending a memorandum up "through the chain of command," and Chief Troche learned about the email after receiving the memorandum. *See* Dkt. 53-1 at 27:1–25. However, there is unrebutted evidence that Chief Troche did not take any action since he believed "Captain Armstrong handled the situation impeccably," and that Plaintiff's concerns in the email had been resolved. *Id.* at 39:5–16. Following

Plaintiff's August 2022 email, it is undisputed that Chief Troche never heard Plaintiff make any other complaints about being misgendered. *Id.* at 107:5–15.

Importantly, Chief Troche testified that he ordered Plaintiff to undergo a FFDE due to the misconduct he saw when reviewing Plaintiff's BWC during the March 26 domestic violence incident. *Id.* at 107:16–112:6. This misconduct during the domestic violence incident can be a superseding cause that undermines any causal connection between Plaintiff's protected conduct and the materially adverse decision. *See Moss v. St. Vincent's Health Sys.*, No. 22-13956, 2024 WL 729953, at *4 (11th Cir. Feb. 22, 2024) (citing *Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997)).

Because there is a substantial delay between the protected expression and the adverse actions without any additional circumstantial evidence that gives rise to a reasonable inference of retaliatory intent, Plaintiff's retaliation claims cannot survive summary judgment. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law."). The Court grants City's motion for summary judgment on Counts XII–XIII.

## II. Chief Troche's Motion for Summary Judgment

Turning to Defendant Troche's motion, Chief Troche seeks summary judgment on the FFDE and termination gender discrimination claims in violation of the Equal Protection Clause of the Fourteenth Amendment under § 1983 (Counts XIV–XV). *See* Dkt. 75. Because these counts are against Chief Troche in his individual capacity, he asserts a qualified immunity defense, which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[E]ntitlement to qualified immunity is for the court to decide as a matter of law." *Simmons v. Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018). To receive qualified immunity, an official must first "establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Robinson v. Sauls*, 46 F.4th 1332, 1340 (11th Cir. 2022) (citation modified). Once this showing is made, the burden shifts to the plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* at 1340–41 (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)).

As an initial matter, there is no dispute that Defendant Troche was acting within the scope of his discretionary authority as the Chief of Police of the SPD.

Dkt. 17 ¶¶ 3, 171, 181. Indeed, Chief Troche had been "performing a function that, but for the alleged constitutional infirmity, would have fallen with[in] his legitimate job description" with the SPD to manage personnel and determine an officer's fitness for duty. *Holloman*, 370 F.3d at 1266 (emphasis omitted). As such, Plaintiff has the burden to show that Chief Troche violated a constitutional right and that this right was clearly established at the time of the alleged violation.

The Court's discussion will proceed in two parts. First, the Court will begin with Count XV, explaining why Chief Troche cannot be individually liable under § 1983. Second, the Court will consider Count XIV, discussing why Plaintiff failed to establish that Chief Troche violated any constitutional right when ordering Plaintiff to undergo the FFDE.

*a. Count XV—Termination Gender Discrimination Claim under § 1983*

Much like the municipal liability claims against the City, individual liability under § 1983 only attaches if Chief Troche had "the power to make official decisions." *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003) ("The 'decisionmaker' inquiry addresses who has the power to make official decisions and, thus, be held individually liable."). In the employment termination context, an official decisionmaker is someone who has the power to "immediately effectuate" termination, "not merely to *recommend*" it. *Id.* at 1328. "At times, a discharge recommendation by a party without actual power to discharge an employee may be

actionable," but only if the recommendation "directly resulted in the employee's discharge." *Gilroy v. Baldwin*, 843 F. App'x 194, 196 (11th Cir. 2021) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999)).

Here, regardless of whether the underlying (termination) gender discrimination claim has been proven, Chief Troche cannot be individually liable under § 1983 because Deputy City Manager Robinson—not Chief Troche individually—terminated Plaintiff. Dkt. 74 ¶ 50; Dkt. 58-1 at 123:6–9. Chief Troche cannot be held individually liable for that decision under § 1983. Moreover, Chief Troche did not recommend Plaintiff's termination either. Instead, HR Director Mason made the recommendation to Robinson without input from Chief Troche. Dkt. 74 ¶¶ 50, 53; Dkt. 53-1 at 93:9–18, 117:8–11; Dkt. 60-1 at 118:8–23; *see Quinn*, 330 F.3d at 1326, 1328. Because the evidence indisputably shows Chief Troche neither recommended nor ordered Plaintiff's termination, the Court grants the motion for summary judgment as to Count XV.

*b. Count XIV—FFDE Gender Discrimination Claim under § 1983*

In contrast to Count XV, Chief Troche concedes that he directly ordered Plaintiff to undergo a FFDE. Dkt. 74 ¶¶ 40–41; Dkt. 75 at 19. Instead, Chief Troche argues Plaintiff's underlying FFDE "gender discrimination claim[] fail[s] because he cannot establish (1) . . . direct evidence of discrimination, (2) a prima facie case of discrimination, or (3) that Chief Troche's legitimate, non-discriminatory reasons

for his fitness for duty evaluation . . . are pretextual." Dkt. 75 at 5. Because much of the discussion on Count XIV mirrors the Court's prior analysis on the Title VII (FFDE) gender discrimination in Count III against the City, the Court will incorporate and reference that analysis when relevant.[11]

i. Direct Evidence of Discrimination

Any direct evidence of discrimination fails on similar grounds as Count III against the City. As discussed above, Plaintiff points to several instances of misgendering by Chief Troche as direct evidence of discrimination, Dkt. 86 at 4–5, but "[d]irect evidence is evidence[] that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson*, 891 F.3d at 921 (citation modified). Again, no reasonable jury could find that the two times Chief Troche used Plaintiff's then-legal name rise to the level of being "blatant remarks, whose intent could mean nothing other than to discriminate on the basis of [Plaintiff's gender]." *Id.* at 922 (citation modified). Indeed, Plaintiff admitted that being subjected to a FFDE was not due to his transgender status. *See* Dkt. 52-1 at 215:15-21.

[11] "[W]hen, as here, a plaintiff attempts to use Title VII and 42 U.S.C. § 1983 as parallel remedies for the same allegedly unlawful employment discrimination, the elements of the two causes of action are identical, . . . and identical methods of proof, such as the *McDonnell Douglas* framework, are used for both causes of action[.]" *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citations omitted).

ii. Circumstantial Evidence under *McDonnell Douglas*

Because Plaintiff fails to raise any direct evidence of gender discrimination, the Court proceeds to analyze his FFDE gender discrimination claims under the *McDonnell Douglas* framework outlined in prior counts. Here, the Court incorporates by reference its prior analysis in Count III on the "similarly situated" element. As discussed above, Crenshaw, Rossnagle, and Gilbert are the only potential comparators in this case, Dkt. 86 at 9–10, but none of them are "similarly situated in all material respects." *Lewis* I, 918 F.3d at 1224. The proposed comparators neither engaged in the same basic misconduct as Plaintiff nor shared the same disciplinary history as Plaintiff. Thus, Plaintiff cannot make a prima facie case for discrimination and must demonstrate a material issue of triable fact by constructing "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Ismael*, 161 F.4th at 760 (quoting *Smith*, 644 F.3d at 1328).

iii. Convincing Mosaic

Plaintiff's convincing mosaic argument does not fare any better. As mentioned above, Plaintiff's proffered mosaic of circumstantial evidence relates to the termination gender discrimination claims, not to the FFDE gender discrimination claims. *See* Dkt. 86 at 6. Any circumstantial evidence of suspicious timing as to Plaintiff's termination before the IA investigation was complete, the alleged falsities

in Peters' report, the misgendering in Peters' report, Peters' ambiguous statements in her text messages to Captain Armstrong, the submission of the FFDE report before Plaintiff's tests scores were incorporated, the City's refusal to allow a second opinion on the FFDE, and declining to allow Plaintiff to use the CBA grievance process all occurred *after* Chief Troche ordered Plaintiff to undergo the FFDE on April 7, 2023. Dkt. 74 ¶ 41.

When examining the record in the light most favorable to Plaintiff, only Chief Troche's misgendering and the comparators relate to the FFDE gender discrimination claim. But a reasonable trier of fact could not infer any unlawful intent from Chief Troche's two minor instances of using Plaintiff's then-legal name. As to the potential comparators, the extent of the material differences between Plaintiff and the comparators means this circumstantial evidence is given little weight at the convincing mosaic stage. *See Johnson*, 169 F.4th at 1310 (citing *Tynes*, 88 F.4th at 947). Again, Plaintiff's "distinguishable comparators, standing alone, do not raise a reasonable inference of unlawful conduct." *Id*. Because no reasonable jury could infer intentional discrimination by Chief Troche when subjecting Plaintiff to the FFDE, the Court finds Chief Troche is entitled to summary judgment on Count XIV.[12]

[12] Because the § 1983 claims against Chief Troche fail to demonstrate any constitutional violation, the Court does not reach the second part of the qualified immunity analysis—whether, at the time of the violation, the constitutional right was clearly established. *See, e.g.*, *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendant City of Sarasota's Motion for Summary Judgment, Dkt. 79, is **GRANTED in part and DENIED in part:**
   i. The Court **GRANTS** the City of Sarasota's motion as to **Counts I, III, V, VI, XII, and XIII.**
   ii. The Court **DENIES** the City of Sarasota's motion as to **Counts II and IV.**
   iii. The Clerk is directed to **ENTER** judgment in favor of Defendant City of Sarasota and against Plaintiff Eli Schanley on **Counts I, III, V, VI, XII, and XIII** of the Amended Complaint.
2. Defendant Rex Troche's Motion for Summary Judgment, Dkt. 75, is **GRANTED**:
   i. The Clerk is directed to **ENTER** judgment in favor of Defendant Rex Troche and against Plaintiff Eli Schanley on **Counts XIV and XV.**
   ii. The Clerk is also directed to **TERMINATE** Defendant Rex Troche from this case.

3. This case will proceed to trial as to Counts II and IV on November 30, 2026. The Final Pretrial Conference is set for November 13, 2026. *See* Dkt. 89.

**DONE AND ORDERED** at Tampa, Florida, on the above-inscribed date, August, 2026.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record